**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MALLINCKRODT PLC, *et al.*,[1] | : | Case No. 20-12522 (JTD) |
| Debtors. | : | (Jointly Administered) |
| | | |
| MALLINCKRODT PLC, | : | Adv. Pro. No. 21-50242 (JTD) |
| Plaintiff, | : | Re: Adv. D.I. 1, 2 & 3 |
| v. | : | |
| THE BUXTON HELMSLEY GROUP, INC. and ANTHONY E. PARKER, | : | |
| Defendants. | : | |

**DECLARATION OF RANDALL S. EISENBERG IN SUPPORT OF MALLINCKRODT
PLC'S MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Randall S. Eisenberg, hereby declare as follows:

1.  I am a Managing Director at AlixPartners, LLP ("**AlixPartners**"), which maintains its principal office at 909 3rd Avenue, New York, NY 10022 as well as other offices located throughout the world. Since August 2019, AlixPartners has served as restructuring consultant and financial advisor to Mallinckrodt plc ("**Mallinckrodt**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**").

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

2.       I submit this declaration ("**Declaration**") in support of *Mallinckrodt plc's Motion for Temporary Restraining Order* filed contemporaneously herewith ("**Motion**").

3.       Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations; (b) my review of relevant documents; (c) information provided to me by employees of AlixPartners working under my supervision; (d) information provided to me by, or discussions with, members of the Debtors' management team, other employees, or the Debtors' other advisors; and/or (e) my general experience and knowledge. I am authorized to submit this declaration.  If called upon to testify, I can and will testify competently as to the facts set forth herein.

## BACKGROUND & QUALIFICATIONS

4.       I have held the position of Managing Director at AlixPartners since January 2013 where, among other current responsibilities, I serve on the Americas Steering Committee for the Turnaround and Restructuring Services practice.  AlixPartners is a global corporate consulting and advisory firm with specialties that include advising on complex turnarounds and restructurings, among other significant capabilities.

5.       I hold a Bachelor of Science in Business Administration degree from University of the Pacific and a Master's in Management from Northwestern University's Kellogg Graduate School of Management.  I am a Certified Turnaround Professional, a Certified Public Accountant, and a Fellow in both the American College of Bankruptcy and the International Insolvency Institute.  During the course of my career, I have served as the President and Chairman of the Turnaround Management Association and the Association of Certified Turnaround Professionals, the latter of which was merged into the Turnaround Management Association.

6.       I have worked in the turnaround and restructuring field for more than 25 years. Prior to joining AlixPartners in January 2013, I was a Senior Managing Director in FTI Consulting,

Inc.'s Corporate Finance/Restructuring segment ("**FTI**"), where I was a member of its leadership team during most of the approximately 10 years after FTI acquired the practice from PriceWaterhouseCoopers, LLP in 2002. At the time of the acquisition, I was a Partner at PriceWaterhouseCoopers.

7.  Since 1990, I have served as an advisor or interim executive in the transformation, turnaround and restructuring of numerous large and complex companies, advising management teams, boards of directors, equity sponsors, and creditor constituents. I have also authored articles and spoken regularly on the topics of transformations, turnarounds and restructurings. During the course of my career, I have been involved in numerous large and complex restructurings. Recently, I served as the Chief Restructuring Officer to both Caesars Entertainment Operating Company, Inc. and Constellis. Additional examples of large, complex restructurings in which I served a lead role include, but are not limited to, Hexion, Inc., Momentive Performance Materials, Inc., Delphi Corporation, US Airways Group, Inc., Visteon Corporation, Jackson Hewitt, Vertis, Inc., Anthracite Capital, Inc., Planet Hollywood International, Inc., RSL Communications, Ltd., Rotech Healthcare, Inc., and Select Staffing. I have been an award recipient either individually or as part of a team for successful accomplishments throughout my career.

8.  AlixPartners has a wealth of experience providing advisory and interim management services for companies undergoing transformations, turnarounds and restructurings as having one of the largest and most experienced practices in these areas within the United States and globally. Its clients include companies, creditors, corporate parents and financial sponsors, as well as acquirers of underperforming businesses.

9.  AlixPartners has served as one of the principal advisors to the Debtors. As an advisor to the Debtors, I have been working with Latham & Watkins LLP, Guggenheim Partners,

and Wachtell, Lipton, Rosen and Katz to advise the Debtors on decisions related to their business operations and the impacts of the Debtors' ongoing restructuring activities.

10. During the course of the engagement, I and my colleagues have interacted extensively with the management team and other employees of the Debtors. These interactions include regularly scheduled weekly meetings, numerous ad hoc meetings and individual discussions on numerous matters affecting the business and its operations, the overall resolution of its opioid related and other litigation, as well as deleveraging of the Debtors' capital structure. As a result of this work, I have personal knowledge of the Debtors' financial affairs, business operations, and other related matters.

11. On October 12, 2020 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

**OVERVIEW**

12. From the outset of these cases, the Buxton Helmsley Group, Inc. ("**BHG**") which I understand identifies itself as a financial service, asset management and securities research firm, through its principal, Alexander Parker ("**Mr. Parker**"), has taken a variety of actions premised on the theory that the Debtors should pursue a recovery for the equity holders and that equity holders are entitled to meaningful recovery.

13. Among other efforts, BHG and Mr. Parker participated in a process resulting in a full evidentiary hearing and subsequent ruling by the Court on the question of whether an equity committee should be appointed in these cases. The Court determined in a December 22, 2020 bench ruling that no such committee should be appointed, holding in relevant part that the Debtors are "hopelessly insolvent" and that "the shareholders have no economic interest in these cases."

14. Despite this clear ruling, BHG resurfaced in January 2021 purporting to launch a solicitation for proxies to call an immediate "extraordinary general meeting" (the "**General Meeting**") as defined by section 178 of the Companies Act of 2014 in order to displace all directors and senior management, and replace the same with directors and officers who will seek a recovery for equity or, failing that, liquidate the company. In pursuit of this strategy, BHG issued a number of press releases and shareholder letters as well as launched a website (www.revivemallinckrodt.com) setting forth its position and seeking shareholder support. The press releases and letters are attached to the *Declaration of M. Viola So in Support of Mallinckrodt plc's Motion for Temporary Restraining Order* (the "**LW Declaration**") filed simultaneously herewith.

15. BHG's and Mr. Parker's public statements were, and are, highly misleading and inflammatory, and they remain uncorrected to date. From my review, these statement include extensive attacks on directors and management, including statements that management has "destroyed the retirement account values of many, and had absolutely no qualms about it"; that they "could not have displayed more traitorous actions"; that they "abandoned shareholder interests"; that they are "talking out [of] both sides of their mouth" by describing the Debtors as insolvent; that they are "wheeling and dealing . . . to merely preserve their paychecks"; and that they are "committing one of the largest breaches of fiduciary duty in the history of business." BHG and Mr. Parker also falsely stated that directors and management had considered no alternatives to a chapter 11 filing and that "virtually no parties support" the Debtors' proposed restructuring.

16. Furthermore, despite this Court's clear ruling that the Debtors are hopelessly insolvent, BHG and Mr. Parker have recently asserted that Mallinckrodt's equity is worth "$11-

30+" per share, and urged shareholders to accumulate more holdings "to enhance their personal profit potential."

17. These and other misstatements were a prologue to a request to support BHG and Mr. Parker in seeking to call the General Meeting. Again, my understanding is that the express purpose of such a meeting is to replace the Debtors' directors and senior management with new directors and officers—specifically, BHG's principal, Mr. Parker, as Chairman and CEO, and others chosen by BHG—who will seek an "advantageous deal" for equity. In the absence of that impossible "advantageous deal," BHG asserts that it will seek liquidation of the Debtors so that creditors can be forced to "scavenge" for value.

18. On March 5, 2021, BHG and Mr. Parker, together with several other shareholders, filed a 13-D statement noticing the existence of a group of shareholders holding 5.4% of Mallinckrodt's outstanding common shares. On March 10, 2021, BHG and Mr. Parker, and the other signatories, filed an amended 13-D statement disclosing 5.6% ownership of Mallinckrodt's outstanding common shares. I am advised this is more than half of the amount needed to requisition a General Meeting under the Companies Act. Given that BHG's thoroughgoing inflammatory misstatements have never been corrected or retracted, this group presumably was assembled based on those misstatements. The 13-D statements are also attached to the LW Declaration, Ex. L.

19. On March 6, 2021, BHG issued another shareholder letter falsely implying that BHG was in contact with the Debtors, asserting it would imminently submit a written demand to the Company to make various governance and strategy changes, and that in the absence of a response, BHG would "immediately call the shareholder meeting . . . without notice." The March 6 letter is also attached to the LW Declaration, Ex. M.

20. On March 10, 2021, BHG, through Mr. Parker, sent a letter to the Board of Directors stating that BHG and like-minded investors had accumulated a 5.5% interest in Mallinckrodt, repeating various baseless assertions allegedly demonstrating that the Board was "recklessly purs[uing] the complete destruction of shareholder value," and demanding that the Board contact Mr. Parker by 4pm Eastern Standard Time on Friday March 12, 2021. I, and the Debtors, interpret this letter to be the earlier mentioned "written demand," that would trigger BHG's and Mr. Parker's attempt to "immediately call the shareholder meeting" if not responded to.

21. My understanding is that, simultaneously with the submission of this Declaration and related pleadings, the Debtors have responded to BHG's letter to advise BHG and Mr. Parker that they do not view discussion with BHG and Mr. Parker as appropriate given BHG's and Mr. Parker's ongoing and flagrant misconduct to the detriment of not only the Debtors but also the shareholders whom BHG and Mr. Parker have misled.

## IMMEDIATE AND IRREPARABLE HARM TO THE DEBTORS

22. BHG's actions are causing immediate and irreparable harm to the Debtors, and if BHG is permitted to proceed, that harm could escalate, even to the point of meaningfully harming the Debtors' business and enterprise value while adversely impacting recovery to creditors.

23. To begin with, BHG's actions and *ad hominem* attacks on management already constitute a substantial and unwarranted distraction to a management team devoted more than full-time to managing the enterprise and guiding the Debtors through a complex Chapter 11 process. As this Court is aware, the Debtors' cases are particularly complex and involve ongoing, delicate negotiations with a diverse group of creditor constituents. These negotiations, and the process of reorganizing for the benefit of stakeholders with a real economic interest in these cases, require

the full attention of the Debtors' management as well as a meaningful commitment of time from the directors. However, management is being diverted from that focus by reviewing, absorbing, and considering responses to BHG's ongoing public attacks. This distraction will increase markedly if BHG is permitted to escalate its attacks by continuing its campaign to call a shareholder meeting with the stated purpose of replacing the board and thereafter firing management "for cause" in order to pursue an unrealistic path of creating recovery for shareholders when the Court has concluded the Debtors are hopelessly insolvent. Instead of focusing on reorganizing, management and the board will instead be forced to focus on fending off baseless attacks from a constituent where recovery simply doesn't exist.

24. In addition, these ongoing attacks impact not only management but also the Debtors' stakeholders—patients, employees, vendors, creditors, among many others—who are told to not only doubt the Debtors' management and governance, but also doubt that the Debtors will successfully reorganize. BHG has stated they will seek a Chapter 7 liquidation as a means to increase recovery to equity. As the Court knows, a Chapter 7 liquidation will lead to a fire sale of assets which will not maximize value to creditors, and the threat of liquidation can be interpreted to suggest disruptive extortion in order to extract value that shareholders are not entitled to under the Bankruptcy Code. Furthermore, ongoing commentary of liquidation will undoubtedly cause the Debtors' key operating stakeholders—vendors, customers and employees— to reconsider whether the very stability that the Debtors have worked so hard to achieve truly exists. Losing the confidence of these stakeholders risks loss of support from important operating partners that are essential for maximizing enterprise value and recovery to creditors. Similarly, the uncertainty created by these continuing attacks threatens to undermine the ongoing efforts to further gain support of key creditor constituents who have economic stakes in the reorganization, and whose

US-DOCS\121697923.7RLF1 24950371v.1

engagement is critical to progressing the Debtors' cases on an efficient and value-maximizing timeframe.  While negative press releases are damaging in and of themselves, the damage to stakeholder support may increase markedly if BHG is permitted to pursue a shareholder meeting with the aim of replacing the board, firing management, and terminating the Debtors' complex and well advanced reorganization efforts.

25. In addition, as set forth above, BHG's communications with shareholders have repeatedly and misleadingly asserted that there is value in Mallinckrodt equity—maybe even $30 per share—and they have encouraged shareholders to accumulate holdings on the promise that BHG's agenda can result in a recovery for equity.  These misleading statements not only could cause innocent and perhaps naïve investors to invest in a company that is hopelessly insolvent—specifically to purchase equity that will have no recovery to holders thereof—it also creates an increasing body of investors motivated to disrupt the Debtors' reorganization on the basis of an impossible promise of recovery to equity.  This creates irreparable harm not only to the Debtors and the various creditors, but also harm to these investors.

26. The aforementioned harm arises just from the *process* of calling a shareholder meeting.  If BHG and Mr. Parker are actually permitted to convene such a meeting and direct votes to implement their strategy, then the irreparable harm could escalate to substantial destruction of value.

## CONCLUSION

27. Based on the foregoing ongoing, and escalating, harms, I believe the Debtors require immediate relief to halt BHG's baseless and destructive campaign.

Pursuant to 28 U.S.C. § 1746, to the best of my knowledge, information and belief, and after reasonable inquiry, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 12, 2021

          */s/ Randall S. Eisenberg*
          Randall S. Eisenberg
          Managing Director
          AlixPartners, LLP