# EXHIBIT Q

1
                    UNITED STATES BANKRUPTCY COURT
2                          DISTRICT OF DELAWARE

3                                      .   Chapter 11
   IN RE:                              .
4                                      .   Case No. 20-12522 (JTD)
   MALLINCKRODT PLC, *et al.*,         .
5                                      .
                                       .
6                                      .   Courtroom No. 5
                                       .   824 North Market Street
7                                      .   Wilmington, Delaware 19801
                                       .
8                         Debtors.     .   December 15, 2020
   . . . . . . . . . . . . . . . . .       10:00 A.M.
9
                         TRANSCRIPT OF HEARING
10              BEFORE THE HONORABLE JOHN T. DORSEY
                   UNITED STATES BANKRUPTCY JUDGE
11   APPEARANCES:

12
   For the Debtor:          Christopher Harris, Esquire
13                          Betsy Marks, Esquire
                            LATHAM & WATKINS
14                          885 Third Avenue
                            New York, New York 10022
15
                            Michael Merchant, Esquire
16                          RICHARDS LAYTON FINGER
                            920 North King Street
17                          Wilmington, Delaware 19801

18   Audio Operator:        Jason Spencer

19   Transcription Company: Reliable
                            1007 N. Orange Street
20                          Wilmington, Delaware 19801
                            (302)654-8080
21                          Email: gmatthews@reliable-co.com

22   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
23

24

25

1   APPEARANCES (Continued):

2   For Ad Hoc Committee of
    Equity Holders:              Kathleen Miller, Esquire
3                                SMITH KATZENSTEIN JENKINS LLP
                                 1000 West Street
4                                Wilmington, Delaware 19801

5                                - and -

6
                                 Lawrence Eagel, Esquire
7                                BRAGAR EAGEL SQUIRE, P.C.
                                 810 Seventh Avenue
8                                New York, New York 10019

9                                - and -

10
                                 Tristan Manthey, Esquire
11                               FISHMAN HAYGOOD, LLP
                                 201 St. Charles Avenue
12                               New Orleans, Louisiana 70170

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2

#1) Motion of Debtors for Entry of an Order Appointing Roger

3   Frankel, as Legal Representative for Future Claimants,
Effective as of the Petition Date [Docket No. 189 – filed

4   October 13, 2020].

5   **Ruling: ..**

6
#2) The Official Committee of Opioid Related Claimants' (I)

7   Request for Adjournment of or, in the Alternative, Objection
to Motion of Debtors to Appoint Future Claimants

8   Representative and (II) Cross-Motion to Compel Debtors to
Establish Bar Date and Noticing Program for Opioid Claimants

9   [Docket No. 658 – filed November 28, 2020].

10  **Ruling: ..**

11  OPENING COMMENTS - Tristan Manthey and Chris Harris    9, 14

12

13  AD HOC COMMITTEE OF
   EQUITY HOLDERS WITNESS(s):

14  **STEPHEN WELCH**

15
       Direct Examination by Mr. Manthey    17

16
       Cross Examination by Ms. Marks       87

17
       Redirect Examination by Mr. Manthey  111

18

19  DEBTORS' WITNESS(s):

20  **BILL JEFFERS**

21
       Direct Examination by Ms. Miller     122

22
       Cross Examination by Mr. Harris      152

23
       Redirect Examination by Ms. Miller   210

24

25

WITNESS(s) - Continued

**BRENDAN HAYES**

     Direct Examination by Mr. Harris     214


<u>EXHIBITS</u>                          <u>I.D.</u>     <u>REC'D</u>

Joint Exhibit List (Exception 7/12)           7

1          (Proceedings commence at 10:00 a.m.)

2          THE COURT:  Good morning, everyone, his is Judge

3   Dorsey.  We're on the record in Mallinckrodt PLC; case number

4   20-12522.

5          This is the time the court set aside for the

6   hearing on the motion to appoint an equity committee.  Before

7   we get started, are there any preliminary issues that we need

8   to talk about?

9      (No verbal response)

10         THE COURT:  No.  Okay.

11         I see there's a couple of people in the waiting

12  room that are not using proper names; one is just

13  shareholder, the other is -- I can't even read it.  We don't

14  admit people unless you use your full name and we can compare

15  it to the CourtCall sheet because we've had some problems

16  with people trying to get into these calls and create

17  disruption.  So, we're trying to be care with letting people

18  in.

19         With that, since this is the ad hoc committee of

20  equity holders' motion, I'll go ahead and turn it over to

21  them.

22         MS. MILLER:  Good morning, Your Honor.  This is --

23         THE COURT:  Good morning.

24         MS. MILLER:  -- Kathy Miller on behalf of the

25  committee.

1          First, I'd just like to introduce my co-counsel

2   who will also be handling witnesses today.

3          First, we have Larry Eagel from the firm of Bragar

4   Eagel & Squire.

5          MR. EAGEL:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MS. MILLER:  And Tristan Manthey at Fishman

8   Haygood.

9          MR. MANTHEY:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MS. MILLER:  Your Honor, the parties have

12   conferred and I believe Your Honor has the joint exhibit list

13   and exhibits, and we have agreed to the admissibility of the

14   exhibits.

15          The committee has one comment with respect to the

16   Debtors' Exhibits 7 through 12.  These are notices for claims

17   of indemnification.  The committee agreed to the

18   admissibility of the letters for the purposes that the

19   debtors received the letters but not for the validity of the

20   content thereof or of the claims.

21          THE COURT:  Okay.

22          MS. MILLER:  And unless the debtors have any

23   comments of the housekeeping matter, I would move for the

24   admission of the exhibits at this time.

25          THE COURT:  Any comment from the debtors?

1          Mr. Harris?

2          MR. HARRIS:  Your Honor, Chris Harris of Latham.

3  No comment when we -- that is our agreement.

4          THE COURT:  Okay.  Then the exhibits on the joint

5  exhibit list are admitted without objection, subject to the

6  limitation on Exhibits 7 -- was it 7 through 12?

7          MS. MILLER:  Yes, Your Honor.

8          THE COURT:  With the --

9          MS. MILLER:  Now cross exhibits, yes.

10         THE COURT:  Right the exception of the limitation

11  on the Exhibit 7 through 12 of the debtors' exhibits.

12      (Joint Exhibit List, received into evidence)

13         MS. MILLER:  And with that, Mr. Eagel will be

14  calling our first witness on behalf of the committee.

15         THE COURT:  All right, Mr. Eagel.

16         MR. EAGEL:  Actually, I thought I was going to be

17  (indiscernible).  I think we were first going to do an

18  opening statement.  (indiscernible).

19         THE COURT:  Mr. Eagel, I can barely hear you.  I

20  heard you say you were going --

21         MR. EAGEL:  My apologies.

22         I'm going to turn it over to Mr. Manthey.  He's

23  going to make a little opening and I think he's taking our

24  first witness.

25         MS. MILLER:  I apologize; my error.

1      THE COURT:  Okay.  Mr. Manthey.

2      MR. MANTHEY:  Good morning, Your Honor.  Given

3 this is the first time before Your Honor, we'd like to make a

4 brief opening statement and then call our first witness, if

5 that is okay with Your Honor?

6      THE COURT:  Very brief.  Thank you, because I have

7 read the papers.

8      MR. MANTHEY:  Okay.  Thank you, Your Honor.

9      Just briefly.  Your Honor, has seen a flood of

10 letters from shareholders filed into the record, objecting to

11 the RSA and the proposed extinguishment of the 84.7 million

12 shares of Mallinckrodt PLC.

13      Mallinckrodt PLC is a publicly traded company

14 incorporated under Irish law that is at the top of a complex

15 corporate structure.  Sophisticated lawyers created the

16 corporate structure to manage the risk of the former business

17 and the company scrupulously respected its corporate form.

18 It appears the company is now abandoned the corporate form

19 for this restructuring.

20      The collective Mallinckrodt that these are divided

21 generally billions of dollars of free cash flow.  And it

22 provided into two segments: Specialty Brands and Specialty

23 Generics.  It is not contested that Specialty Brands

24 generates significantly more cash flow than Specialty

25 Generics.

1          Just five years ago, Mallinckrodt PLC stock was

2   trading at a $132 dollars per share with a market cap of more

3   than $11 billion dollars.  A few months prior to the petition

4   date, the stock was trading at almost $6 dollars per share

5   with a market cap of approximately $504 million.

6          On the petition date --

7          THE COURT:  Hold on one second, Mr. Manthey.  I

8   hear someone else making noises in the background.  If you're

9   not speaking, please mute your phone.  Thank you.

10          Sorry, Mr. Manthey.  Go ahead.

11          MR. MANTHEY:   No problem. Thank you, Your Honor.

12          On the petition date, the stock was trading at .75

13   cents per share with a market cap of approximately $64

14   million.

15          The ad hoc committee before you was formed to

16   engage the law firms that are before Your Honor to present

17   the evidence to the court to support the shareholder's

18   complaint and request the appointment of an official

19   committee of equity holders.

20          The ad hoc committee understands its burden and

21   that the appointment of equity committee is not ordinarily

22   done.  However, Your Honor, these are unique cases with

23   significant contingent litigation liabilities that will

24   determine whether there is equity or not.

25          If the debtors stated public position which it has

1  been its position from day one to today that there is no

2  liability for any of these liabilities, then there's

3  significant equity.  If the litigation claimant's claims are

4  correct and their quantum is correct, then there is no

5  equity.

6          But, Your Honor, if it falls somewhere in between

7  we believe there is also equity for the shareholders.  It is

8  undisputed that this company did not have contingent

9  litigation liabilities that we would not be here before Your

10 Honor.

11         The debtors have plenty of cash flow to fund these

12 bankruptcy cases and ongoing business operations while in

13 Chapter 11.  There's nothing today that Your Honor is going

14 to do to put these debtors in jeopardy in their Chapter 11

15 cases.  They have significant cash flow for their operations,

16 as well as to fund the Chapter 11 cases.

17         Contingent liabilities principally arise from the

18 opioid distribution by Specialty Generics and the sale of

19 Acthar Gel by Specialty Brands.  Prior to the bankruptcy, the

20 company steadfastly defended the litigation and continues

21 today to maintain there is no liability for any of the claims

22 -- opioid related or Acthar relating.

23         Putting aside the liability of the companies for

24 the debtors, there's a real issue whether these liabilities,

25 to steal a word from the debtors, can be cabined off into

1  various entities and value preserved at the PLC level.  The

2  corporate structure presents real risk to the litigant

3  claimants.  They may obtain millions, even billions, of

4  dollars of judgment but they may be uncollectable from the

5  responsible debtors.

6          Instead of litigating these claims in thousands of

7  pending cases, the debtors have chosen the path of Chapter 11

8  to address these contingent litigation liabilities and

9  provide the centralized forum.  At prepetition, the debtors

10  have entered into two settlements with the supporting

11  governmental opioid claimants which is memorialized in the

12  RSA and the Department of Justice regarding the sale of

13  Acthar Gel.

14          The debtors trumpet the RSA as the backbone of the

15  Chapter 11 filing and that without it, there would be a

16  freefall.  The RSA is not quite what the debtors make it out

17  to be.  The evidence will show that the RSA captured an

18  extremely small percentage of the principal in interest here,

19  and that the company still have a long, long, long way to go

20  to achieve a successful result here.

21          The RSA basically provided for four things.  It

22  gave the company to the bondholders.  It agreed to a generous

23  myth that gives management 10 percent of a de-levered

24  Mallinckrodt PLC with protection of fulsome releases and

25  generous indemnity provisions in favor of the directors and

1  officers.   The settlement is with only some of the government

2  related opioid but far from all of them.   And, finally, they

3  agreed to abandon the 84.7 million common shares.

4          This was all done without any input from equity.

5  And continues to be done without any input from equity.

6  Despite the avalanche of complaints by shareholders, the

7  debtors have not reached out to anyone with equity to either

8  negotiate or even answer some of the complaints that they

9  have made.

10          The evidence will show the debtors and their

11  financial advisors have done no valuation work to establish

12  equity is out of the money.   Instead, they rely completely on

13  the trading of value of unsecured notes and the threats of

14  millions, billions, and even trillions of dollars of

15  litigation liabilities by the various litigant

16  constituencies, all of which they have denied any liability

17  to, to this date.

18          And as the evidence will show, this is just the

19  start of the negotiations that will have to take place in

20  these bankruptcy cases.   The debtors' path will require

21  numerous intensive settlement negotiations for the case to be

22  successful and equity should be part of those negotiations.

23          Management is thrown in the top. They have

24  abandoned the effort to use its defense to preserve the value

25  for equity.   Management has cut its deal and is ready to go

1  forward without equity.

2           The ad hoc committee recognized that the litigant

3  claimants for both opioid and Acthar have tried to sue the

4  parent, Mallinckrodt PLC, but those claims have never been

5  adjudicated and they are vigorously denied.  They are based

6  on alter ego and respondeat-superior theories and other

7  attempts to reach the solvent debtor.

8           Remarkably, the debtors have pulled out a notice

9  of claim that was never brought forward previously regarding

10 the purchase of the Mallinckrodt PLC; however, there's been

11 no analysis or assessment of the risk of that for

12 Mallinckrodt PLC.

13          While the ad hoc committee did not have time to or

14 the resources to accept the company's non-public records to

15 conduct a full valuation, you will hear testimony today that

16 our expert conducted a preliminary valuation which the

17 evidence will show based upon publicly available documents

18 that there could be substantial equity for the shareholders.

19          The evidence will further show that the debtors

20 and creditors have a mass and army of lawyers and financial

21 advisors in these bankruptcy cases.  In their mind, it's a

22 foregone conclusion that equity should be extinguished.

23 There is no one other than an official committee appointed by

24 this court or appointed by the U.S. Trustee after instructed

25 by this court that will represent equity.

1          If today Your Honor denies the motion, the debtors

2    and creditor constituencies will be successful and equity

3    more than likely will be extinguished.  It is simply not

4    realistic or practical to believe the equity holders can

5    represent themselves without the designation of an official

6    committee.

7          It's time to level the playing field and give

8    equity a voice in these bankruptcy cases.  Thank you, Your

9    Honor.

10          THE COURT:  Thank you, Mr. Manthey.

11          Mr. Harris, do you want to make an opening before

12    we go to the evidence?

13          MR. HARRIS:  I'll just be very brief.

14          I just want to review what the standard is to

15    consider when you hear the evidence, and then I'll save my

16    remarks for closing.

17          As the court knows, it is very rare to appoint an

18    equity committee.  The (indiscernible) calls it a rare

19    exception.  Spansion calls it extraordinary relief.  And this

20    is not one of those extraordinary cases.

21          You're not going to hear any evidence of the

22    extreme or troubling indicia that has caused a few courts to

23    appoint an equity committee, such as extremely high

24    valuations or assurances of positive shareholder value,

25    shortly before the bankruptcy filing; or even going to the

1  market to raise new equity right before a bankruptcy filing.

2         To the contrary, the company has been talking

3  about bankruptcy all year as the committee concedes.  To the

4  burden of the ad hoc committee is going to have is quite

5  high.  You know, from Spansion the burden is they have to

6  show a substantial likelihood of the meaningful recovery

7  under a strict application of the absolute priority

8  waterfall.  That's their burden.

9         But this is all about whether they can show a

10 substantial likelihood of recovery on the PLC shares.  But

11 there's no valuation of the PLC shares or of PLC.  They

12 promised you in their motion that they had a valuation of PLC

13 over $500 million dollars and that they had a valuation of

14 the PLC shares at over $6.00 dollars.  They don't.

15        Their expert says, you'll hear.  He's not valuing

16 PLC and he's not valuing the shares.  All he did was a, what

17 he described this as a limited valuation of one particular

18 asset which is the Brands' business if it were hypothetically

19 spun off.

20        And you're not going to hear any evidence such as

21 Mr. Manthey just described that the debtors abandoned the

22 corporate form.  To the contrary, the debtors have defended

23 it and attempted to use it vigorously.  But the problem is

24 we're facing an avalanche of litigation against all entities,

25 including PLC.  There's no solvent PLC out there to salvage,

1   unfortunately.  We've done all we can.  This is the best we

2   can do.

3            They're also going to have to show that they are

4   unable to represent their interest without an official

5   committee.  That the management fought for months, if not a

6   year, to have a structure that was save PLC equity value.

7            They continued to have a duty to look out for

8   shareholders, the creditors committee which is

9   (indiscernible) and out of the money; constituency has the

10  same interest to attempt to value the company as high as they

11  can.  And these shareholders here have able counsel and can

12  seek a fee award if they make a substantial contribution.

13           With that, I will stop and save my other comments

14  for closing.

15           THE COURT:  Thank you, Mr. Harris.

16           Mr. Manthey, you want to call your first witness.

17           MR. MANTHEY:  Yes, Your Honor.

18           The ad hoc equity committee calls Stephen Welch.

19           THE COURT:  Mr. Welch, are you on video here

20  somewhere?

21           MR. WELCH:  I am, Your Honor. Can you hear me?

22           THE COURT:  There you are.  Okay.

23           Mr. Welch, can you raise your right hand, please;

24  state your full name for the record and spell your last name?

25           MR. WELCH:  Stephen Welch; W-E-L-C-H.

1          STEPHEN WELCH, WITNESS, SWORN

2              THE WITNESS:  I do.

3              THE COURT:  Mr. Manthey, go ahead.

4              MR. MANTHEY:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6  BY MR. MANTHEY:

7  Q     Mr. Welch, who do you work for?

8  A     I work for -- I'm an employee of ST Shared Services

9  which is a subsidiary of Mallinckrodt Pharmaceuticals.

10 Q     And what is your title with the company?

11 A     I am chief transformation officer.

12 Q     And what does a chief transformation officer do?

13 A     It was a role that we created in the fall of 2019 under

14 which I had oversight of the Specialty Generics business and

15 responsibility for the day-to-day restructuring effort.

16 Q     Now you understand you are appearing at this hearing as

17 a representative of the debtors, correct?

18 A     Correct.

19 Q     And what do the debtors do?

20 A     The debtors are a global biopharmaceutical company with

21 the Specialty Brands segment that focuses on underserved

22 patients with severe and critical conditions and a Specialty

23 Generic business that focuses on manufacturing and selling

24 high quality generics at a low price.

25 Q     And what is Mallinckrodt PLC?

1  A     Mallinckrodt PLC is the Irish parent of the global

2  Mallinckrodt enterprise.

3  Q     Publicly traded company?

4  A     It is a publicly traded company, correct.

5  Q     And how many shares were outstanding on the petition

6  date?

7  A     I think we just heard roughly 84 million shares as of

8  the petition date.

9  Q     You had identified that there are two principal

10  segments, Specialty Generics and Specialty Brands.  You would

11  agree that Specialty Brands is much more valuable than

12  Specialty Generics, correct?

13  A     That is correct.

14  Q     Okay.  At this point, can I get --

15           MR. MANTHEY:  And I apologize, Your Honor, I

16  forgot the name of the person at debtors who's going to put

17  exhibits up on the screen.  I apologize, but if she could put

18  up Exhibit AH17.

19           THE CLERK:  And Tristan, that is Gail Roger.

20           MR. MANTHEY:  Thank you.

21           Gail, if wouldn't mind put up AH Exhibit 17?

22  BY MR. MANTHEY:

23  Q     Mr. Wells, are you familiar with this document?

24  A     Yes, the document that I'm looking at on the screen is

25  a copy of the Mallinckrodt legal entity structure as of the

1  petition date.

2  Q    Okay.  And this was an exhibit to your first day

3  declaration, correct?

4  A    That is correct.

5  Q    Would you consider this a complex corporate structure?

6  A    I would.  I have seen more complex structures, but it

7  is a complex structure due to a number of features in it.

8  Q    And why did the debtors develop this corporate

9  structure?

10  A    I think it's actually to start off a mistake to say

11  that debtors developed this.  We spun out of Covidien in 2013

12  and there was an inherited legal entity structure as a result

13  of that spin off transaction.  So, there was a starting point

14  in 2013.  And then it evolved over time as we acquired legal

15  entities.

16      So, on the far-right hand-side, for example, there's a

17  chain of entities that have the Sucampo name.  You know, we

18  acquired Sucampo, that was our last significant acquisition

19  transaction and that brought in a new chain of legal

20  entities.  And that's why I said this is the legal entity

21  chart as of the petition date because over the years, as we

22  disposed of assets and acquired new legal entities, the org

23  chart changed.

24  Q    And it was the practice of the collective companies to

25  keep the books and records of each corporate entity separate,

1  correct?

2  A      That is correct.

3  Q      And were the operations, Specialty Generics and

4  Specialty Brands, kept separate?

5  A      They were.

6  Q      And the books and records of those entities were kept

7  separate, correct?

8  A      That is correct.

9  Q      You would agree that the debtors have diligently

10  maintained the appropriate separation from the various

11  corporate entities in the corporate organization chart?

12  A      I would, yes.

13  Q      Prior to being named the chief transformation officer,

14  you were tasked with spinning off Specialty Generics,

15  correct?

16  A      That is correct.

17  Q      And that spinoff was going to occur out of court,

18  correct?

19  A      That is correct.

20  Q      And that was not successful, correct?

21  A      We announced in August of 2019 that we were suspending

22  our plans to spinoff Specialty Generics.

23  Q      Okay.  And when that was not successful, you were

24  tasked with overseeing a process where Specialty Generics,

25  that segment, would file what you called a surgical Chapter

1 | 11, correct?

2 | A    That's correct.  Immediately after suspending the

3 | spinoff we started focusing on a settlement structure that

4 | would have required the generic entities to go into Chapter

5 | 11, but only the Generic entities.

6 | Q    And what was the timeframe of that?

7 | A    We first introduced the idea to our board in mid-July

8 | 2019, so a few weeks before publicly announcing that we were

9 | going to proceed with dispense.  And then we, ultimately,

10 | announced the surgical filing structure publicly in late

11 | February of 2020.

12 | Q    And a key element of that filing was the settlement

13 | with the opioid governmental entities, correct?

14 | A    That was a key prong of the February 2020 settlement,

15 | yes.

16 | Q    And that settlement provided for a channeling

17 | injunction and trust where the opioid related litigation

18 | claims would be directed, correct?

19 | A    That is correct.

20 | Q    And that injunction was going to protect Mallinckrodt

21 | PLC, the parent, even though they were not going to file

22 | Chapter 11, correct?

23 | A    Ideally, yes, but that was not without risk.

24 | Q    Okay.  But the companies understood that risk with the

25 | strategy to file the surgical Chapter 11, correct?

1  A     That's correct.  We understood that risk.  It's like,

2  you know, can you put your foot in the water without falling

3  all the way in, and that was the worry that once we started

4  down that road could we avoid giving features of our

5  structure, could we avoid a holdco.  But we believe that we

6  had a path forward.

7  Q     Okay.  And the equity interest were going to be

8  preserved in that surgical filing, correct; the equity

9  interest of Mallinckrodt PLC?

10 A     That's correct.  That was the primary purpose for the

11 surgical strategy was to preserve the equity value.

12 Q     And that surgical filing did not occur, correct?

13 A     That is correct.

14 Q     And in your first day declaration, you state that it

15 did not happen because of adverse developments in Specialty

16 Brands litigation, the Coronavirus pandemic, and difficulties

17 in refinancing the Mallinckrodt indebtedness, correct?

18 A     That's correct.  It was really a constellation of

19 issues, including those.

20 Q     Okay.  And the adverse developments in the Specialty

21 Brands litigation was the summary judgment ruling against

22 Mallinckrodt ARD, correct?

23 A     I would call that the first domino, yes.  That ruling

24 and then the subsequent revelation that the DOJ was pursuing

25 a (indiscernible) litigation out of the Boston office with

1  potential treble damages on the same underlying facts as the

2  CMS, but yes -- $650 million dollars there treble, you know,

3  to, you know, a little over $1.9 billion.

4  Q    Okay.  And the only party that the judgment was entered

5  against was Mallinckrodt ARD, correct?

6  A    I believe that is correct.

7  Q    And the magnitude of that adverse ruling was estimated

8  to be approximately $650 million dollars, correct?

9  A    The District Court ruling --

10            MS. MARKS:  I'm going to object -- objection.

11            THE COURT:  Hold on; hold on.  We have an

12  objection.

13            MS. MARKS:  I was just going to object to the form

14  of the way that that question is phrased.

15            THE COURT:  Overruled.  You can answer it, Mr.

16  Welch.

17  BY MR. MANTHEY:

18  A    Yeah, we're talking about the DC District judgment

19  which was adverse to the company.  It denied the injunctive

20  relief the company was seeking.  And as a result of that, it

21  was less a judgment and more a requirement that Mallinckrodt

22  recalculate rebates going all the way back to 2012 on the

23  Acthar drug product in the state Medicaid program.  As a

24  consequence of that, the estimated retrospective liability

25  was $650 million dollars.

1   Q     There was no judgment in that amount.  It was just a

2   calculation that the company developed based upon the adverse

3   ruling, correct?

4   A     It was as litigation about the proper rebate

5   calculation based on underlying CMS rules and requirements.

6   Q     And that judgment was not against Mallinckrodt PLC,

7   correct?

8   A     I believe that that is correct, yes.  The ruling, yes.

9   Q     And assuming the ruling would result in Mallinckrodt

10  ARD having to recalculate the rebates and come up with $650

11  million dollars, was Mallinckrodt ARD able to pay that

12  amount?

13  A     There would have been ways from an intercompany basis

14  to provide that liquidity.  That would have created other

15  challenges for the company, though.  That's why I kind of

16  referred to it as a domino right.  That kind of liquidity

17  demand would have been, you know, severely detrimental to the

18  company.

19  Q     It's also mentioned the Coronavirus pandemic as a

20  reason for the failed surgical filing.  What was the effect

21  of the Coronavirus pandemic?

22  A     I wouldn't give that kind of primary causation.  I do

23  think that our business has been adversely impacted by COVID-

24  19. For example, our product, Ofirmev, which is used for

25  post-surgical pain, that was several impacted by the shutdown

1  of surgical centers in the final year of exclusivity.

2  Patients, you know, didn't go to the doctor nearly as much in

3  the March to May period when the country was shutdown and

4  certainly our 2020 revenues on both the Specialty Brand and

5  Specialty Generic's side kind of bear the scars of the

6  pandemic on Generics.

7       We noticed that ADHD sales, for example, were

8  negatively impacted by students being pulled out of school.

9  It really just showed the importance of teachers in keeping

10 children on appropriate therapy.

11 Q    But didn't the Coronavirus pandemic provide other

12 opportunities for the company, for the collective debtors?

13 A    It certainly has helped us on the acetaminophen

14 business, but we were already kind of sold-out capacity

15 already.  The demand for acetaminophen was high and we've

16 been able to utilize that demand to secure contracts for

17 future years, so that's beneficial in providing stability

18 going forward.  But, overall, I would say that the impact of

19 the pandemic has been a negative on the business rather than

20 a positive.

21 Q    Okay.  But not significant, correct?

22 A    We would not -- the pandemic would not have driven us

23 into Chapter 11 on itself, right.  It's the litigation that

24 brought us here before the court.

25 Q    So, at some point, the board decides that it's in the

1  best interest to switch gears and follow holdco bankruptcy,

2  correct?

3  A     Overtime, we came to realize -- we looked at a lot of

4  different ways to keep the surgical alive.  Overtime, it

5  became increasingly evident that we were going to need to

6  pivot to a holdco strategy.  For some time, we were

7  continuing to make preparations in parallel, just depending

8  on how flexible.

9  Q     And what was that timeframe?  When did the pivot occur?

10 A     The pivot occurred really in kind of the March

11 timeframe.  A lot happened very quickly.  The pandemic hit.

12 The CMS judgment hit.  The false claims action hit.  Very

13 quickly the Acthar liabilities were seen to dwarf, the opioid

14 liability settlement that we had just announced.  That

15 resulted in some financing having to be reworked.

16       We had an April 2020 maturity.  We had had agreement

17 from our secured lenders to put in new money that would not

18 only have allowed us to take out the April 2020 maturity, but

19 also to take out additional unsecured debt at a significant

20 discount.  That financing was withdrawn on us and so, we had

21 to revert to an exchange transaction and had to actually

22 contribute $119 million dollars of cash to avoid a default on

23 the April 2020 maturity.

24       So our liquidity position changed dramatically in a

25 very short amount of time.  And we were suddenly faced with a

1  looming demand of $650 million from the various estate

2  (indiscernible) offices that they worked revised rebate

3  calculation through their systems.

4  Q    How much cash did the company have after they paid the

5  $110 million dollars?

6  A    I don't recall offhand, how much we had.  It would have

7  been under a billion dollars, but in the, you know, several

8  hundred millions of dollars.

9  Q    So the pivot occurs and the companies are going to file

10 a holdco restructuring.  At that point the debtors reached

11 back out to the opioid governmental entities again, correct?

12 A    I think that's a little bit of a simplification.

13 Throughout the summer, we were engaged with the opioid

14 plaintiffs, you know, the ad hoc group of governmental

15 plaintiffs and ad hoc group of unsecured noteholders was

16 formed.  We began an outreach to the DOJ to see if settlement

17 were possible with the DOJ.  So all of those things were

18 commencing around the same time and a framework for thinking

19 about what a holdco could look like, you know, that dialogue

20 began.  It was an intense negotiation that lasted for many

21 months with many different permeations along the way.

22 Q    Okay.  Was anyone from equity involved in those

23 negotiations?

24 A    No one from equity was involved in those discussions.

25 Q    Okay.  The negotiations that you're talking about

1  ultimately led to the entry of the restructuring support

2  agreement, correct?

3  A     That is correct; right before the petitions were filed

4  on October 12th.

5  Q     And the parties to the restructuring support agreement

6  are the debtors, correct?

7  A     The debtors are a party to the restructuring support

8  agreement.

9  Q     The opioid governmental entities, certain opioid

10 governmental entities, I assume?

11 A     They are a party, yes.

12 Q     And then you were able to get or obtain 84 percent of

13 the bondholders, correct?

14 A     That is correct.

15 Q     You said equity was not involved in those negotiations.

16 Did anybody reach out to anyone with equity?

17 A     Well most of us who were involved in the negotiations

18 on the debtor side were our shareholders or were shareholders

19 at the time.  With 84 million shares outstanding, you know,

20 who would belong at the table?  Many of the unsecured

21 noteholders had position in the equity as well, but they were

22 never kind of equity per se was never a negotiating party as

23 the RSA was worked on.

24 Q     Okay.  And it's your position, I believe you testified

25 at the RSA is the backbone of this Chapter 11 filing and

1   without it, the debtors would be a freefall, correct?

2   A     I believe that that is true.  Without the RSA, the

3   different litigation interest in this case could be at each

4   other for value for many years.

5   Q     Okay.  Well, let's turn our attention to the RSA and

6   that was, again, attached to your first-day declaration,

7   correct?

8   A     That is correct.

9   Q     And you testified that the parties to the -- that

10  agreed to the RSA are, one, the debtors, correct?

11  A     That's correct.

12  Q     Two, the supporting unsecured noteholders, correct?

13  A     That is correct.

14  Q     And that's only 84 percent, right?

15  A     It's 84 percent, but it was 100 percent of those

16  parties that were brought under the tent for purposes of

17  negotiating the RSA.  There were smaller holders that were

18  holders that weren't willing to be restricted.  So, I think

19  we were very pleased to have, you know, full support for

20  those that were involved in the process -- 84 percent openly

21  reflected in those that signed off.

22  Q     Okay.  And the third party was the supporting

23  governmental opioid claimants, correct?

24  A     That is correct.

25  Q     And that doesn't capture all of the governmental opioid

1  claimants, does it?

2  A    It does not.  So this court is aware, the multistate

3  governmental entity group, for example, joined the RSA

4  representing 1300 municipalities, subsequent to the petition

5  date, but they were not involved and there are other

6  governmental plaintiffs and, of course, the private

7  plaintiffs that were not party to the RSA.

8  Q    Can you explain to the court what under the tent means?

9  A    Under the tent just means if you're a party to a

10 particular transaction, you agree to, in exchange for

11 receiving confidential information, you agree to not divulge

12 that information nor trade on that information.  So, those

13 unsecured noteholders that engaged in the process were unable

14 to trade while, you know, for the period that they were

15 "under the tent."

16 Q    And anyone from equity brought under the tent?

17 A    Well, again, employees, shareholders that were working

18 on the transaction were restricted.  We had an internal list.

19 Anytime anyone was apprised of the work on the project, that

20 were put on that list and notified that they were unable to

21 trade in Mallinckrodt security.

22 Q    Okay.  You identified the multistate governmental

23 entities who had now agreed to the RSA since the petition

24 date.  Are there any other parties since the petition date

25 that have agreed to restructuring support agreement?

1  A      Not since the petition date, no.

2  Q      Can you identify the principal terms of the RSA for the

3  court?

4  A      Certainly. The principal terms and there is a term

5  sheet in my declaration, and I'm going to go very high level

6  because it is a lengthy document and there are many terms.

7       The opioid settlement is a pilar of the RSA.  It calls

8  for 1.6, a billion-dollar settlement payable over seven years

9  with $450 million dollars payable at emergence.  It also

10 provides warrants in the amount of 19.99 percent at a stripe

11 price valuation of, you know, they're in the money after the

12 emergent company reaches a valuation of $1.55 billion

13 dollars.

14      The unsecured noteholders, save the 2023 noteholders,

15 that note has a different guarantee package, and it has no

16 recovery under the RSA.  The other unsecured noteholder

17 agrees to surrender their notes in exchange for equity in the

18 new company and they received 375 million of take-back paper.

19      Existing equity is wiped out.  Secured the existing

20 secured debt, that's $3.6 billion dollars as of the petition

21 date.  That is reinstated on its terms. We believe that

22 that's oversecured at this point.

23      Unsecured claims, general unsecured claims and trade

24 claims, collectively, are entitled to $150 million dollars of

25 recovery.  And there, as I said, many other terms that are

1  viewable in my declaration where the RSA is attached.

2  Q     Okay.  In addition to the terms you identified, there

3  is a MIF for management, correct?

4  A     There is a management incentive plan that is included

5  in my declaration, yes, in terms of the terms.

6  Q     And the percentage of common stock that is set aside

7  for the MIF, again the management incentive program, is 10

8  percent of the company, correct?

9  A     Ten percent of the fully dilute equity, so that would

10  envision the warrants as well that are set aside for the

11  opioid claimants.

12  Q     Okay.  In addition to the MIF, management is receiving

13  fulsome releases, correct?

14  A     I think we're actually confusing two different things.

15  So the management team that's receiving the release is the

16  management team that exists today.  Whether or not that same

17  management team is in place when the company emerges is, in

18  part, the decision of the new to be appointed board under the

19  RSA.  The unsecured noteholders will be able to appoint a new

20  board of directors and they presumably will have some say as

21  to who the management of the company is.  They certainly will

22  be the party controlling the MIF under the plan.

23      So I think it's a mistake to assume that all those who

24  are receiving releases under the RSA will be receiving awards

25  under the MIF.  None of us who are part of the management

1 team have any control or have been made any promises to

2 receive any awards under the management incentive plan.

3 Q    Yeah, I'm separating the two, the releases and the MIF,

4 so let's move the MIF to the side.  Okay.

5      In the term sheet, there is a provision that the

6 debtors are going to provide releases as set forth and

7 annexed for, as well as there's going to be third-party

8 releases.  So my question to you are the directors and

9 officers expecting a release under the ultimate plan of

10 reorganization that is confirmed by this court?

11 A    That is a component of the RSA and we would expect that

12 it would be a component of the ultimate plan of

13 reorganization that's filed in this case as well.

14 Q    Okay.  And there's also a section -- and, again, let's

15 put the release behind -- a section for indemnity, correct?

16 A    There is a section on indemnity, yes.

17 Q    And the directors and officers are expecting that they

18 obtain indemnity to the fullest extent allowed by the law,

19 correct?

20 A    That is correct.

21 Q    When these terms, and I'm specifically going to narrow

22 it to the MIF, the releases and the indemnity provisions, did

23 management have independent counsel that negotiated those

24 terms in the RSA?

25 A    Yes, we had independent -- well, it depends on what you

1  mean by independent counsel.  What do you mean by independent

2  counsel?

3  Q     Well I'll be specific.  Did company counsel, Latham &

4  Watkins, negotiate those provisions on your behalf?

5  A     Yes, Latham & Watkins negotiated those on our behalf.

6  Q     And you understand Latham & Watkins represents, in

7  these cases, the debtors and, before the petition date, the

8  company, correct?

9  A     That is correct.

10 Q     So management did not have separate and apart counsel

11 that represented it in a negotiation of the RSA, correct?

12 A     That is correct.

13 Q     Okay.  All right, we've identified the parties who have

14 agreed to the RSA.  You testified to those.  So now, I want

15 to go through the parties who have not agreed to the RSA and

16 that have made some type of appearance in this bankruptcy

17 case or have been identified by the debtors as potentially

18 claimants.

19        First did the official committee of unsecured creditors

20 agree to the RSA?

21 A     The unsecured creditors committee has not agreed to the

22 RSA, no.

23 Q     What about the official committee of opioid related

24 claimants?

25 A     That committee has not agreed to the RSA either.

1  Q      What about the ad hoc committee of NAS children?

2  A      That ad hoc group has not agreed to the RSA.

3  Q      What about the ad hoc group of personal injury victims?

4  A      They have not agreed to the RSA either.

5  Q      Okay.  I understand there has been an identified

6  potential future claims representative and there's some issue

7  whether he's going to be appointed.  But you've identified a

8  person for the future claim's representative, correct?

9  A      Yes, we have.

10 Q      Has the future claims representative agreed to the RSA?

11 A      The future claim's representative has not been

12 appointed nor have they agreed to the RSA.

13 Q      And I believe the debtors have identified that there's

14 a group of private opioid litigants, correct?

15 A      I think there are many different private litigants.

16 I'm not aware of how many different groups there are not

17 mention the NAS children group and the PI group, just a

18 moment ago.  I'm aware that there are many different private

19 plaintiffs in this situation.

20 Q      And other than the supporting governmental opioid

21 claimants, they have not agreed to the RSA, correct?

22 A      That is correct.

23 Q      My understanding is there are various Acthar claimants,

24 correct?

25 A      Both public and private plaintiffs are suing the

1 | debtors over the Acthar product.

2 | Q    Okay.  Well, let's start with the private Acthar

3 | litigants.  Have they agreed to the RSA?

4 | A    They have not.

5 | Q    Okay.  What about the public Acthar litigants, have

6 | they agreed to the RSA?

7 | A    That group is not monolithic.  Many have not that are

8 | suing under similar theories as to some of the private

9 | plaintiffs.  We do have a settlement in principle with the

10 | Department of Justice that covers a number of litigations and

11 | investigations, including the CMF decision from the DC

12 | District Court and the false claims matter out of Boston with

13 | the treble damages that would amount to $1.9 billion and

14 | there's another false claims act out of the Eastern District

15 | of Pennsylvania that had the potential for treble damages

16 | that would have been $250 million.  All of that has been

17 | agreed to in principle for $260 million dollars.

18 |       And while not a component of the RSA that settlement

19 | was known by the parties that entered the RSA and I think

20 | highly important to the RSA.

21 | Q    When you say settled in principle, has it been

22 | documented?

23 | A    The settlement agreement has not been finalized. So

24 | there's nothing that would preclude the DOJ from walking away

25 | from that deal.  There are over five pages of termination

1  rights in the RSA and I imagine that if the overall framework

2  started to unwind that counterparties to the RSA could find

3  good cause to exit the RSA and renegotiate their positions.

4       It is a settlement in principle, only at this point.

5  Q    Okay.  So that settlement captures CMS and the DOJ,

6  correct?

7  A    It does, yes.

8  Q    So the -- I'm going to get to what you're talking about

9  under the DOJ in a second.  But in terms of state government

10  Acthar litigants that settlement doesn't cover them, correct?

11  A    It does not.

12  Q    And they would not be a party to your RSA, correct?

13  A    That is correct.

14  Q    And then the DOJ, my understanding from your testimony

15  the other day that while they entered into this preliminary

16  settlement, okay, that they've carved out a Florida

17  investigation related to Acthar, correct?

18  A    I don't know that it was carved out as much as not

19  included and that's what I was trying to -- on the previous

20  answer, trying to flesh that out to CMS and DOJ with respect

21  to the identified matters in that settlement.  There is that

22  Florida sales and marketing investigation that is ongoing.

23  Q    Okay.  And they would not be part of the RSA, correct?

24  A    That is correct.

25  Q    Okay.  And then there's 16 percent of the non-

1  supporting unsecured noteholders, they would not be a party

2  to your RSA, correct?

3  A    They are not a party to the RSA.

4  Q    What about the ad hoc first lien notes group?

5  A    They are not a party to the RSA and I think the court

6  heard from them on the first day of the case in terms of

7  their thoughts on the matter.

8  Q    Okay.  And they objected to the payment of the fees to

9  the RSA professionals that was heard by the court last week,

10 correct?

11 A    They did.

12 Q    And then there's an ad hoc first lien term lender

13 group, are they party to the RSA?

14 A    They are not.

15 Q    What about the holders of the 4.75 percent note?  I

16 think you identified them as early as the 2023 notes; are

17 they party to the RSA?

18 A    They are not, but their indenture trustee sits on the

19 UCC, so they are represented through the UCC, but they are

20 not -- as I previously stated did not agree to the RSA.

21 Q    And the holders of the Legacy Debentures, they're not

22 party to the RSA, are they?

23 A    They are not party to the RSA.

24 Q    And then, finally, the ad hoc equity committee or any

25 equity holders, are they party to the RSA?

1   A     They are not party to the RSA, no.

2   Q     So it seemed to be an extensive list.  You would agree

3   that more parties in interest have not agreed to the RSA

4   versus parties in interest that have agreed to the RSA,

5   correct?

6   A     Mr. Manthey, I think it depends on how you define

7   parties.  If we're just counting by number probably not.  If

8   we're counting by importance, I think that the governmental

9   opioid plaintiffs collectively and the MSGE group added in,

10  you know, represents, you know, probably, you know, well in

11  excess of 95 percent of the American population, if not 99

12  percent.  So it's really difficult to weigh these parties

13  against each other in terms of their importance.  Obviously,

14  all interests are important, but in terms of the

15  restructuring, perhaps, not equally so.

16  Q     So you would agree that the debtors and their advisors

17  have a lot of work to do to reach a consent on a Chapter 11

18  claim, wouldn't you agree?

19            MS. MARKS:  Objection to form.

20            THE COURT:  Go ahead and answer, Mr. Welch.

21            Overruled.

22  BY MR. MANTHEY:

23  A     Yeah.  I've said, you know, miles to go before we

24  sleep.  We're encouraged by the way that the parties continue

25  to work cooperatively and to resolve issues as consensually

1  as possible.  We saw that yesterday with agreement to begin

2  negotiations on allocation.  And so, I think from a company

3  perspective, I'm encouraged by what I see.

4       This is not going to be resolved tomorrow, so, and I

5  think we're aware of that.  We said publicly probably a

6  twenty-to-eighteen-month process.  And, you know, we continue

7  to think that that timeline seems realistic.

8  Q    The RSA contains a number of milestones, correct?

9  A    It does, yes.

10 Q    And consistent with your testimony of a twelve-to-

11 eighteen-month process, it requires the plan to be confirmed

12 September 12th, 2021, if my math is correct, right?

13 A    I don't have those milestones in front of me.  I don't

14 have any reason to dispute.  Sounds like you've done that

15 calculation.  I have no reason to not agree to it.

16 Q    Sounds about right, correct?

17 A    Yes.

18 Q    Okay.  And it also requires the plan to go effective no

19 later than fifteen months after the petition date, is that

20 correct?

21 A    That sounds right.

22 Q    Okay.  And the RSA has not been brought before the

23 court for approval, yet, correct?

24 A    It has not.

25 Q    Do you know when that RSA will be brought before the

1  court for approval?

2  A    I think we intend to file our plan or reorganization

3  based on the timeline that was shared sometime in the first

4  quarter of 2021.  And I think that plan will be largely

5  reflective of the RSA terms.

6  Q    And you understand the RSA is not effective without

7  court approval, correct?

8  A    That's correct.  Mr. Manthey, I'm not a bankruptcy

9  lawyer and so, exactly how the RSA evolves into the plan,

10  that's kind of behind my expertise.  I'm a pharmaceutical

11  executive, not a bankruptcy lawyer.  But as I understand it,

12  the kind of -- we called the RSA the backbone and it will be

13  the backbone of the plan of reorganization that we bring

14  forward.

15  Q    Understood.

16       It's the debtors' position that the company is

17  hopelessly insolvent, correct?

18  A    Yes, based on the litigation that's been brought

19  against the company.

20  Q    Okay.  But the company has not performed any valuations

21  to confirm that position, correct?

22  A    That's a -- we don't have a current valuation.  I can

23  tell you that one of the reasons why we did not proceed with

24  our spinoff is we were unable to obtain solvency opinions

25  because of the opioid litigation for either our plan, Spenco

1   or the Remanco, in light of the spinoff transaction which did

2   not, of course, occur.

3        And so, that highlighted to us the importance of

4   resolving once and for all the opioid liability.  Just due to

5   the size of those claims, I don't think any infirm in the

6   world would want to put its name to a solvency opinion, given

7   the litigation claims that have been made.

8   Q    Again, just to confirm, the debtors have not performed

9   any valuation to confirm the position that the company is

10  hopelessly insolvent, correct?

11  A    I have not seen one, so I would say correct.

12  Q    And as chief transformation officer, you would see one,

13  correct?

14  A    I presume that I would see one, yes.

15  Q    And has there been any valuation of Specialty Generic

16  segment conducted?

17  A    You know, with our investment banker when we were

18  working on the spinoff transaction and we were continuing our

19  longstanding sale process through that time, we had a census

20  as to, you know, what that business would be worth, you know,

21  save for the opioid litigation.

22  Q    Okay.  Was the valuation performed?

23  A    An evaluation was not performed, no.

24  Q    Evaluation on Specialty Brands has not been performed,

25  correct?

1    A      That's correct.

2    Q      Have any of the individual companies that were in the

3    corporate org chart, have they been valued?

4    A      Not in terms of like a standardized valuation, no.

5    Q      Okay.  The debtors have engaged in an investment banker

6    in these bankruptcy cases, haven't they?

7    A      That is correct.

8    Q      Actually, I think it's still pending.  It's subject to

9    court approval, but you intend to move forward with the

10   engagement of Guggenheim, correct?

11   A      That is correct.

12   Q      And they were initially engaged by the debtors of the

13   company back in 2019, is that correct?

14   A      That is correct.

15   Q      Okay.  And you did not ask them to perform a valuation,

16   correct?

17   A      We did not ask them to perform a valuation at that

18   time.  They will provide a valuation as part of the, as I

19   understand it, the upcoming plan and disclosure statement.

20   Q      And that's the plan that's going to be filed later in

21   the cases, correct?

22   A      Later in the case, yes.

23   Q      On the petition date, Mallinckrodt stock was trading

24   for .75 cents a share, correct?

25   A      I believe it was definitely under a dollar.  I was

1  focused more on the filings then on the trading prices that

2  day, but that sounds right.

3  Q    Okay.  And at 84.7 million outstanding shares, that

4  would provide a market cap of approximately 64 million?

5  A    That math sounds right to me.

6  Q    Okay.  And wasn't Mallinckrodt PLC trading at almost $6

7  dollars a share just a few months prior to the bankruptcy

8  filing?

9  A    Yes, I believe that's correct.  I think, obviously, as

10 rumors of bankruptcy, you know, spread, you know, there was

11 continuing downward pressure on the stock overtime to where

12 it stood right before the petition date, yes.

13 Q    And that would provide for a significant market share,

14 correct?

15 A    Yeah, it would be six dollars time 84 million

16 outstanding.

17 Q    And the previous high for the price of Mallinckrodt PLC

18 was $132 dollar per share, correct?

19 A    I believe that's correct.

20 Q    And that was about five years ago, correct?

21 A    I believe it was in the summer of 2015 that we hit that

22 number.

23 Q    And that would create a market cap of approximately

24 $11- to $12 billion dollars, correct?

25 A    That's correct.  I believe we were at that market cap

1   at that time.

2   Q     So the company has lost a market cap of, at least, $11

3   billion dollars in less than five years, correct?

4   A     It's been a painful five years from a shareholder

5   perspective.

6   Q     Thank you.

7         All right, let's turn our attention to the opioid

8   related liabilities.

9         You would agree that the principle issue facing

10  Specialty Generics' debtors are the opioid related litigation

11  liabilities, correct?

12  A     Can you restate that?  I didn't hear the first part.

13  Sorry.

14  Q     The principle issue facing the Specialty Generics

15  debtors are the opioid related litigation liabilities

16  correct?

17  A     That is correct.  There's also -- the DOJ price fixing

18  matter pending, but it's the opioid litigation that caused us

19  to consider Chapter 11 for Specialty Generics.

20  Q     What is the DOJ price fixing?  That sounds not good.

21  What is that about?

22  A     Well it does sound not good.  There's a DOJ case

23  pending against a number of generic companies alleging

24  certain price fixing behaviors and collusion between generic

25  companies and we're, of course, vigorously defending the

1  company against those charges, but that is a matter that has

2  been noted.

3  Q     And the company does not believe it committed price

4  fixing, does it?

5  A     No.  I'm not close to that litigation, but we are

6  defending ourselves.  And we were defending ourselves in that

7  matter until it was stayed.

8  Q     And to what that is --

9  A     We were a later named party to that litigation so

10 that's a relatively new development.

11 Q     And you had mentioned that that stayed.  Isn't all of

12 the opioid related litigation against the debtor stayed?

13 A     It is now all stayed, yes.

14 Q     And I believe you had testified previously that the

15 magnitude, the quantum of the opioid related litigation

16 liabilities could be in the billions of dollars, correct?

17 A     Yes, I think if you look at the opioid plaintiffs'

18 filings, they believe it could be into the trillions, right.

19 And so, the $1.6 billion dollar settlement from their

20 perspective represents just pennies on the dollar in terms of

21 their alleged claim.

22 Q     But despite the settlement that you just referenced,

23 Specialty Generics debtors continue to maintain that they

24 have no liability for the opioid related claims, isn't that

25 correct?

1  A      That's correct.  And the RSA does not require an

2  admission of liability.

3  Q      And even though Mallinckrodt PLC has been named in some

4  of the lawsuits, and I'm referring to the parent as

5  Mallinckrodt PLC, as well as the publicly traded company, it

6  also maintains that it had no liability for the opioid

7  related litigation claims, correct?

8  A      That is correct.  It's been named in 2,839 of the over

9  three thousand cases, so 93 percent and we have already

10  denied the charges against Mallinckrodt PLC in the opioid

11  matters.

12  Q      And continue to deny, correct?

13  A      Well that litigation is stayed, but we continue to deny

14  the Mallinckrodt PLC has any liability.

15  Q      If the opioid litigation claimants are correct on

16  liability, as well as the quantum; okay, the quantum which is

17  alleged as you testified to trillions of dollars, could

18  Specialty Generic debtors satisfy that judgment?

19  A      Very few companies could satisfy that judgment.

20  Specialty Generic on a standalone basis certainly could not

21  satisfy a judgment in the trillions of dollars.

22  Q      What about Mallinckrodt PLC?

23  A      It also could not sustain a judgment into the trillions

24  of dollars.

25  Q      Okay.  Prior to the petition date, have any of the

1  debtors been casting judgment for any opioid related

2  litigation liabilities?

3  A     There have been no judgments entered at present, to

4  date.

5  Q     In fact, there's been no trials conducted, correct?

6  A     That is correct.

7  Q     So unless there are trials conducted to determine

8  liability or quantum, it looks like a settlement makes the

9  most sense for all parties, correct?

10 A     So I can share how we thought about it.  In early fall

11 of 2019, we settled the first two Bellwether County cases in

12 Ohio for $30 million dollars; $24 million of cash, $6 million

13 dollars of free product.

14     That bought us time to negotiate a global settlement.

15 I believe at the time they were roughly 2600 cases pending

16 against the company and if you just extrapolate $15 million

17 dollars per company across 2600 cases you get to a number

18 that's around $39 billion dollars.

19     And so, you know, maybe you don't get to hundreds of

20 billions of dollars but you get to a number that's not a

21 trillion but it's still not capable of being satisfied by

22 either Specialty Generics or Mallinckrodt PLC, if that

23 litigation moves forward and results in significant

24 judgments.

25     And I believe that the plaintiffs in those two counties

1 alone were alleging damages in the tens of billions of

2 dollars in terms of what it would be required to bate the

3 opioid crisis in those jurisdictions. So the dollars that are

4 at stake are sizeable.

5 Q     So, again, it looks like settlement is probably is the

6 path that the parties, that would make the most interest and

7 those settlements would be implemented through a Chapter 11

8 process, correct?

9 A     That certainly drove our behavior from December of 2019

10 forward that a global settlement on that achieved a

11 comprehensive piece for the company.  We saw no other means

12 to doing that, that would keep Mallinckrodt financially

13 viable save a Chapter 11 process.

14      And, you know, we worked really hard to come up with

15 the surgical construct.  We believe that our corporate

16 history made that possible and that our debt documents made

17 that possible.  And that that would allow us to preserve the

18 equity value and we believe that that was in the

19 shareholder's best interest that we could pursue that in the

20 best interest of our creditors.

21      And so, that was the path that we set on.  We called

22 that project Balboa.  The concept being it's like Rocky

23 Balboa.  You can get knocked down but you're not knocked out.

24 And spoke to the resilience of the organization and we

25 believe that that path forward was in the company's best

1  interest and we worked very hard to make that deal possible.

2  And, sadly, as we've discussed in March 2020, the facts

3  became significantly worse for the company.

4       But settlement of the opioid litigation has certainly

5  been something we've been pursuing, we believe it's in the

6  public best interest, Mallinckrodt's best interest to get

7  this matter resolved and to provide communities needed funds

8  to address the opioid crisis.  While we deny liability, we

9  don't deny that there is a crisis.  And to the extent that

10 the settlement funds can be used to address that crisis, we

11 see that as a public good.

12 Q    Okay.  And one of the attractions of filing a Chapter

13 11 is for this to occur in a centralized forum, correct?

14 A    That is correct.  To have the benefit of channeling so

15 that we're not dealing with opioid litigation on a piecemeal

16 basis for many years to come.

17      Another key feature of the settlement is a voluntary

18 injunction that governs the operation of the opioid business.

19 That has not been introduced yet.  It is a cornerstone of the

20 RSA as well.  I neglected to mention that.

21      It's very important to many of the governmental opioid

22 plaintiffs.  It's important to the company that there be

23 agreement on what it means for us to continue on as a

24 responsible generic opioid manufacturer.

25 Q    And the centralized forum of Chapter 11 brings all the

1  parties to the table, correct?

2  A      It does.

3  Q      Okay.  And to the extent that the parties are unable to

4  reach an agreement voluntarily, the company has the option to

5  bring those issues before a bankruptcy court to determine

6  them, isn't that correct?

7  A      That is correct.

8  Q      And, again, the attraction is the Chapter 11 process is

9  these thousands of forums, the cases are stayed and those

10  parties now need to come forward in bankruptcy court, isn't

11  that correct?

12  A      Or wait to see what happens, right?  They don't

13  necessarily have to come forward.  They can wait the outcome.

14  But we believe that the bankruptcy process, the Bankruptcy

15  Code provides an attractive means for dealing with complex

16  situations like this with a variety of creditor interest that

17  need to be protected.

18  Q      And equity interest, correct?

19  A      To the extent provided by applicable law, certainly.

20  Q      All right, let's turn our attention to the Acthar

21  related liabilities.  You would agree that the principle

22  issue, and I say Acthar related liabilities, the Acthar

23  related litigation liabilities.  The principle issue facing

24  Specialty Brands debtors is the Acthar related litigation

25  liabilities, correct?

1  A     That is correct.

2  Q     Okay.  And can you briefly give the court a description

3  of how the Acthar related litigation liabilities arose?

4  A     Again that litigation is not monolithic.  There are a

5  variety of different claims that have been brought forward.

6  The court is familiar with some of the private Acthar

7  litigation and the public, the parties represented by the

8  Haviland group, for example, that alleged that there are

9  antitrust violations fraud, anticompetitive pricing of the

10 product.  You know that's one kind of basket of that's our

11 litigation.

12      There's securities litigation that have been brought

13 and SEC investigation around company statements about the

14 Acthar product historically.  And then, of course, there's

15 the CMS issue which is really over the appropriate use of

16 base average manufacturers price and calculating fee, the

17 cost of the product to the Medicaid program that was the

18 subject of the litigation we've been discussing in the DC

19 District Court.

20 Q     Isn't it simple to say that all of this litigation

21 arose from the pricing of the Acthar product?

22            MS. MARKS:  I'm going to object to form.

23            THE COURT:  Overruled.

24 BY MR. MANTHEY:

25 A     I think it's safe to say that much of the controversy

1  around Acthar is around the pricing of the product, yes.

2  Q     And who set the pricing of the product?

3  A     The company sets the pricing of the product.

4  Q     The company's management, correct?

5  A     The company's management under the oversight of the

6  board of directors, yes.

7  Q     And the litigation related to this is also stayed,

8  correct?

9  A     That is correct.

10  Q     We have previously identified the summary judgment

11  ruling related to CMS.  There are numerous other outstanding

12  claims related to the sales of Acthar, correct?

13  A     Yes, I believe in my declaration I have noted that the

14  claims could be more than $15 billion dollars of aggregated

15  across the various Acthar litigations.

16  Q     And, again, despite the settlement with DOJ, the

17  Specialty Brands debtors maintain that they have no liability

18  for the Acthar related litigation claims, isn't that correct?

19  A     That is correct.  Again, it's a settlement in principle

20  with the DOJ.  It's not a final settlement yet.

21  Q     And it hasn't been brought before the court for

22  approval, correct?

23  A     That is correct.

24  Q     It's Specialty Brands' debtors' position that

25  management appropriately priced the Acthar product, correct?

1  A     We believe that the pricing did not violate any laws

2  and was an appropriate price for the value provided to the

3  patients receiving the product.

4  Q     If the Acthar litigant claimants are correct as to

5  liability and quantum, and I think you testified and you

6  identified in your declaration that the magnitude of that is

7  $15 billion dollars, would Specialty Brands be able to

8  satisfy such judgments?

9  A     It would not.

10  Q     What about Mallinckrodt PLC?

11  A     It would not either.

12  Q     Okay.  Other than the summary judgment in favor of CMS,

13  have any of the debtors been casting judgment for Acthar

14  related litigation liabilities?

15  A     I'm not aware of any other judgments, no.

16  Q     And, again, all of that litigation is also stayed as a

17  result of the bankruptcy filing?

18  A     That is correct.

19  Q     Okay.  And the debtors' omnibus objection, I believe

20  the debtors state and I'll quote,

21      "There is a chance that CMS could take the position

22  that every Mallinckrodt entity should be disqualified from

23  participating in the Medicaid drug related program and other

24  federal programs like Medicare, an outcome that would be a

25  crippling blow to the entire enterprise."

1       You recall that quote?

2  A     I do recall that quote.

3  Q     Okay.  Have they taken that position?

4  A     As a result of our settlement with the DOJ, there has

5  been conversations and discussions between our independent

6  counsel and the office of Inspector General for the Centers

7  for Medicaid and Medicare services, CMS.  I have not been

8  privy to those discussions.  I can't specify what has or has

9  not been said.

10      I do know that that potential remedy of expulsion not

11 only of the Mallinckrodt ARD business that sells Acthar, but

12 of the entire company from not only Medicaid but also

13 Medicare is a possibility that's a remedy within the power of

14 CMS as a governmental entity to remove Mallinckrodt from

15 several programs.  So the threat discussed in the declaration

16 is and was a concern.

17 Q     Okay.  But I believe you testified the other day that

18 CMS has not made such a threat, correct?

19 A     I think I have to go back to what I said in my

20 deposition.  I have not been privy to those discussions and I

21 am not aware of what has or has not been actually threatened.

22 Q     Well given the statement that it would cripple -- be a

23 crippling blown to the enterprise, wouldn't you think you

24 would be aware of it if it happened?

25            MS. MARKS:  And I'd just like to interject.

1  Steve, I would just like you to be careful here not to reveal

2  the substance in any privileged communications you may have

3  had on the topic.

4  BY MR. MANTHEY:

5  A    Mr. Manthey, I think you can know regardless of whether

6  or not it has been threatened that if CMS has the power

7  through the office of Inspector General of the Department

8  Health & Human Services to remove a participant from several

9  healthcare programs, that if you're a pharmaceutical company

10 that receives funds from those federal healthcare programs

11 that to not be able to participate in those federal

12 healthcare programs would be highly problematic.

13      I think that's just a matter of logic, not necessarily

14 -- and it doesn't require you to know the specifics of any of

15 the discussions between the company and the office of

16 Inspector General on the matter.

17 Q    Well I think we can agree that it would be if the CMS

18 followed through with such a threat and found the companies

19 in violation to where they could do that.  I think we all

20 would agree that it would be a crippling blow.

21      The difference is have they made that threat and is it

22 realistic that they are going to take that action against the

23 debtors.  That's what I'm trying to understand.

24 A    And I'm stating that I have not been privy to those

25 discussions and as my counsel just advised, those may be

1 privileged conversations and that's one of the reasons why I

2 have not necessarily pursued that information.  And I think

3 that's consistent with what I said in my deposition.

4 Q    And do you understand that if Medicaid took such

5 action, it would be in violation of the automatic stay?

6         MS. MARKS:  And I object here.  It calls for legal

7 conclusion.

8         MR. MANTHEY:  Okay.  I'll withdraw the question,

9 Your Honor.

10 BY MR. MANTHEY:

11 Q    So like the opioid related litigation liabilities

12 unless there are trials conducted to determine liability of

13 quantum, again, it looks like settlement makes the most sense

14 for the parties going forward, isn't that true?

15 A    We have sought to settle.  I think the settlements in

16 principle with the DOJ is an example of that.  And the other

17 matters, I think, the form of Chapter 11 in terms of

18 resolving those unsecured claims is, you know, the avenue

19 that the company has elected to pursue.

20 Q    All right.  And the company is going to seek a bar date

21 for where the claims will have to be filed with the

22 bankruptcy court, isn't that true?

23 A    I believe the bar date order has already been entered

24 in this case, yes.

25 Q    So they've already established a bar date for the

1  parties to come forward with claims in this centralized

2  forum, correct?

3  A    I think that that bar date depends on when we file our

4  statement of financial affairs which is due on or before

5  December 24th, but noticing would ensue shortly thereafter,

6  yes.

7  Q    In the debtors' omnibus objection, the debtors allege

8  that equity is adequately represented by the board of

9  directors and management, correct?

10 A    That is correct.  Management and the board of directors

11 have duties to shareholders and have exercised those duties

12 very thoughtfully throughout the leadup to the case.

13 Q    Okay.  And you're aware that there are a number of

14 unhappy shareholders that have filed numerous letters with

15 the court and I believe at your deposition, you testified

16 that you have read most of those letters, correct?

17 A    That is correct.  I have read most of those letters, if

18 not all of them.

19 Q    And have you or any of your professionals reached out

20 to any of the equity holders to address their concerns?

21 A    I do not believe the company has reached out to those

22 letter writers and I don't believe our advisors have either.

23 Q    Okay.  And you were the debtors' representative at the

24 341 meeting of creditors, correct?

25 A    I was and I believe there are a number of equity

1  holders that joined that discussion.

2  Q    In fact, there were numerous shareholders that asked

3  questions of you, correct?

4  A    That is correct.  I presume that they were

5  shareholders.  They represented themselves to be such.

6  Q    Okay. And, I guess, the tone of those questions and was

7  that they were unhappy, correct?

8  A    I think that's a fair assessment.

9  Q    And you understand that the meeting was adjourned to a

10  later date after almost two hours of questions, correct?

11  A    I think we went almost two and a half hours before

12  adjourning.  And the reason for the adjournment was we had

13  not filed our statement of financial affairs yet.  And there

14  will be a subsequent meeting, presumably called by the U.S.

15  Trustee, where we can answer questions about those filings

16  which, as I said, are due to be filed on or before December

17  24th.

18  Q    Okay.  Have you or any of your professionals reached

19  out to any of the shareholders who made an appearance at the

20  341 meeting to address their concerns?

21  A    I don't believe there has been any outreach, no.

22  Q    And the debtors and management are subject to the RSA

23  that they have agreed to, correct?

24  A    That is correct.  To the extent that any shares are

25  owned, there is no recovery for an employee, manager or

1 director shareholder.

2 Q    And, again, 84.7 million shares of common stock are

3 extinguished under the RSA, correct or envision to be

4 extinguished?

5 A    That is correct.

6 Q    And the debtors and management further agreed to

7 fulsome releases which would include releases of derivative

8 claims the company may have against the directors and

9 officers, but also individual claims the shareholders may

10 have against directors and officers, isn't that correct?

11 A    I believe that the releases that are sought in the RSA

12 are fulsome releases, yes.  I think that characterization is

13 fair.

14 Q    And the debtors and management have further agreed that

15 the directors and officers should receive generous

16 indemnities to the fullest extent allowed by law and to the

17 extent they're prepetition to ride through the bankruptcy

18 case, isn't that correct?

19 A    That is correct.  I think it's worth noting that the

20 directors and officers already enjoy indemnification either

21 contractual or by virtue of the articles of incorporation or

22 organization from the Mallinckrodt entities for the

23 performance of their duties.

24 Q    Okay.  Have the debtors investigated whether there are

25 any potential claims against the directors and officers?

1   A      I believe we will disclose all known claims in the

2   schedules of liability. All contingents claim that have been

3   brought against officers and directors and this court is

4   aware from the Section 105 proceeding of certain actions

5   where officers and directors were named defendants in cases.

6   And those cases have now been stayed with respect to those

7   nondebtor individuals.

8   Q      Let me ask my question again.  Have the debtors

9   investigated whether it has any potential claims against the

10  directors and officers?

11  A      We have not conducted that kind of investigation, no.

12  Q      Has the company engaged any independent parties to

13  investigate whether it has any potential claims against the

14  directors and officers?

15  A      We have not.

16  Q      Prior to the bankruptcy filing the executive team

17  received substantial KEIP bonuses, correct?

18  A      The management team and many of our employees.  We have

19  a very broad incentive compensation program that's designed

20  to encourage the company to hit its net sales and EBITDA

21  target.  Those metrics are established by our human resources

22  and compensation committee at the beginning of each year.

23  And any amounts payable are overseen by our HRCC committee.

24  Q      And these were cash distributions that the executives

25  received, correct?

1  A     That's correct.  Given that we had announced a

2  restructuring of Specialty Generics at the beginning of the

3  year, it was determined that equity awards would have little

4  persuasive better kind of long vesting would not be an

5  appropriate tool to retain talents.   And so, the board of

6  directors shifted to a cash award for 2020.

7          MR. MANTHEY:  If you could pull up AHC Exhibit 16,

8  please?

9  BY MR. MANTHEY:

10  Q     Mr. Welch, are you familiar with this document?

11  A     Right now, I'm just seeing the standard header for an

12  8k.

13          MR. MANTHEY:  Okay.  Let's go to the next page,

14  Gail, please?

15  BY MR. MANTHEY:

16  Q     And you see -- now are you familiar with this document?

17  A     I am familiar with this document.

18  Q     And this is the SEC filing where the company disclosed

19  what we will call the KEIP, key incentive, key employee

20  incentive program to the executive team, correct?

21  A     That is correct, to the main executive officers, yes.

22  Q     Okay.  And, again, this was in lieu of normally the

23  stock that would be issued to management, correct?

24  A     If you look at the fourth paragraph there.

25  Q     Yes.

1  A    It says that the cash incentive award at target is

2  equal to the sum of acts they're previously approved target

3  annual incentive opportunity for fiscal 2020 and why 80

4  percent of their previously approved target long-term equity

5  incentive for fiscal 2020, a 20 percent reduction to reflect

6  the shorter-term nature of this component of the award.

7        So, again, for named executive officers a significant

8  portion of their compensation historically had been long term

9  equity incentive grand.  With the company's share price going

10 down, with bankruptcy rumors that kind of incentive award

11 isn't really much of an incentive to encourage management to

12 stay at a company.  And so, the board, under advisement of an

13 independent compensation consultant, modified the plan for

14 2020.

15 Q    Okay. And if you look at a little below that paragraph,

16 you see where the key target award payout was identified for

17 each of the executives, correct?

18 A    I do see that.

19 Q    How much was the key target payout award for Mr.

20 Trudeau?

21 A    Mr. Trudeau's award target was $9.3 million dollars.

22 Q    Okay.  And Mr. Casey?

23 A    $2.15 million.

24 Q    And Hugh O'Neill?

25 A    $2.4 million.

1   Q      And Bryan Reasons?

2   A      $1.99 million.

3   Q      And Steven Romano?

4   A      $2.4 million.

5   Q      If you add these up, we're somewhere over $17 million,

6   correct?

7   A      That seems like reasonable addition to me.

8   Q      And this was a cash payout, correct?

9   A      That is correct.

10  Q      And when was the cash payout made?

11  A      So I'm not sure it's identified in this document.  If

12  we can go back to the -- if you look at the third paragraph,

13  it explains when its payable.

14         So 50 percent of it was based on first half

15  performance.  And the reason for that was because the plan

16  was put in place early in the first quarter, but the year had

17  already started.  And just to dispel any notion that the

18  target had been set to been easily achieved, it was made to

19  be based on kind of first half performance; 25 percent

20  payable based on third quarter performance and a final 25

21  percent based on fourth quarter performance, based on

22  performance against a number of preset performance measures.

23  Q      Okay.  And so how much prior to the petition date do

24  you know how much of these awards have been paid?

25  A      I don't know off the top of my head.  It would be 75

1  percent of the -- in terms of the potential program payouts

2  in terms of the first half and third quarter were paid prior

3  to the petition date; fourth quarter instances payout has not

4  come before this court yet.  All of these individuals are

5  named insiders in our case.   And so, their compensation is,

6  you know, subject to the oversight of this court.

7  Q    So you understand, you would have to seek approval of

8  the bankruptcy court to make that fourth quarter related

9  payment, correct?

10  A    That motion has not been filed yet and it's probably

11  not appropriate for me to speak to future filings are not

12  before this court yet.

13         MR. MANTHEY:  We're done with that exhibit.  Thank

14  you.

15         THE COURT:  Mr. Manthey, are you at a good

16  stopping point so we can take a short recess?

17         MR. MANTHEY:  Sure.

18         THE COURT:  All right, do you know how much longer

19  you have with the witness?

20         MR. MANTHEY:  I don't have that much longer.  I'm

21  on my last few pages.  You want to go to the --

22         THE COURT:  Last few pages can mean a lot of

23  things, Mr. Manthey.  I don't know how small you write.

24         MR. MANTHEY:  I think I'm about fifteen to twenty

25  minutes to go.

1        THE COURT:  Let's take a recess then.

2        We're at almost 11:30.  Let's recess until 11:45.

3        THE WITNESS:  Thank you, Your Honor.

4        THE COURT:  Thank you.

5   (Recess at 11:30 a.m.)

6   (Proceedings resumed at 11:45 a.m.)

7   DIRECT EXAMINATION RESUMES

8   BY MR. MANTHEY:

9   Q    In the debtor's omnibus objection, the debtors allege

10  that the individual economic interest of the board are

11  aligned with the shareholders because many of them own equity

12  in Mallinckrodt PLC, correct?

13  A    That is correct.

14  Q    Isn't it true that the board and management have

15  divested in themselves of much of their shares in

16  Mallinckrodt PLC?

17  A    Since the filing of the petition and the release of

18  blackout periods, yes many have sold, myself included.  I

19  think that indicates a belief that the RSA will ultimately be

20  the framework for a plan that gets confirmed.

21  Q    Isn't it true that you divested yourself of your common

22  shares on the first day of the blackout period expiring?

23  A    It was shortly thereafter.  I think it was the second

24  day, but it was after we released our third quarter results

25  that I sold my shares.

1 | Q      And do you have any common shares currently?

2 | A      To the best of my knowledge, I don't; no.

3 | Q      Okay. Do you have any idea how many common shares the

4 | executives presently own?

5 | A      I don't.  We have form 4 is required. Any time a member

6 | of the management or the directors do a divestiture or an

7 | acquisition, so those SEC filings show their activity.

8 | Q      And the form 4 is what it's called, correct?

9 | A      That's correct.  It's an SEC filing.

10 | Q      Would it surprise you that if it was less than .003

11 | percent according to the latest form 4's filed for each of

12 | the executives?

13 | A      It would not surprise me that they took steps to

14 | capture tax losses or for whatever reasons would have sought

15 | to exit the stock, given that publicly we signed on to an RSA

16 | that calls for no recovery for equity.

17 | Q      Do you still agree that the economic interest of the

18 | board are aligned with the shareholders today?

19 | A      I believe that there are still some who hold, I think,

20 | the duty of the board irrespective of their shareholding

21 | remains to protect their stakeholder interest, including --

22 | getting some feedback -- including the shareholders but

23 | importantly, because non-profit PLC's is an Irish entity

24 | under Irish law.  Once you're in the zone of insolvency,

25 | there's a superior duty that's owed to creditors to protect

1  their value, to protect their assets and to optimize their

2  recovery.

3       And so, there are many different duties that the board

4  owns and I believe that they continue to be faithful to those

5  fiduciary duties irrespective of their individual

6  shareholdings.

7  Q    Okay.  So, but, again, would you agree, as we sit here

8  today, that the individual economic interest of the board who

9  only own .003 percent of Mallinckrodt PLC are aligned with

10 the shareholders because of their equity ownership?

11 A    To the extent that equity is not held in common between

12 directors and shareholders, clearly that linkage has been

13 weakened.

14 Q    And under the RSA that management has negotiated, the

15 management incentive plan provides for up to 10 percent of

16 the de-levered reorganized debtors to be distributed to

17 executives, board of directors and key employees, correct?

18 A    That is correct. Again, the management incentive plan

19 sits within an RSA construct that calls for the unsecured

20 creditors who are being equitized to be able to appoint an

21 appropriate company board that may or may not include any of

22 our existing directors. And so, there's no guarantee for any

23 number of existing board or the existing management of

24 receiving any award under the management incentive plan.

25 Q    Were any of the equity holders a beneficiary of the

1  management incentive plan?

2  A    No, they are not.

3  Q    Next, the debtors argue that the equity interest are

4  aligned with the junior creditors interest in their omnibus

5  objection.  Do you recall that?

6  A    That sounds familiar.

7  Q    And in this case, there's been two official committees

8  appointed by the court, by the U.S. Trustee, correct?

9  A    Correct; the UCC and the OCC as they're often referred

10  to.

11  Q    Okay.  Do you believe those official committees are

12  going to look out and negotiate on behalf of equity?

13  A    They do not -- I'm not a bankruptcy lawyer, so I cannot

14  speak to the scope of the fiduciary duties of the unsecured

15  creditors committee.  Clearly, the opioid claimant's

16  committee has a distinct charter.

17      I think to the extent the UCC has any obligations

18  towards equity holders they would clearly, in my mind, again,

19  as a non-bankruptcy person, presumably be subservient to

20  their duties to the notes that are not receiving any recovery

21  under the plan and to their general unsecured claimants that

22  they represent.

23  Q    In any of the negotiations of the RSA and this happened

24  with many of the government related opioid claimants, did any

25  of those parties negotiate on behalf of equity?

1  A      Not on behalf of equity, no.

2  Q      No one negotiated --

3  A      Can I clarity that answer?

4  Q      Sure.

5  A      The February 2020 announcement included warrants for

6  19.99 percent of the company with a belief that opioid, an

7  opioid settlement would be in the best interest of

8  Mallinckrodt shareholders and, thus, could increase the share

9  price.  And that opioid claimants should participate in that

10  unlocking of value.

11      And within that announcement, there was an agreement

12  that those warrants could not all be exercised

13  simultaneously.  That would have had a dilutive impact on

14  existing shareholders.  And so, the parties were mindful of

15  equity in that February 2020 situation with the facts having

16  changed and equity not being envisioned to receive an award,

17  certainly from that point on.  And there was broad agreement

18  on all parties that equity should not have recovery; all

19  parties to the RSA.

20      Obviously, at that point forward, the interest of

21  equity holders was not something that was negotiated.  But

22  early on when many of us were focused on a path forward that

23  could result in equity recovery, clearly even the opioid

24  plaintiffs were mindful of that, as indicated by their

25  agreement to certain terms with respect to those warrants.

1  Q     Okay.  But that was the February 2020 surgical filing,

2  not the holdco filing, correct?

3  A     Correct.  That is correct.

4  Q     And there was no discussions or negotiations on behalf

5  of equity related to the holdco bankruptcy filing, correct?

6  A     That is correct.

7  Q     In these bankruptcy cases, you would agree that the

8  debtors are paying a substantial amount of professional fees

9  and expenses, correct?

10  A     It seems substantial to me.

11  Q     And the debtors have engaged numerous sets of

12  professionals, correct?

13  A     That is correct.

14  Q     And the debtors are going to pay for those

15  professionals and expenses that are approved by the

16  bankruptcy court, correct?

17  A     That is correct.

18  Q     You also understand as a matter of bankruptcy law that

19  the debtors are required to pay the professional fees and

20  expenses that are approved by the bankruptcy court for the

21  official committees, correct?

22  A     I do understand that, yes.

23  Q     And you have two committees in this case that have

24  formed to date, correct?

25  A     Correct.

1  Q      And those committees have engaged numerous sets of
2  professionals, correct?
3  A      I believe that those retentions are before the court in
4  the coming weeks.
5  Q      And it was the debtors' intention to pay the
6  professional fees and expenses of the RSA parties, correct?
7  A      It was, yes.
8  Q      And the only thing that changed that was the ruling
9  yesterday by the bankruptcy court that said the debtors are
10 not authorized to pay those fees, correct?
11 A      That is correct. I'll note that that ruling was without
12 prejudice.
13 Q      And it's the debtors' intention to bring that matter
14 before the court in one shape or another, correct?
15 A      We believe that the counterparties to the RSA are
16 important to our restructuring as we noted in our request for
17 the RSA fees that we believe that it's in the best interest
18 of the estate that those professionals be compensated for the
19 value that they bring to this process.  And so, one way or
20 another we are supportive of them being compensated for their
21 efforts in this case.
22 Q      Okay.  And that would capture the supporting unsecured
23 noteholders, correct?
24 A      That is correct.
25 Q      The supporting governmental opioid claimants, correct?

1  A      All advisors for all RSA parties, yes.

2  Q      And the multistate government claimants also, correct?

3  A      Yes and they have joined the RSA, correct.

4  Q      And each of those parties has engaged numerous sets of

5  professionals, correct?

6  A      That's correct.

7  Q      And under the cash collateral order the debtors agree

8  to pay the fees and expenses of the two different first lien

9  groups, correct?

10  A      That is correct.

11  Q      And those groups have engaged numerous professionals,

12  correct?

13  A      That is correct.

14  Q      I also noticed last Friday in the docket that the

15  current and former board members made an appearance in the

16  bankruptcy cases, do you know about that?

17  A      I'm familiar with that filing.  I'm familiar with that

18  filing, yes.

19  Q      And are the debtors going to pay the fees and expenses

20  of those professionals?

21  A      We have sought limited relief as outlined in that

22  filing.

23  Q      Okay.  And I noticed that last night the independent

24  directors' counsel filed a notice of rate increase last

25  night.  Are the debtors paying those fees and expenses?

1  A     I did not review that particular filing, but we have --

2  I'm not sure exactly what you're referring to.

3  Q     That filing was a notice to the parties that they were

4  increasing their hourly rates pursuant to the notice.  And my

5  question is --

6  A     Was it a filing by -- I'm just trying to understand

7  which party filed.  Was that a filing by Katten?

8  Q     Yes, it was.  It was by the professionals, by the

9  attorneys.

10  A     Yes.  Okay.  So that firm, yes, we would seek to

11  continue to pay their fees.  They perform an important role

12  in this case.

13  Q     Okay.  And they represent the independent directors,

14  correct?

15  A     That's correct.  Of the Specialty Generic.

16  Q     How much are the debtors paying Guggenheim in these

17  bankruptcy cases?

18  A     The Guggenheim engagement letter is capped and it

19  covers a number of different possible services that

20  Guggenheim may perform for the debtors.  The restructuring

21  fee payable to Guggenheim under the engagement letter is $25

22  million dollars.  There are crediting mechanisms within that

23  document.  And, again, the overall engagement is subject to a

24  cap which I believe is $37.5 million.  I don't have that in

25  front of me, but that's my recollection.

1  Q    I think your recollection is correct.  And you also

2  understand at a certain date that if the company has not

3  emerged from bankruptcy, they'll be an accrual of another

4  $100,000 dollars after that cap, correct?

5  A    Yes, there's an increase for (indiscernible).  The

6  situation language is longer than (indiscernible).

7  Q    And they would be entitled to that restructuring fee

8  under any emergence by these companies from bankruptcy,

9  correct?

10 A    I would have to go back and look at the specific

11 language in terms of how that fee is described as being

12 earned.  I don't have that in front of me at the moment.

13 Q    All right.  The first thirteen-week cash flow forecast

14 that was attached to the cash collateral order, the final

15 cash collateral order, do you recall how much it shows being

16 paid the professionals in the first thirteen weeks?

17 A    We reviewed that in my deposition, and I believe it was

18 approximately $31 million dollars.

19 Q    That is correct.  In the debtors' omnibus objection,

20 the debtors admit that they will generate enough cash flow to

21 the fund the Chapter 11 cases and their ongoing business

22 operations.  This means the debtors are not facing an

23 imminent shortfall.  Would you agree with that

24 representation?

25 A    That cash flow statement shows that the business was

1   cash flow positive by $1.4 million dollars; notwithstanding

2   the payments of professional fees.  That $31 million, I don't

3   know if that envisioned the relief sought to pay the RSA

4   counterparties, if those amounts are included in the $31

5   million or not.  I'm assuming that they are, but I would have

6   to understand from AlixPartners what amounts were actually

7   included in that calculated sum.

8   Q    If the court directs the U.S. Trustee to appoint an

9   equity committee, is that going to change the fact that the

10  company generates enough cash flow to fund these Chapter 11

11  cases and the ongoing business operations?

12  A    I would not think that the appointment of an equity

13  committee and payment of professionals while I believe it

14  would be ultimately injurious to the estate and not add

15  value, it would not threaten our ability to continue to fund

16  operations.  It would not require us to obtain DIP financing,

17  for example.

18       Is that what --

19  Q    And you understand -- yes, that is what I'm asking.

20  Thank you.

21       And you understand that any attorney's fees and

22  expenses or professional fees and expenses incurred by an

23  official committee of equity holders, like all other

24  professionals in this case, would be subject to the review of

25  the bankruptcy court, correct?  Approval of the bankruptcy

1  court.

2  A     That's correct.  That's correct, and I believe --

3  Q     And my understanding is the court has advised the

4  parties that he would like a fee examiner in these cases,

5  correct?

6  A     That is correct.

7  Q     And the fee examiner would also review the fees and

8  expenses of an official committee of equity holders, correct?

9  A     I understand that that's the role of a fee examiner,

10 yes, to look at such fees.

11 Q     Wouldn't you agree that that would provide a safeguard

12 against the reasonableness of the fees and expenses incurred

13 by an official committee of equity holders?

14 A     A safeguard as to appropriate billing practice, yes.  I

15 don't think that the existence of the fee examiner speaks to

16 whether or not the underlying services actually provide any

17 value to the estate.

18 Q     In your first-day declaration you stated, and I quote,

19 "Much remains to be done and the debtors have time to achieve

20 even greater consensus with the emergence, milestone under

21 the RSA set for fifteen months and their outside date for

22 cash collateral use being April 2022."

23       What did you mean by the two words greater consensus?

24 A     Well I think we spent a lot of time talking this

25 morning about who is and who is not a party to the RSA.  And,

1 ultimately, a plan will be put forward and votes will be

2 captured and counted.

3     I think we intend to continue to work with our

4 counterparties on the UCC, the OCC, other groups to build

5 support for the framework envisioned by the RSA.  Not

6 everyone has signed onto it today.  Our secured lenders, for

7 example, very much to look build consensus, we believe.  The

8 company (indiscernible) a vital one that we have an ongoing

9 role to play in the pharmaceutical industry and we're eager

10 to emerge from this process a stronger Mallinckrodt and we're

11 looking forward to working constructively with other parties

12 in this case to have a successful plan that can be confirmed.

13 Q    I noticed you didn't identify equity as part of that

14 greatest consensus, correct?

15 A    That is correct.  I believe that no recovery for

16 equity, as specified in the RSA, is an equitable result,

17 given the less than full recovery that many of our creditors

18 are being asked to support under the RSA.

19 Q    Again, you're saying that your creditors are taking

20 less than what they're entitled to.  However, the debtors'

21 position is that there is no liability for opioid related

22 litigation claims, isn't that correct?

23 A    The position that there is no liability on the

24 underlying facts is different then assessing the implications

25 of entering into settlements to deal with the Acthar

1  litigation and, you know, a significant mass tort issue.  And
2  I think we could speculate as to well (indiscernible)
3  litigation didn't exist or if it could be cabined to a
4  particular entity what the result might be, but I suspect
5  that would just doom us to wander a circuitous maze finding
6  neither entrance nor exit, to quote Augustus.
7      I'm just not sure that that's really fruitful for us
8  here, given the size of the claims and just the sheer scope
9  of those claims.  I mean the magnitude as I've already
10 testified to today, a trillion dollars claimed by the opioid
11 claimants, more than $15 billion by the Acthar plaintiffs.
12 Those are overwhelming amounts and the underlying litigation
13 is just voluminous.
14     And the expenses incurred to date to defend against tat
15 litigation are just incredible and would have grown, but for
16 the automatic stay.
17 Q    And I assume your answer would be the same as to the
18 Acthar related litigation liabilities, correct?
19 A    Correct.  I included that in my last response.
20 Q    Okay.  But when you say a discount, okay, it's a
21 discount according to who?
22 A    Well in the case of the unsecured noteholders, for
23 example, their exchanging their notes for shares.  They are
24 receiving some take back paper, but they hold $1.66 billion
25 of paper today and $1.3 billion of that is being equitized.

1  That doesn't mean that that equity will have $1.3 billion of

2  value at the date of emergence.

3  Q    As to the -- okay, so your position is the unsecured

4  noteholders have taken a discount because they were getting

5  the company, correct?

6  A    That is correct.  They are getting less than their

7  commercial paper entitles them to receive.

8  Q    Okay.  But, obviously, the value of the company and

9  your expectation, as a vital member of management, is that a

10 de-levered Mallinckrodt PLC is going to be able to thrive and

11 increase the equity value for those bondholders.  Isn't that

12 correct?

13 A    That is certainly the goal of management is to maximize

14 value in whatever context we find ourselves.

15 Q    Okay.  And as to the opioid related claimants, again,

16 the company takes the position there is zero liability. The

17 opioid related claimants take the position there is trillions

18 of liability.  So, under whose view are they taking a

19 discount in these cases?

20 A    Under their view they are receiving pennies on the

21 dollar.

22 Q    Okay.  But under managements' view they're getting more

23 than they should get under the law, correct?

24 A    Under the law, that is correct.

25 Q    Okay.  And I will ask the same question as to the

1  Acthar related liabilities.  They are taking a discount under

2  their view, correct?

3  A    That is correct.

4  Q    Okay.  And under the company's view they are receiving

5  more than they are entitled to under the law, correct?

6  A    Well that is a little bit more complicated, right,

7  because in the case of the DOJ they settled for $260 billion

8  and they actually have a judgment from the District Court

9  that required Mallinckrodt to recalculate and submit to state

10 Medicaid agencies, you know, a revised calculation that

11 resulted in, you know, invoices being generated that

12 aggregated to $650 million.  So, that is not a hypothetical

13 number there.

14      So from the DOJ's perspective -- and, you know, their

15 settlement and agreement it was contingent on a Holdco filing

16 and was based on an ability to pay analysis.  So, it's a

17 haircut from their perspective based on an ability to pay

18 analysis that envisioned, you know, this Holdco restructuring

19 and no recovery for equity.

20 Q    Yeah, but, again, let's go back to management's view.

21 Management has appealed that ruling, correct?

22 A    That's correct.

23 Q    That appeal is still pending, correct?

24 A    It's been, I guess, held in abeyance. I'm not sure what

25 the correct phrasing of that is, but, yes, it's not --

1  Q    The parties have agreed to a standstill agreement as to

2  that, correct?

3  A    That is correct.

4  Q    Okay.  And it's the company's position that that ruling

5  was improper, correct?

6  A    We believed that the district judge, the District Court

7  judge aired in his legal conclusions, yes.

8  Q    So, again, is debtor's position that any dollars paid

9  to Acthar related litigants is more than they are entitled to

10  under the law?  Their position.

11  A    Yeah. That's our position that rightly understood,

12  based on the underlying law and facts, the true liability,

13  you know, should be zero.

14  Q    I think you heard my opening statement where I stated

15  that if the opioid related litigants' liability was zero and

16  the Acthar related liability litigants was zero then there is

17  value for equity here, correct?

18  A    Mr. Manthey, I think that takes us back to that

19  hypothetical situation, I just called it a circuitous maze.

20  In an ideal world where that litigation did not exist there

21  would be value for equity.  That's correct.

22  Q    That is what I'm asking you, okay.  And if the opioid

23  claimants are correct that there is trillions of dollars of

24  liability and it's found to have trillions of dollars of

25  liability, and the Acthar claimants are correct and there's

1  $15 billion of liability for the debtors then there is no

2  possible recovery for equity, correct?

3  A      That's correct.

4  Q      Okay.  And during this process, this Chapter 11

5  process, where you brought everything into a centralized

6  forum, it is the intention of the debtors to attempt to

7  negotiate a consensual resolution with the various parties in

8  interest to bring a plan to the court that can be confirmed.

9  Isn't that correct?

10  A      That is our goal, yes.

11  Q      And to the extent you cannot reach a consensual

12  resolution you will ask the court to make certain rulings to

13  confirm a plan, correct?

14  A      Yes.  I understand what will happen.  It will be a much

15  lengthier process as different groups seek to assert their

16  claims.

17  Q      Why shouldn't equity be allowed to participate in the

18  process to assert its arguments and managements' arguments

19  that the Acthar related claimants and the opioid related

20  claimants have zero liability?

21  A      Can you repeat the question?

22  Q      Why should equity be excluded from this process where

23  they believe and management believe that the opioid related

24  claimants and the Acthar related claimants have no -- should

25  have no recovery.

1    I changed the phrasing of it a little bit.  You get the

2  idea.

3  A    I get the idea.  I think based on management's history

4  of pursuing the surgical filing, I think that evidences

5  significant focus on preserving shareholder value and that we

6  continued to do that until it was clear that a Holdco filing

7  could not be avoided.  As I just mentioned, the DOJ

8  conditioned their settlement with us on a Holdco filing.  The

9  debt markets, we've discussed some of the features that

10  pushed us to consider a Holdco filing.

11    Management has never not had the interest of

12  shareholders in view, but those interests are subordinate to

13  the duties owed to creditors under Irish law.  We believe

14  that those interests, taken as a whole, are reflected in the

15  RSA that was signed.

16    We believe that equity has been adequately represented

17  in this case all the way through, and that no reasonable

18  person looking at the situation and the significance of the

19  litigation that was aware of mass tort litigation and

20  practice would conclude differently that there should be

21  equity recovery in this case.  I think the external markets

22  reflected that.  I think the stock became a speculative stock

23  as to whether or not we would file bankruptcy right at the

24  end.

25    So, I believe shareholder interests have been

1  adequately reflected all the way up to the petition date from

2  a company perspective.

3  Q     Okay.  Based upon your experience and also your

4  participation in the 341 Meeting you understand that some of

5  the shareholders are ex-employees, correct?

6  A     I do.

7  Q     Okay. And those ex-employees are going to lose any

8  recovery if managements' intentions continue to go forward as

9  set forth in the RSA, correct?

10  A     That is correct.

11  Q     You also understand there are numerous retirees who had

12  investments in the stock of Mallinckrodt PLC, correct?

13  A     I have seen that that is true, yes.

14  Q     So why wouldn't the company just stand aside and allow

15  this court to order the U.S. Trustee to appoint an equity

16  committee to level the playing field and let equities voice

17  be heard?

18  A     I think I testified previously before this court that

19  while we believed that the RSA is a strong backbone, it is

20  not insusceptible to risk.  It is a relatively fragile deal.

21  It pulls together a lot of disparate interests, groups that

22  would ordinarily be quite adversarial to each other.  It is

23  an extraordinary accomplishment, but it is fragile.

24       As I mentioned earlier in my testimony today, the RSA

25  has five pages of termination rights.  Clearly, the parties

1  that signed on wanted to be able to jump ship if the deal

2  turned sour on them.  It is not in the debtor's best interest

3  to invite anyone else to the table even if the fees wouldn't

4  tip us into needing DIP financing, invite anybody to the

5  table that is not going to advance the interest of the RSA.

6       That is the basis of our strong opposition that it is

7  not constructive to have any party advocating, you know,

8  views on valuation that are unfounded, that ultimately are

9  speculative, that would cause our RSA counterparties to

10 question their participation, could encourage the DOJ to not

11 finalize the settlement; anything that could hamper or hinder

12 our ability to achieve a successful plan of reorganization,

13 in my view, is not in the best interest of this estate.

14 Q    You identified that there is five pages of termination

15 events in the RSA.  Is the appointment of an equity committee

16 a termination event?

17 A    I don't have that document in front of me.  I don't

18 recall.

19 Q    But the document speaks for itself, correct?

20 A    The document does speak for itself.  Anyone can read

21 it, yes.

22 Q    And if that was a termination event you would think

23 somebody would have brought that to the attention of the

24 court or yourself by now, correct?

25 A    That is correct.  I assume that somebody would refer to

1  it in one of their filings.  I think it's clear that if,

2  let's say, the equity -- engage in the hypothetical, if an

3  equity committee were appointed and a massive basket of value

4  that no party had previously identified or found, people just

5  made category mistakes and, hey, wow, there's this bucket of

6  gold leftover for shareholders that parties would go back

7  very quickly to those termination rights and find a way to

8  exit the RSA and renegotiate their positions to capture

9  whatever incremental value was found.  I believe that

10  wholeheartedly.

11           MR. MANTHEY:  Your Honor, I pass the witness.

12           THE COURT:  Thank you, Mr. Manthey.

13           Just for future reference I will note that three

14  pages for you is about thirty-five minutes.

15           MR. MANTHEY:  I apologize.  I was going to make

16  that comment, but I knew you'd get me on it.

17        (Laughter)

18           THE COURT:  All right.  Ms. Marks, are you doing

19  the cross examination?

20           MS. MARKS:  Yes.  I am, Your Honor.

21           THE COURT:  Go ahead.

22                         CROSS EXAMINATION

23  BY MS. MARKS:

24  Q    Mr. Welch, as of the petition date did the debtors have

25  any debt?

1  A      Yes.   We had $5,283,000,000 in debt as of the petition

2  date.

3  Q      Is that debt guaranteed?

4  A      Yes.   It's all guaranteed by the PLC and, as I've

5  mentioned previously, the different instruments have

6  different guarantee packages with some of the Mallinckrodt

7  subsidiary entities.

8  Q      And you said PLC.  Mallinckrodt PLC, is that the parent

9  company?

10  A      That is the parent company, yes.

11  Q      How much of the debt is secured vs. unsecured?

12  A      $3.6 billion is secured, $1.66 billion approximately is

13  unsecured.

14  Q      Did the debtors have other unsecured liability?

15  A      We do.  We have trade claims with our vendors.  We have

16  litigation liabilities and we have non-litigation unsecured

17  claims such as pension liabilities, for example.

18  Q      Do you know the approximate amount of the trade

19  liabilities and the non-litigation liabilities?

20  A      Yes.  Its approximately $185 million.

21  Q      And you mentioned the debtors have litigation

22  liabilities?

23  A      That's correct.

24  Q      As of the petition date could you just generally

25  describe the company's litigation liabilities?

1  A     Yes.  I think the litigation liabilities that we have

2  been talking about that drove us into Chapter 11 really fall

3  into two primary categories; opioid litigation and the Acthar

4  related litigation.

5       The opioid litigation claims that amount are either

6  overstated the benefits of opioids, or understated the risks

7  of the use of opioid products, or that Mallinckrodt failed to

8  fulfill its duties to have a suspicious monitoring program

9  that was adequate.

10      With respect to Acthar most of the claims, as I've

11  testified to today, revolve around the price of the product,

12  but also their claims of anti-competitive behavior, anti-

13  trust violations, marketing issues; things like that.

14  Q     Is Mallinckrodt PLC named as a defendant in any of

15  these cases?

16  A     Yes.  Mallinckrodt PLC is a defendant in ninety-three

17  percent of the opioid cases and it's a named party in almost

18  all of the Acthar litigation.

19  Q     And has the company tried to get the PLC dismissed from

20  the opioid cases?

21  A     Yes.  In the opioid cases I believe we brought twenty-

22  six motions to dismiss in various cases and we were

23  successful in only one of those.  So, that represents a

24  little under one percent of the total opioid cases.  So, a

25  one for twenty-six record isn't the greatest.

1   Q     And what is the financial exposure from the opioid

2   litigations?

3   A     As I said, the plaintiffs would represent that it's

4   potentially into the trillions of dollars.  Certainly, tens

5   or hundreds of billions of alleged claims.  I testified today

6   it's kind of a back-of-the-envelope math if you use what we

7   settled in two Ohio counties for and extrapolate based on,

8   you know, the then cases that we had pending against us you'd

9   get to a number just shy of $40 billion.

10  Q     Okay.  Your declaration discusses the opioid and Acthar

11  litigations in more detail, but I believe the court is

12  already familiar with those lawsuits.  So, I am not going to

13  go into more detail on them here.

14        When did Mallinckrodt begin to contemplate the

15  possibility of a Chapter 11 restructuring?

16  A     It really was the summer of 2019 when it became clear

17  that we were not going to be able to spin-off the specialty

18  generics business.  We did a presentation to our board in

19  mid-July that presented the idea of pursuing settlement

20  through Chapter 11 or even using Chapter 11 without a

21  settlement to have a bankruptcy court estimation of the

22  opioid liability that that was a potential pathway to

23  securing a comprehensive resolution of the opioid issue which

24  was very quickly, you know, overwhelming the company.

25        So, the focus was really on a discreet, you know, we've

1  used the word "surgical" bankruptcy to deal with opioid

2  litigation and that was where the effort was focused in late

3  summer, early fall 2019.

4  Q    And what steps did the company take in that time period

5  to pursue a restructuring?

6  A    So we were able to negotiate, as I have just mentioned,

7  settlement of the two Ohio Bellwether County cases and that

8  really took us into discussions with the plaintiff's

9  executive committee, various state attorneys general, you

10  know, the ad hoc group that is now a party to this case

11  formed.  And over the fall of 2019 and, really, early months

12  of 2020 an opioid settlement was hammered out and voluntary

13  injunctive terms were worked on to resolve the opioid

14  liability.

15  Q    In the fall of 2019 did Mallinckrodt intend to consider

16  the entire company for bankruptcy?

17  A    No.  The whole point of, I call, "Project Balboa" was

18  to avoid a filing by PLC precisely to maintain equity value.

19  We were concerned about the ability to deal with, you know,

20  the potential claims that Mallinckrodt PLC had in the opioid

21  cases, whether directly or indirectly, through

22  indemnification claims that might have been brought by

23  Covidien or the successor in interest Medtronic PLC.

24      The focus was on negotiating a global settlement with

25  channeling injunctions.  We knew that there was a lot of work

1  to do to bring, you know, the private plaintiffs that weren't

2  a party to those negotiations on board, but we believed that

3  that could be a pathway to achieving resolution of the opioid

4  litigation in a way that avoided a PLC filing and preserved

5  equity value.

6  Q      And when Mallinckrodt publicly announced the global

7  opioid settlement in February 2020 did Mallinckrodt still

8  intend to do a surgical generics only filing at that point?

9  A      Yes, we did.

10  Q      And would there have been equity value in Mallinckrodt

11  PLC after that type of restructuring?

12  A      There would have been.  And as I noted, the warrants in

13  that suggested that the opioid claimants believed that a

14  global settlement would result in even more equity value

15  because they received warrants for 19.99 percent of the fully

16  diluted equity of the company at a $3.15 strike price which

17  indicates that they believed that that settlement could

18  unlock, you know, more value for shareholders and they wanted

19  to be partakers of that value creation.

20  Q      Was it important to management to try to preserve

21  equity?

22  A      It was very important, I think.  It was a really

23  challenging experience to realize that we weren't going to be

24  able to be successful on "Project Balboa."  Many of us had

25  worked for about nine months, by that time, on that filing

1  and then to not be able to move it forward, and to switch

2  gears and really, in some ways, start over expanding the

3  numbers of parties brought to the negotiating table it was a

4  demoralizing time, to tell you the truth.

5       The focus was on, you know, is there a way to make

6  "Balboa" still work.  Could we get a settlement with the DOJ

7  that would make, you know, that surgical filing possible.  It

8  wasn't like it just happened over night that we suddenly

9  said, oh, we can't do that anymore.  It was, what I refer to,

10  a constellation of events earlier where it just became clear

11  that given the overwhelming nature of the liabilities and the

12  market uncertainties around the company that a Holdco filing

13  would be required.

14       I think even kind of seeing what was happening to

15  Acthar, with the Acthar litigation, in the opioid claimants

16  that had agreed to the February settlement their recovery of

17  that $1.6 billion was far less certain.  That was a

18  structured deal, unsecured claim.  So, for even the opioid

19  plaintiffs that had agreed to the settlements in principle in

20  February, you know, what was happening with Acthar, with the

21  DOJ investigations and suits clearly introduced a lot of very

22  challenging questions that the parties had to work through.

23  Q    And can you just remind us, you mentioned the

24  constellation of events caused the company to pivot to

25  considering a Holdco filing.  What was the first event and

1  when was that?

2  A    Yeah, it was the CMS ruling that came out in early

3  March 2020 that had the retrospective liability of $650

4  million, again, driven by that rebate calculation.  Then a

5  forward-looking implication of that rebate calculation change

6  that had an impact of about $100 million a year on Acthar

7  sales prospectively.

8  Q    And in addition to those amounts, were there additional

9  potential damages and a lawsuit brought by the Department of

10  Justice in the District of Massachusetts?

11  A    Yes.  As I testified earlier, we became aware of that

12  qui tam litigation.  It's the same underlying claim,

13  basically, alleging that because Mallinckrodt was knowingly

14  using, allegedly, a wrong rebate formulation that the

15  government had been injured to the tune of $650 million under

16  the False Claims Act.  That could be troubled to

17  approximately $1.9 billion of damages.

18  Q    And earlier you testified about other potential risks

19  as well arising from the dispute with CMS.  Disqualification,

20  is that what you called it?

21  A    Yeah.  The disqualification is, really, what led us to

22  file the DC court case.  That is why we sought to enjoin CMS

23  from imposing because the threat was either change your

24  rebate calculation or we'll remove you from the Medicaid

25  program.  At that point it was just Medicaid.

1    Obviously, you know, when the government is a

2  significant payer, as it is in American healthcare, to be

3  removed from those programs, as my declaration says, is very

4  detrimental to the pharmaceutical company.  So, that is why

5  we sought injunctive relief from the DC District Court.

6  Q    And the District of Massachusetts case was based on the

7  CMS dispute.  That wasn't the DOJ's only case against

8  Mallinckrodt related to Acthar.  I believe earlier you

9  mentioned another lawsuit.

10 A    Yeah.  There was an older Eastern District of

11 Pennsylvania case all the way back to the Questcor days on

12 patient assistant programs.  That amount, you know, by our

13 calculations, you know, with (indiscernible) would have been

14 about a quarter of a billion dollars of potential liability.

15 That one was resolved as part of that settlement in principle

16 with the DOJ in the late fall of 2020 before we filed.

17 Q    And then there are all of the other Acthar related

18 litigations, some brought by private plaintiffs and a few

19 brought by public plaintiffs.

20 A    Right.  And you just asked what are the consequences of

21 that.  One of the challenges is when you have a product that

22 competes against other approved therapies and every single

23 one of its indications where its approved and sold, you know,

24 doctors may not want to be associated with a product that has

25 a lot of, kind of, public scrutiny and a lot of reputational

1  void attached to it.

2       So, all of that litigation not only has consequences

3  like for mathematical rebate calculations, but also can

4  injure, kind of, future market access.  Physicians don't want

5  to deal with the product and the potential, kind of,

6  reputational taint that it might bring to them.  We have had

7  a number of doctors subpoenaed by various parties and so, you

8  know, these investigations weren't harmless with respect to

9  future sales of the Acthar product.

10 Q    And for those other Acthar related litigations can you

11 just remind us what are the potential damages, exposure in

12 those cases?

13 A    If we take out, kind of, the DOJ settlement issues that

14 we've talked about we've said in the $10 to $15 billion

15 range.

16 Q    And I want to go back to something that Mr. Manthey had

17 asked you about. I believe he asked you whether any states

18 were involved in the Acthar settlement with the DOJ.  Do you

19 remember that question?

20 A    He did.  He is trying to speak to other public

21 plaintiffs, but I believe that those are actually

22 municipalities and not states like Marietta, Georgia, for

23 example City of Rockford.  I am not aware of -- I may not be

24 thinking of them, but I'm not aware of any actual states that

25 have filed suits on Acthar claims.  They wouldn't be

1  precluded from doing so.

2  Q    So, I'd like to -- just to correct this I'd like to

3  show you your declaration.  You had commented on this in your

4  declaration in Paragraph 25.

5      May Ms. Reiser have access to control the screen to

6  display, I believe it's, Exhibit JX-2.  And, Ms. Reiser, if

7  you could go down to Paragraph 25.

8      Steve, if you see the second sentence starts "Pursuant

9  to the Acthar settlement."  It's about four lines down.

10 A    Yes, I do see that.

11 Q    You can --

12 A    So what that is -- go ahead.

13 Q    Yeah.  I was just going to ask if you could just

14 explain that reference to the states.

15 A    Yeah.  So the states joined onto the False Claims Act

16 litigation.  So they are, kind of, parties to that

17 litigation.  They were not the initial plaintiffs in that

18 matter.  So, yes, there are state interests with respect to

19 Acthar.  Clarifying what I just said about --

20 Q    And are those --

21 A    -- those named parties.

22 Q    Okay.  And those states, they are a part of the

23 settlement with the DOJ as well?

24 A    They will, as I understand it, have to agree, you know,

25 with the federal government on the settlement structure and

1  support it.

2       MS. MARKS:  Thank you.  Ms. Reiser, you can take

3  that down now.

4  BY MS. MARKS:

5  Q    In March 2020, after Mallinckrodt lost the case against

6  CMS, could you describe the company's financial outlook at

7  that point?

8  A    The outlook was challenged.  We knew we had the April

9  2020 maturity to deal with.  We had enough cash that we could

10  have paid the $650 million, but that would have left us

11  needing to refinance by one means or another the April 2020

12  maturity.  I think financial markets reacted adversely to the

13  announcement, the revelation of the false claims action and

14  the potential for trouble damages.

15       As I testified earlier, the financing that we had

16  announced in conjunction with the surgical bankruptcy whereby

17  our secured lenders were going to provide new money financing

18  that would allow us to take care of the 2020 maturity and

19  have some incremental funds to take out additional unsecured

20  debt at a steep discount that financing evaporated on us and

21  we were forced to transition to an exchange transaction to

22  avoid a default on the April 2020 maturity and had to use,

23  you know, cash on hand; I think $119 million if I remember

24  correctly.  That had to deal with the April 2020 maturity to

25  avoid a default.

1        Under all of our debt, you know, there are typical

2   cross-default provisions.  So had we not been able to deal

3   with that early April 2020 maturity it would have created an

4   imminent need to file for Chapter 11 protection.

5   Q    And when the ruling in the CMS case came out and the

6   company realized it might need to file the whole company what

7   did management do next?

8   A    We continued to assess the viability of "Balboa",

9   looked at a number of different constructs, started thinking

10  about what different possible Holdco restructurings might

11  look like and we began, as I said, kind of working on those

12  transactions in parallel.  You know, new ad hoc groups were

13  formed, old ad hoc groups were brought back to the table to,

14  kind of, discuss and share their views on the situation.  And

15  over the course of many more months the ultimate RSA that was

16  filed with my declaration came into theme.

17  Q    And can you tell us a little more about the settlement

18  discussions with the DOJ in the spring of 2020?

19  A    Yes.  So, as was noted previously, we did appeal the

20  District Court case, but we also sought to have conversations

21  with the DOJ, I think I can share this without avoiding any

22  privileged conversations, to see if we could achieve a

23  settlement.  The thought being if we could deal with that

24  issue and the False Claims Act together there might be a path

25  to still be able to do the "Balboa" surgical filing.  We

1   could contain the public Acthar litigation that that might

2   give us the, might being an operative word, path to do

3   "Project Balboa."

4        As we engaged with the DOJ and our ability to pay units

5   and, ultimately, their bankruptcy counsel, ultimately what

6   emerged was a willingness to settle but conditioned on the

7   company filing a Holdco filing.  You know, we shared quite a

8   bit of financial information about the company that, you

9   know, caused, presumably, the DOJ to recognize that we could

10  not pay the full 650 and be a viable company upon emergence.

11       So, the $260 million amount was ultimately negotiated

12  to resolve a number of the federal Acthar issues with the

13  state joinder that we just discussed.

14  Q    And so to be clear did the federal government, in fact,

15  require that Mallinckrodt file the entire company for

16  bankruptcy as a part of the settlement in principle?

17  A    It did, yes.  So, you have agreements, kind of, in late

18  fall 2020 prepetition of a majority of the states, you have

19  the federal government in the form of the DOJ on Acthar, kind

20  of, all pointing the same direction to a deal that really is

21  contingent on a Holdco filing.

22  Q    And you testified earlier that both the opioid

23  settlement and the Acthar settlement are just settlements in

24  principle.  Are they contingent upon a successful

25  reorganization under the RSA?

1  A      They are.

2  Q      Were both of those settlements based on an ability to

3  pay (indiscernible)?

4  A      They were.

5  Q      And are bot the opioid plaintiffs and the Department of

6  Justice, with respect to the Acthar settlement, taking a

7  significant haircut on their potential claims against the

8  debtors?

9  A      They are.

10 Q      Do you believe the debtors will be able to finalize

11 both settlements if it turns out that there is additional

12 value at the company that was not accounted for in the

13 ability to pay analysis?

14 A      As I just testified a few moments ago, you know, if

15 everyone has been mistaken about the financial condition of

16 the company and there was a significant amount of value that

17 had previously been unaccounted for then, no, I do not

18 believe that the RSA construct would hold.  Parties would

19 scramble to lay hold of that incremental value wherever it

20 may be found.  We would be in a very different case in a very

21 different situation.

22 Q      And are there other stakeholders who have agreed to the

23 RSA who are also agreeing to steep discounts on amounts

24 they're owed?

25 A      So we talked about the opioid plaintiffs.  The

1   unsecured creditors are, obviously, agreeing, you know, to

2   have a net $1.3 billion of paper, you know, equitized.

3   Clearly the unsecured -- the general basket of unsecured

4   claims are trade creditors.  Many will have less than a full

5   recovery.

6        We're very pleased that our vendors have remained

7   supportive of the company and are continuing to allow us to

8   use their goods and services to carry-on as a pharmaceutical

9   company, but many parties are receiving less than full

10  recovery.  We take no joy in that.  It's an unfortunate

11  situation.

12  Q    Do you remember Mr. Manthey asked you some questions

13  about whether management believed it should be liable to the

14  opioid plaintiffs and the plaintiffs in the Acthar

15  litigation?

16  A    I do remember him asking me that.

17  Q    Why would the debtors enter into the global opioid

18  settlement and the settlement with the DOJ regarding the

19  Acthar cases if management doesn't believe that it's liable

20  in those litigations?

21  A    Well unless litigation is frivolous both sides to a

22  litigation believe in the validity of their argument and the

23  number of cases, and the aggregate amount of the cases is

24  simply overwhelming.

25       One of the challenges for us on the opioid litigation,

1  to just stick with that for a moment, is to the extent that

2  any -- the after -- the public actors on the opioid side are

3  often elected officials that are accountable to

4  constituencies.  And had there been any judgments rendered

5  against the company for an outsized amount achieving a

6  settlement that is reasonable and comprehensive could have

7  been very challenging.

8        So, you know, our settlement discussions weren't held

9  in a vacuum.  We were mindful, for example, of the judgments

10  entered against J&J for just one year in Oklahoma for, I

11  believe, around $500 million.  And J&J had a very small

12  percentage of the opioid market in Oklahoma.

13        So, the numbers that we're talking about here are just

14  simply staggering.  Every party believes in the virtues of

15  its case.  The hazards of litigation, though, here are steep

16  because one misstep could have made achieving a global

17  settlement an impossibility.

18        So, one of the things that the management team asked

19  itself is do we really believe that we can run the gauntlet

20  and win all of the cases because, you know, when you have

21  over 3,000 cases and growing, and, you know, close to 40,000

22  municipalities in the country you have to get it right very

23  consistently when you're a small company like Mallinckrodt in

24  order to survive.

25        Even one loss with the ability to post an appeal bond

1  would have been questionable.  We just came to the conclusion

2  that settlement was in the best interest of the company to

3  resolve this once and for all.

4  Q    Have you read the shareholders' motion in the letters

5  requesting an equity committee?

6  A    I have reviewed their filings, yes.

7  Q    And did you see the assumption that if PLC is solvent

8  and the shareholders keep their equity and get a recovery

9  that the federal government would still be willing to enter

10 into the Acthar settlement?

11 A    I did see that assumption.

12 Q    You agree with that assumption?

13 A    I do not agree with that assumption.  I don't think

14 there is any basis for believing that if there was more value

15 and the ability to pay analysis were flawed that the federal

16 government would have been satisfied with the $260 million

17 given that if it won at the District Court, you know, a

18 retrospective judgment that had the financial impact of $650

19 million.

20 Q    And did you see the shareholders' assumption that the

21 other unresolved Acthar litigations also could be settled for

22 $260 million?

23 A    I did see that assumption as well.

24 Q    And do you have any reason to believe that that is

25 true?

1  A     I don't think there is any -- there is no explanation

2  given for it.  It seemed like a pretty bald assumption and

3  based on what we have already seen in this case from certain

4  Acthar plaintiffs, you know, it's a very large assumption to

5  believe that piece would be achieved with that amount.

6  Q     And did you see the shareholders' assumption that if

7  PLC is solvent and the shareholders keep their equity and get

8  a recovery that the opioid plaintiffs would still be willing

9  to enter into the $1.6 billion global settlement?

10 A     I did see that.

11       Ms. Marks, can I just go back to my previous answer on

12 Acthar because I think this is really important for everyone

13 to understand.

14       If Mallinckrodt had entered into a settlement for, call

15 it, $260 million with the public and private Acthar

16 plaintiffs in a way that avoided a Holdco and, thus, provided

17 a pathway to equity recovery Acthar suits would have come out

18 of the woodwork with additional suits being filed and parties

19 looking for a recovery on those same claims.  So, there is no

20 reason to believe that $260 million dollars would have been

21 able to contain that issue.  The presentation of that kind of

22 value would have just attracted an immense amount of

23 additional litigation to this issue.

24 Q     Thank you for that clarification.

25       And then with respect to my question about the opioid

1 settlement do you believe that if the shareholders'

2 assumptions were true that PLC is solvent, that that

3 settlement would still happen?

4 A      No.  I believe that they would seek to rework it and

5 improve the financial terms to capture that value.

6 Q      And they entered into the settlement, you know,

7 previously.  Why do you think they wouldn't be willing to

8 enter into it now if it turns out there was solvency at PLC?

9 A      So the basis of my statements are just the fact that it

10 took as long as it did to negotiate the terms.  The parties

11 were very deliberate using their advisors, spending a lot of

12 time with our financial advisors including AlixPartners,

13 looking at the company's finances, understanding the

14 guarantee structures, you know, a very complicated history,

15 and coming to the conclusion that $1.6 billion, you know, was

16 a fair resolution of the issue and similar exercises by the

17 other parties to really, you know, wrestle and at the end of

18 the day agree to recover less than they believe that they are

19 entitled to.

20       That is one of the great accomplishments of this RSA is

21 that the parties, kind of, collectively agreeing to receive

22 less than they believe that they are entitled to.  It's kind

23 of the nature of compromise.  And so many of our creditors

24 have had to truly assess what a different universe would look

25 like in which there is a freefall fight for value.  They have

1  elected a more constructive path and we're very pleased that

2  they have decided to go down that path with us.

3  Q     If equity value is not canceled could the opioid

4  plaintiffs get out of the RSA?

5  A     They could.

6  Q     And what about the consenting lenders?

7  A     They could.

8  Q     What would happen to the debtor's financial landscape

9  without the RSA?

10  A     Without the RSA I think we have a much longer process.

11  You know, Mr. Manthey asked me about professional fees, they

12  are sizeable; you know, $31 million over thirteen weeks.  If

13  you go into a freefall where every issue is litigated and the

14  complexities of Mallinckrodt's history are litigated the cost

15  of this case could just be astronomical over time with so

16  much value lost and destroyed.

17  Q     Have you read the declaration of Mr. Jeffers, the

18  plaintiffs' expert?

19  A     I have read Mr. Jeffers's declaration.

20  Q     And do you see his assumption in Paragraph 27 that the

21  company's perpetuity growth rate and the terminal period

22  estimated to be 2.5 percent?

23  A     I did see that and what caught my eye there was if he

24  was basing it on the pipeline that the company has.  He

25  included a table.  The problem with that table is many of the

1 pipeline products that are on that table have actually failed

2 in the clinical trial.

3     So, stannsoporfin is an example of a product that we

4 thought would be approved.  The FDA did not approve it.

5 Terlipressin, in my declaration I noted that in September of

6 2020 we received what's called a CRO letter, a continuing

7 response letter, from the FDA.  That product was not approved

8 on the time table we expected it to.  We're still in dialog

9 with the FDA on it.

10     There are a number of products on that pipeline list

11 that simply have fallen out of our pipeline.  Getting a

12 product approved by the FDA is very hard work.  The

13 pharmaceutical industry is littered with the skeletal remains

14 of companies that weren't able to get assets across the

15 finish line.

16     We do believe that there are some assets in our

17 pipeline that are exciting and that there is value there, but

18 to just assume success and that its going to result in that

19 kind of a growth rate that just seems a bit of a stretch to

20 me especially in light of our recent pipeline experiences.

21 Q    Thank you.

22     All right.  Let's switch gears a little bit and we're

23 getting near the end.  Do you recall being asked at your

24 deposition whether Covidien has made any indemnity claims

25 against Mallinckrodt related to opioid litigation?

1  A      I do remember being asked that at my deposition.

2  Q      Who is Covidien?

3  A      So Covidien was the parent of Mallinckrodt at the time

4  of the 2013 spinoff of Mallinckrodt PLC.

5  Q      And as a part of that spinoff did Covidien retain any

6  liabilities related to opioids?

7  A      Covidien, as part of the separation and distribution

8  agreement in that spinoff transaction, had an indemnification

9  from Mallinckrodt for all liabilities associated with the

10 pharmaceutical business.  And this is one of the challenges

11 with our surgical filing that we had not completely solved

12 for.  Clearly, direct claims against PLC would have been

13 channeled if we had secured a 105 injunction for Mallinckrodt

14 PLC and secured, kind of, agreement from the parties.

15       There was also the question of, well, what happens is

16 Covidien, which had been sued, brought indemnification claims

17 against Mallinckrodt PLC.  Couldn't those indemnification

18 claims overwhelm PLC and push us into a Holdco Chapter 11

19 through that avenue.

20 Q      And you mentioned Covidien has been sued.  Has

21 Covidien, in fact, been named as a defendant in some of the

22 opioid litigations?

23 A      They have been named as a defendant in cases.

24 Q      And I believe at your deposition you testified that

25 Covidien had not made any indemnity claims against

1   Mallinckrodt based on being named in those lawsuits.  Do you

2   recall that?

3   A     I do recall that I said to the best of my knowledge

4   they have not filed indemnification claims.  In fact, that

5   was an incorrect statement upon further review.  I have been

6   informed and reminded that they actually have filed, over the

7   years, as they have been named in cases they have filed a

8   number of indemnification claims against Mallinckrodt.

9   Q     And you touched on this, but to be clear did these

10  indemnity claims assess the debtor's decision about whether

11  to do a surgical Specialty Generics filing or a PLC level

12  filing?

13  A     Ultimately we believed that we could find a pathway to

14  resolving the challenge of the indemnification issue

15  Medtronic in the surgical filing, but it was an uncertainty.

16  Clearly our counterparties in the February 2020 deal were

17  aware of that issue.  The challenge of, you know, the private

18  plaintiffs were not part of that deal and, you know, the

19  private plaintiffs would have ultimately had to agree to have

20  any claims potentially that could have been brought against

21  Covidien or Medtronic a successor in interest to Covidien,

22  have those claims covered and ultimately channeled into the

23  "Balboa" surgical filing.  And that was an uncertainty going

24  into it, but not ultimately the cause of us going into a

25  Holdco filing.

1  Q     And would the global opioid settlement in any way

2  effect the indemnification obligations of PLC to Covidien?

3  A     It actually speaks to those, I believe, in the opioid

4  settlement and it deals with that issue.

5            MS. MARKS:  Okay.  I have no further questions.

6            THE COURT:  Thank you.

7            Redirect?

8            MR. MANTHEY:  Thank you, Your Honor.  Just a few

9  questions.

10                    REDIRECT EXAMINATION

11  BY MR. MANTHEY:

12  Q     Let's go back to the Covidien notice.  You did testify

13  you were not aware of it at your deposition, correct?

14  A     That is correct.

15  Q     And you just testified that uncertainty related to that

16  did not prevent the surgical bankruptcy filing, correct?

17  A     I testified that it was a risk.  It was a known risk

18  and one that we had not entirely solved for when we announced

19  the surgical filing in February 2020.

20  Q     But it was something you were aware of and contemplated

21  before the surgical filing and new that it existed, correct?

22  A     That is correct.

23  Q     You talked about -- you testified about the settlement

24  with the DOJ.  And you testified that that settlement

25  required the Holdco Chapter 11 filing, correct?

1  A      That is correct.

2  Q      Did you testify earlier that this settlement had not

3  been documented?

4  A      I think by settlement I think we said enough times over

5  the course of the day that it is a settlement in principle,

6  as is the opioid settlement.  So, it's not final, but a

7  condition of that ultimately to be finalized settlement is

8  that we undertake this Holdco filing.

9  Q      Okay.  What does "to be finalized" mean?  Are they

10  terms outstanding that still need to be negotiated?

11  A      So I am not part of that negotiation.  I understand

12  we're, obviously, experiencing a change of administrations. I

13  don't know what has to happen behind the scenes at the DOJ

14  for the settlement to be approved and who ultimately needs to

15  sign-off on that.

16      We do believe that, you know, based on the

17  representations of DOJ's counsel that that deal, you know,

18  could be announced and shared with -- that settlement in

19  principle could be shared with the counterparties, you know,

20  to our RSA and taken into account by them in their own

21  negotiations of this.

22      So, there is no reason to believe that it won't

23  ultimately be finalized, but, you know, were there to be

24  incremental value discovered that could be disruptive and

25  could prevent finalization.

1  Q     And that settlement relates to the Acthar related

2  litigation which you earlier confirmed that that related to

3  price fixing, correct?

4  A     Well with respect to the CMS issue that's a rebate

5  calculation.  The qui tam litigation, the false claims action

6  litigation on that matter is related to the use of that

7  rebate.  There are other DOJ matters like the Eastern

8  District of Pennsylvania.  That was a patient assistance

9  claim.  There are other kind of marketing issues that are

10  wrapped up in it.  So, it's a variety of legacy issues

11  related to the Acthar products.

12  Q     And you had testified earlier about "Project Balboa"

13  and that was the surgical filing.  There was no MIP included

14  in "Project Balboa" for management, correct?

15  A     There wasn't because in "Project Balboa" there was no

16  impairment of equity, right.  Mallinckrodt PLC wasn't the

17  debtor.  Again, the parties believed in February 2020 that

18  that announcement and the ultimate completion of that

19  project, if successful, would generate, you know, a positive

20  shareholder value.

21        MR. MANTHEY:  One second, Your Honor, I'm just

22  going through my notes.

23        THE COURT:  All right.

24  BY MR. MANTHEY:

25  Q     You had testified that there was an ability to pay

1  analysis that was conducted.  Who was that conducted by?

2  A    So, really, all of the counterparties gained access to

3  financial plans, spent time with AlixPartners, our financial

4  advisor, reviewing kind of waterfall analysis and concluding

5  that ultimately what was negotiated was a reasonable recovery

6  based on their position in the structure and the company's,

7  you know, financial outlook.

8  Q    I noticed you have read in various letters there's been

9  suggestions by shareholders that the ten percent that has

10 been allocated or put aside for management should be put

11 aside for equity.  Have you read those letters?

12 A    I have seen that in those letters, yes.

13 Q    And you have recognized that there are a number of

14 settlement negotiations that are going to have to be made

15 throughout these bankruptcy cases, correct?

16 A    That is correct.

17 Q    And here you have continued to say that parties have

18 had to take a steep discount, but equity has taken not only a

19 steep discount they're getting extinguished, correct?

20 A    They are not the only party that receives no recovery,

21 but there is no recovery for equity.  That is correct.

22 Q    And why wouldn't a reasonable resolution be a

23 negotiation that included equity where equity got some of the

24 allocated percentage that is set aside for management?

25 A    Let's talk a little bit about what the purpose of a

1  management incentive plan is.  It's not to provide a windfall

2  for management.  It's to provide the emerging company's board

3  of directors with tools to retain and attract appropriate

4  talent into the organization.  So, it provides a share pool

5  from which future equities could be granted.

6       We grant equity quite deep into our organization as

7  many pharmaceuticals do.  We compete in these biotech

8  companies that one of their main compensation currencies is

9  equity.  And we're in an industry where equity compensation

10 is a significant part of compensation packages and if

11 Mallinckrodt is to be a successful go forward company, we

12 will need to have talent that has long term incentive

13 compensation in order to retain that talent.

14      So, it is an important tool for the emerging company to

15 have and we felt that that was important to get the parties

16 to agree to that so that Mallinckrodt can emerge as a vibrant

17 pharmaceutical company on the other side of this process.  As

18 I said, no existing member of the management team has been

19 offered or guaranteed any participation rights in that

20 management incentive plan.

21 Q    There has been no guarantee nor has there been any

22 prohibition, isn't that correct?

23 A    That is correct.

24 Q    And you can understand the view of equity holders who

25 have seen their equity share price drop from $132 to 75

1  cents.  I understand their view that management, who they

2  perceive was responsible for that incredible decrease in

3  share price, is being rewarded in this management incentive

4  program. Couldn't you see that view?

5  A    I read that view expressed and I have heard that view

6  expressed in the 341 Meetings.  So, I am familiar with that

7  perspective.

8  Q    And you have also testified that the Acthar related

9  liabilities are related to pricing issues where the price was

10 set by management, correct?

11 A    That is correct.

12 Q    And --

13 A    Can I please expand upon that answer?

14 Q    Sure.

15 A    So the rebate calculation at issue was established by

16 the predecessor company, that pricing that Mallinckrodt's

17 existing management did continue and we had positive -- we

18 had a written letter from CMS about the appropriateness of

19 that rebate, our allegation is that the federal government

20 changed its mind and inappropriately seeks to make that

21 change of mind retroactive in that case.

22       The pricing of Acthar is controversial.  It is a

23 product that is not used for many patients.  And, you know,

24 it is a lightning rod because at one point in time it was

25 sold for $40 a vial.  No company can be viable that has very

1  few products selling a product for $40 a vial to a few

2  thousand patients.

3      So we understand that Acthar is controversial for its

4  pricing, but for the patients whose lives it transforms

5  provides significant value and we believe that it provides

6  significant value to the healthcare system.  And that many of

7  the alternative therapies to Acthar are similarly high

8  priced.  Acthar is just a part of a US pharmaceutical

9  landscape that many believe is high priced. It is a

10  controversial area, but not an illegal one.

11  Q    I don't think anyone here disputes the value of Acthar;

12  however, can you tell the court what the price of a vial of

13  Acthar is now?

14  A    Its closer to 40,000.  I am not sure of the exact list

15  price.  But list price does not mean that that is what the

16  patients pay.  Our payment system is very complicated.  In

17  the US there is all kinds of rebating.  So that gross list

18  price that gets thrown around is not the net price that

19  Mallinckrodt receives by (indiscernible) and certainly not

20  what the Acthar patient pays.

21  Q    It seemed to me that you were stating or you testified

22  that the pricing -- all we did was -- as Mallinckrodt's

23  manager we just continued the pricing from the predecessor

24  entity, correct?

25  A    We inherited -- we acquired a product that was high

1  priced and did not drop the pricing.  In fact, over time the

2  pricing did increase since Mallinckrodt acquired Acthar.  We

3  do believe that we have been responsible in our pricing of

4  the product though.

5  Q    And isn't it true that CMS put you on notice in 2016

6  that there may be an issue related to the rebate and, for

7  lack of a better term, validity of the rebate?

8  A    That's correct.  That was the first time that CMS

9  indicated that it might be changing its mind about the rebate

10 calculation.

11 Q    That was in 2016 and we're in 2020 right now, correct?

12 A    That is correct.

13 Q    And management made the decision to continue the

14 pricing despite the receipt of this notice, isn't that

15 correct?

16 A    Based on the documentation of --

17           MS. MARKS:  Objection.

18           THE COURT:  Go ahead, Ms. Marks.

19           MS. MARKS:  I want to object to the

20 characterization of pricing.

21           THE COURT:  Overruled.  Go ahead and answer, Mr.

22 Welch.

23           THE WITNESS:  So we received a form letter in

24 2016.  We had direct correspondence previously from CMS.  So

25 we did not, as a result of the receipt of that initial

1 │ correspondence, which we believed was incorrect, from CMS

2 │ undertake any price change as a consequence of having

3 │ received that initial correspondence in 2016.

4 │ BY MR. MANTHEY:

5 │ Q     When you say form letter what do you mean by that?  Did

6 │ they send you notice or did they not send you notice?

7 │ A     It was a notice.

8 │ Q     And, again, under the RSA and under the plan of

9 │ reorganization you would like this court to confirm, and as

10 │ contemplated by the RSA you're seeking broad releases for the

11 │ directors and officers, correct?

12 │ A     That would be part of the plan of reorganization, yes.

13 │ Q     And generous indemnity provisions, correct?

14 │ A     There are indemnity provisions and, again, the officers

15 │ and directors currently have indemnification from the

16 │ entities either contractually or based on the articles of

17 │ incorporation or formation depending on the entity type.

18 │           MR. MANTHEY:  No further questions, Your Honor.

19 │           THE COURT:  Thank you.

20 │           Mr. Welch, you are excused from the virtual

21 │ witness stand.

22 │           THE WITNESS:  Thank you.

23 │      (Witness excused)

24 │           THE COURT:  How many more witnesses do we have

25 │ today, two?

1          MR. MANTHEY:  Yes, Your Honor.

2          THE COURT:  Okay.  Do we know how long -- are

3    those witnesses going to take as long as Mr. Welch took?  I'm

4    trying to figure out timing here.

5          MS. MILLER:  This is Kathy Miller.  I will be

6    taking the examination of Mr. Jeffers.  We think it's about

7    thirty, forty-five minutes for his direct and then we are

8    going to -- I understand the plan is to call -- the debtors

9    will call Mr. Hayes and we reserve our right, obviously, to

10   cross-examine him.

11         THE COURT:  Okay.

12         MR. HARRIS:  Your Honor, this is Chris Harris of

13   Latham.  I would imagine that the cross examination of Mr.

14   Jeffers will be forty-five minutes as well, maybe an hour.

15   Then Mr. Hayes will be shorter.  His direct testimony would

16   be under thirty minutes, I would think.

17         THE COURT:  All right.  So, it looks like we're

18   probably going to just get through the witnesses by the end

19   of the day today because I do want to take a lunch break, but

20   we will keep it on the shorter side. We're at ten after one.

21   Let's take a recess until 1:45 then we will come back and

22   pick-up with the next witness.

23         We're in recess.

24      (Recess taken at 1:10 p.m.)

25      (Proceedings resumed at 1:46 p.m.)

1              THE COURT:  Next witness?

2              OPERATOR:  Your Honor, this is CourtCall.  One

3    moment while I unmute the lines.

4              THE COURT:  Okay.  Thank you.

5              MS. MILLER:  Your Honor, this is Kathy Miller on

6    behalf of the ad hoc committee.  I will be calling the next

7    witness.

8              I am trying to start my video, but it's telling me

9    that the host has stopped it.  Oh, there we go.

10             THE COURT:  You got it?  Okay.

11             MS. MILLER:  Okay.  Thank you.

12             Your Honor, the committee calls William Jeffers.

13             THE COURT:  Okay.  Mr. Jeffers, are you on the

14   video call?  Okay.

15             Mr. Jeffers, can you raise your right hand please

16   and state your name for the record and spell your last name.

17             MR. JEFFERS:  Williams Jeffers, J-E-F-F-E-R-S.

18        (Witness being sworn)

19         WILLIAM JEFFERS, COMMITTEE WITNESS, SWORN

20             THE COURT:  Thank you.  You may lower your hand

21   and you may proceed, Ms. Miller.

22             MS. MILLER:  Thank you, Your Honor.  Again, this

23   is Kathy Miller for the record.

24                        DIRECT EXAMINATION

25   BY MS. MILLER:

1   Q      Mr. Jeffers --

2   A      Can you see me okay?

3   Q      Yes.

4           THE COURT:  Yes, we can.  Thank you.

5           THE WITNESS:  Okay.  My screen says I'm muted.

6           THE COURT:  You're muted on Zoom because we don't

7   use Zoom for the audio.  So, your audio is only through the

8   CourtCall.

9           THE WITNESS:  Okay.  Perfect.

10  BY MS. MILLER:

11  Q    Mr. Jeffers, you're currently employed by the Griffin

12  Group?

13  A      I am.

14  Q    Okay.  I want to start with some background, your

15  educational background before we get into your experience

16  with the Griffin Group.

17       Can you describe for the court your post-college

18  background and any certifications you may have that relate to

19  your evaluation work?

20  A      I have an MBA from the University of Wisconsin in

21  finance, investment and banking.  I also have -- I'm a

22  Chartered financial analyst which means that I completed a

23  three-year course of study, sort of graduate level of finance

24  that included financial theory and valuation practice.

25  Q    How long have you been with the Griffin Group?

1 A      Ten years.  Time flies.

2 Q      And can you describe, in addition to your work at the

3 Griffin Group, your relevant work experience relating to

4 valuations?

5 A      I spent fifteen years as a commercial banker where I

6 was responsible for assessing the printed worthiness of

7 borrowers or potential borrowers and that included reviewing

8 their financial records and cash-flow projections.  It also

9 involved me making my own cash-flow projections both on an

10 income statement and balance sheet statement.

11       At the Griffin Group my primary responsibility has been

12 to valuations of differences involved in mergers and

13 acquisitions primarily for litigation.  Most of that work has

14 been done in the Delaware Court of Chancery.

15 Q      And is the business of the Griffin Group providing the

16 litigation support for those kinds of transactions?

17 A      Yes.

18 Q      I note your CV is -- it is ACH Exhibit 7, so it's in

19 the record.  I know you had a note -- your CV reflects that

20 you've had about fifteen expert witness and litigation

21 support matters related to Court of Chancery cases.  Have you

22 testified in the Court of Chancery?

23 A      I have, two times.

24 Q      And your other engagements where you haven't testified

25 had you offered opinions as to evaluation?

1  A     Yes, for most of them.  You know, as you know, most

2  litigation matters settle and these particular ones didn't go

3  to trial.  In one case they settled after the trial which was

4  interesting.

5  Q     It happens.

6       I want to talk generally about valuations and your

7  approach.  When you perform an evaluation typically what type

8  of information do you obtain?

9  A     Well, we're looking primarily for financial statements

10 on a historical basis and we're also looking for cash-flow

11 projections.  We'd like to say five-year projections because

12 that is what we typically use in our discounted cash-flow

13 analysis.

14      When we look at those cash-flow projections we want to

15 know if they're reasonable.  We want to know, for instance,

16 who made them, when did they make them.  Do they have a

17 history of making them?  Are they any good at it?  We all

18 know that, you know, some people can't shoot straight and

19 some people are not very good at making projections.

20      So, by doing that sometimes we're able to compare

21 actual results to earn year projections to assess just how

22 good they are at doing this.

23 Q     Okay.  Are there other methods that you use to test the

24 reasonableness of management projections?

25 A     We often times look at companies that are in similar

1  industries to see are their projections similar to the

2  subject company.  We look at a lot of things to compare how

3  this company compares with the industry at large.  And, of

4  course, the competitive -- the competition in that industry.

5  Q    You mentioned in your testimony some of the factors or

6  details around the development of the projections.  Would you

7  typically get that information from interviewing management,

8  for example?

9  A    In my experience with the Delaware Court of Chancery

10 typically not.  This is typically we're dealing with public

11 companies.  Typically, we haven't had the ability to

12 interview them, but in private companies we typically do.

13 That gives you, sometimes, a richer understanding of what the

14 company is doing and what they should be expected to do in

15 the future.

16 Q    And then in the matters that are litigation matters

17 where its, say, a public company or the company your valuing

18 is adverse are you able to get some of the information about

19 how projections were developed and what they're based on

20 through the discovery process?

21 A    Often times we can.  And we look at that very carefully

22 because the Chancery Court has told us, through a variety of

23 opinions, that this is the kind of -- this is the way they

24 assess these projections.  And this is why they have thrown

25 out certain projections in the past.

1        So, when we do this for a bankruptcy matter my

2    understanding from talking to other practitioners in the

3    bankruptcy field is that the management's projections are not

4    given the same sort of credibility that they are in the

5    Chancery Court.  I think that is due in part to the nature of

6    the proceedings.

7    Q    What type of information did you have available or not

8    have available for this engagement that you typically would?

9    A    Well here we had historical results.  Obviously, this

10   is a public company and they have SEC filings.  Those are

11   comprehensive.  We also had five-year projections by

12   (indiscernible) here and that was very useful.  We had that

13   for both revenues and EBITDA.  And that was useful because we

14   were trying to separate the two segments in the analysis.

15   Unfortunately, what we had also was just projections of

16   capital expenditures and working capital on a company wide

17   basis.  We didn't have that for particular segments.

18   Q    Okay.  What are the segments for which you had this

19   financial information?

20   A    The two segments, Specialty Brands and Specialty

21   Generics.

22   Q    And so you had the revenue and the EBITDA projections

23   by those two segments, is that right?

24   A    That is correct.

25   Q    And, I think you said, the CapEx working capital that

1  was on a company basis?

2  A     It was.

3  Q     Did you have any access to non-public information for

4  this engagement?

5  A     No.

6  Q     What was the engagement that you were hired for, for

7  this matter?

8  A     I was asked to value the company and specifically to

9  look at the company on a segment basis and focus on Specialty

10  Brands rather than Specialty Generics.  The idea was that

11  Specialty Generics would either be sold off or spun-off and

12  would no longer be part of PLC.

13  Q     So when you said you were valuing the company you were

14  valuing the company as a whole?

15  A     I am valuing the company as a whole without Generics.

16  Q     All right.  Did the level of information that you had

17  or did not have impact your valuation?

18  A     Yes, it did.

19  Q     How so?

20  A     We had to make assumptions about, for instance, how

21  capital expenditures would be divided between Specialty

22  Brands and Specialty Generics.  Same thing with working

23  capital.  With other things we made other assumptions, for

24  instance.

25          I assumed that all of the debt would be borne by

1 Specialty Brands and Specialty Generics would take the opioid

2 litigation, but none of the debt with it.  So, those were

3 some of the assumptions we had to make.

4 Q    Okay.  We will walk through those when we get into the

5 details of your analysis.

6 A      Okay.

7 Q      So what valuation methodologies do you typically use?

8 A      I almost use a discounted cash-flow.  Sometimes we use

9 a comparable company analysis and unfortunately, rarely do we

10 use a transaction analysis.

11 Q    Okay.  Did you do a comparable companies' analysis

12 here?

13 A      We did, but we didn't rely on it.  We found that it was

14 -- we didn't have enough information about the company and

15 the peer group to make what we consider to be valid

16 comparisons and conclusions based on those comparisons.  So,

17 we decided that it was not reliable and because this is a

18 preliminary analysis, we thought that it would be acceptable

19 to rely strictly on the discounted cash-flow.

20 Q    All right.  In your evaluation why did you focus on

21 Specialty Brands when the stockholders here, the parties are

22 asking for the appointment of a committee, are holders of

23 Mallinckrodt PLC?

24 A      Well, as Mr. Welch reported earlier today, the company

25 had been looking to spin-off, especially, the Generics along

1  with the opioid litigation for some time.  So, it seemed

2  reasonable that these two segments were divisible without

3  effecting the operation of either one.  And there was a

4  strong incentive for Specialty Brands and PLC to distance

5  itself from the opioid litigation.

6  Q    Your valuation was based on Specialty Brands then, is

7  that right?

8  A    It was, it was because that would be the remaining

9  segment in PLC.

10  Q    And you valued it based on a discounted cash-flow

11  analysis at DCF?

12  A    I did.

13  Q    Okay.  We will walk through your valuation, but can you

14  tell the court what your conclusion was on valuation?

15  A    I concluded that the company was worth $989 million.

16  So, almost a billion dollars.  And that was without any tax

17  benefits.  If we included the tax benefits, including the

18  deductibility of interest expense, the company could be worth

19  as much as $2.7 billion dollars.  So, a significant amount of

20  money.

21  Q    So, did you have information about the tax benefits?

22  A    No.  This is the kind of thing that is very private and

23  public companies rarely give you, sort of, an in-depth view

24  of their tax positions and how they utilize those tax

25  benefits.  That is especially important in bankruptcy where

1  some of these tax benefits might not survive or might be

2  changed in one way or another.

3  Q     Well when you say you didn't include tax benefits can

4  you tell the court, you know, what kind of benefits

5  potentially would be available?

6  A     Well I mentioned the fact that we assumed that the

7  company was paying interest expense, but was unable to deduct

8  that interest expense for tax purposes.  The company also had

9  net operating losses that could be used and other tax

10  benefits that could be used that would, basically, exempt the

11  company from paying income taxes for the foreseeable future.

12  Q     And if you hadn't included these tax benefits in your

13  analysis what impact, if any, would that have had on your

14  valuation?

15  A     If we just looked at the deductibility of the interest

16  expense, which is the simplest thing, that would double the

17  value of the company to around $2.1 billion dollars.  If we

18  were able to use the additional tax benefits like NOL's, the

19  amortization of certain intangibles then the value of the

20  company could be as high as $2.7 billion.

21  Q     Again, this is on a preliminary basis, right?

22  A     Yes.

23  Q     You (indiscernible) information?

24  A     Right.

25  Q     Okay.  Let's break that down and walk through your

1  analysis.

2      First, can you tell me -- I think you touched on a few

3  of them, but let's walk through them.  What assumptions did

4  you make when you were valuing Specialty Brands?

5  A    Well I won't repeat about the Specialty Generics being

6  spun-off, I will just let that go.

7      The most important assumption after this is what

8  happens with the Acthar litigation?  We recognize that the

9  government had settled for $260 million.  We didn't have a

10 good idea about what the private litigation would settle for.

11 So, we just doubled or we assumed that that would settle for

12 the same amount as the government litigation.  So, in total

13 we assumed that that litigation could be settled for $520

14 million.

15 Q    And you --

16 A    That --

17 Q    I'm sorry.  I was going to ask you do you believe that

18 is a reasonable assumption.

19 A    You know, I am not in the position because I don't

20 value litigation results or settlements, but we didn't have

21 enough information on the lawsuits themselves, the history of

22 these types of lawsuits, to give an informed judgment about

23 what the likely dollar number would be.  So, we had to make

24 some sort of placeholder that would sort of say, okay, this

25 is what it could be sold for.  If we find out later that that

1  number is too large or too small it's very easy to change.

2  Q    Did you make a -- I think you did touch on this, but

3  let me just ask anyway; did you make an assumption on the

4  reasonableness of the company's projections?

5  A    Well we didn't have any information about how they were

6  produced.  We did them when we did them with purpose.  We had

7  to -- we know that they made them public in October of 2020,

8  but beyond that they don't really have any, sort of, insight

9  as to how these projections were made.  What we do recognize

10  is that they seem to be fairly conservative.

11  Q    Can I just pause you there for a moment?

12      Ms. Reiser, can you pull-up JX-1 which is Mr. Jeffers

13  declaration.  And turn to Page 5 in the chart in Paragraph

14  11.

15      Mr. Jeffers, are these the projections that you were

16  referring to?

17  A    Yes.

18  Q    Okay.  I'm sorry, I interrupted you.  You were going on

19  to describe them.  Can you please finish your answer?

20  A    Well I looked at these and compared them with the

21  historical segment results that were published in the most

22  recent 10-K, I believe one for 2019.  I saw that the revenue

23  was declining by nineteen percent in 2020 and another ten

24  percent in 2021.

25      Now I understand that there are lots of things going on

1   at this particular time, but those seem to be fairly

2   conservative numbers.  Then after that the company is not

3   projected to grow very fast.  So, I consider this a

4   conservative cash-flow projection, but I had no way to, you

5   know, verify whether this was, in fact, conservative or was

6   not.  So, I had to take it as they provided.

7   Q    Now you're valuing the Specialty Brands segment.  Can

8   you give us a sense of the relative size of Specialty Brand

9   vs. Generics?

10  A    Specialty Brands accounts for about seventy percent of

11  the revenues and about ninety-two percent of the operating

12  income or the EBITDA.  So, it's a significant or it is the

13  most dominant part of PLC.  So, when we're looking at what is

14  the value of PLC vs. the value of Specialty Brands there

15  shouldn't be a great deal of difference between the two

16  because Specialty Generics just doesn't offer that much in

17  terms of value.

18          MS. MILLER:  Ms. Reiser, can we turn to Page 3 of

19  that same exhibit on the chart in Paragraph 6?  Thank you.

20          THE WITNESS:  Yeah, this --

21          MS. MILLER:  Go ahead.

22          THE WITNESS:  This shows the percentage of net

23  sales and operative income which is indicative of the, sort

24  of, value of each segment.  When we look at value w look at

25  the operating income as being the most indicative of the

1 value produced or generated by the company.

2 BY MS. MILLER:

3 Q    All right.  So, let's talk about how you did your DCF

4 analysis.  First, what is weighted average cost of capital or

5 WACC, W-A-C-C, and how is that calculated?

6 A    If we look at this as an equation the cash-flow is on

7 the numerator.  The weighted average cost of capital is the

8 denominator.  That is the way we discount those cash-flows

9 for both the time value of money and risk of holding in

10 equity embodies the risk of that company.  So, when we look

11 at the weighted average cost of capital, we're trying to rate

12 the relative value of the equity and the debt.

13 Q    So what are the components of your WACC analysis?

14 A    Well its -- there is a certain amount of debt and a

15 certain amount of equity.  That is what you would look at as

16 the (indiscernible) or the company's capital structure.  That

17 is how we discount those cash-flows.

18 Q    All right.  Let's break that down and then let's talk

19 about the cost of equity calculation.  What are the factors

20 in that calculation?

21 A    There are three basic factors here.  One is the risk-

22 free rate and that is relatively equivalent to the time value

23 of money.  A dollar today is worth more than a dollar

24 tomorrow.  Second is the equity risk purview which is the

25 difference that an investor requires to assume the risk of

1  the market vs. the risk of holding a risk-free security.  The

2  third part of that is Beta.  That is -- so if the equity risk

3  premium identifies or manifests the systematic risk of

4  holding the market as a whole the beta attempts to capture

5  the non-systematic risk of holding an individual security.

6  So, what we're trying to do with the beta is to

7  determine how does that company's stock perform vs. the

8  market.  Is it riskier?  Is it more volatile?  That is what

9  we're trying to capture in that beta analysis.

10  MS. MILLER:  Ms. Reiser, can we pull-up DX-1 again

11  and we're going to go to Schedule 3-B which I think is on

12  about Page 20 of the 22 PDF.

13  MS. REISER:  Could you please repeat that exhibit?

14  Thank you.

15  MS. MILLER:  JX-1.

16  MS. REISER:  And which page?

17  MS. MILLER:  I believe it should be on around Page

18  20, looking for Schedule 3-B.

19  MS. REISER:  Just one moment please.

20  THE WITNESS:  Not the right schedule.

21  MS. MILLER:  If we can go to Page 20 of 22.  There

22  we go.

23  THE WITNESS:  There we are.

24  BY MS. MILLER:

25  Q    Okay.  So, this is your cost of equity table?

1    A     Yes.

2    Q     Go ahead.

3    A     Well let's start at the top of this where we see the

4    risk-free rate of return at 2.25 percent.

5    Q     And how did you determine that?

6    A     We looked to year on a twenty-year US treasury.

7    Typically, we would do it as of the date of the valuation.

8    Here, because of the disruption caused by the COVID-19

9    pandemic where the fed has artificially reduced the pricing

10   of treasuries initially what we have decided as a firm is to

11   use the December 31st, 2019 effective yield rather than a

12   yield during 2020.

13        So we used 2.25 percent here.  If we were to use the

14   current rate as the date of the filing the current rate was

15   1.53 I believe.  So about a seventy-five percent -- a

16   certified basis point differential here.  So, we're being a

17   little conservative here.

18   Q     Going with the higher number is actually more

19   conservative?

20   A     Yes.  A higher number gives you a higher discount rate

21   and it gives you a lower result.

22   Q     Okay.

23   A     On the equity risk (indiscernible) this is a long-term

24   calculation for 1996 to 2019 to look at the average expected

25   additional return that investors require to invest in the

1  market rather than the risk for securities.

2  Q     And you determined that to be 6.17 percent?

3  A     Yes.

4        The next issue is the size premium.  This is a little

5  controversial.  We, as a firm, take a conservative view of

6  this.  We believe that investors do require a premium for

7  investing in smaller companies vs. large companies.  And so,

8  the smaller the company the larger the size premium and if

9  you get to the large companies, say Google, for instance,

10  there would be a negative size premium.

11       Here what we have -- what we're using here is the 1.42

12  percent.  We're adding that to the cost of equity and this is

13  a combination or an average of the ninth and tenth deciles.

14  These size premiums are graded by deciles.  So, they are ten

15  different premium calculations.  So, this is at the very

16  bottom.

17       Again, this is based on our calculation of where the

18  company would be without any tax incentives.  So, if we were

19  to include the tax incentives then the tax premium would

20  likely be much smaller. It might be as much as, you know,

21  fifty basis points smaller.  We were trying to be

22  conservative so we took the larger size premium.

23       Like I said, in the industry, in the valuation

24  industry, this is somewhat controversial.  For instance, I

25  have never seen Goldman Sachs ever use a size premium and I

1  have seen a lot of their analysis.

2  Q     You thought it was appropriate here?

3  A     As I said, as a firm we always use a size premium.  So,

4  if that's -- you know, we have to sort of come down and be

5  consistent if you're going to be a player as an expert in a

6  place like the Chancery Court because all of your previous

7  testimony is open to question.  So, we always use the size

8  premium.

9  Q     Okay.

10  A     Then the next question is what did the capital

11  structure look like.  Here, what we're saying is that the

12  debt accounts for eighty-five percent of the long-term

13  capital of the company.  And if we skip over the debt to

14  equity, which is not very useful for us here, the cost of

15  debt -- well, let me save that for later.

16  Q     Yeah.  I was going to say, let's hold off on that one.

17  I wanted to circle back because we didn't go over beta yet.

18  A     We didn't.

19  Q     So, can you give me a brief explanation?

20        So, I think we need the next page, Ms. Reiser, Schedule

21  3-C.  Thank you.

22        Okay.  Again, if you could just briefly -- again, what

23  is beta and what are you trying to measure here?

24  A     Remember, what we're trying to look at is how risky is

25  this particular stock vs. the market.  So the typical way to

1  look at that is to look at stock price movements on a weekly

2  or monthly basis on a five year basis.  So, the idea is that

3  you are getting in that five years the upside of the company

4  and the downside.  So, you're looking at the company's

5  results of a whole economic cycle.

6       Typically, you would like to look at the company's own

7  stock price movements, but here because of the impact of the

8  pending litigation and pending bankruptcy the stock price

9  movements at Mallinckrodt were not so much based on the

10 company's operating performance, but they're more based on

11 the likelihood that it would go into bankruptcy.

12      So, we rejected that and what we did is we developed a

13 peer group of companies who are similarly structured in the

14 pharmaceutical area and we took -- we looked at their beta's

15 on a five year basis and determined that on (indiscernible)

16 basis they had an average of 1.28 and a medium of 1.32.

17 Again, trying to be conservative here.  We looked at

18 Mallinckrodt and said, well, it's very similar to

19 (indiscernible) in terms of leverage.  We thought it was

20 slightly riskier.  So, we concluded that the levered beta

21 would be 1.5.

22 Q    If you had to --

23 A    But to get that --

24 Q    I'm sorry.  I didn't mean to interrupt.  Go ahead.

25 A    Your question, I think, is a good one.

1      If we use --

2  Q    If you had used Mallinckrodt's historical beta what

3  impact would that have had on the determination of the beta?

4  A    Well look at the line where, it's in the middle of the

5  page, it shows Mallinckrodt's five year look back.  The 5.8

6  and it doesn't really make any sense because it's so out of

7  kilter with other companies in the industry.  So, that is why

8  we felt that this was unreliable because the stock was being

9  priced off of different variables other than the

10 characteristics of the company.

11 Q    Okay.  So you concluded that the levered beta was 1.5?

12 A    I did.

13 Q    Okay.

14 A    So if we go back to the previous schedule --

15        MS. MILLER:  Ms. Reiser, if we could go to

16 Schedule 3-B, the page before please.

17        THE WITNESS:  There we go.  So, if we look at this

18 indicated cost of equity calculation here, we have the equity

19 risk premium of 6.17, a levered beta of 1.5.  So, you

20 multiply the 1.5 times 6.1 so that we get 9.26 percent.  We

21 add the risk-free rate and we add the size premium to come up

22 with the cost of equity of 12.9 percent and that's what we

23 used when we looked at the weighted average cost of capital.

24 So, fifteen percent of that weighted average is going to be

25 the 12.9 percent

1  BY MS. MILLER:

2  Q     So, we have the cost of equity calculation.  Now let's

3  talk about the cost of debt.  What did you do to make that

4  determination?

5  A     First of all, we looked at what the company's profile

6  was in terms of its leverage.  And here we were looking at

7  the debt to capital of eight-five percent.  So, that to me

8  was indicative of a company that was rated, you know, by one

9  of the rating agencies as a single B.

10        And I remember it was long term debt rating.  The

11  rating agencies value a company or, I should say, in-value a

12  company by different debt ratings.  So, the (indiscernible)

13  their triple AAA, they have the double AA, then single A,

14  then triple B.  When we get below triple BBB we cross what we

15  call the investment grade line and are getting to non-

16  investment grade or sometimes call junk bonds.  And those are

17  rated double BB, single B, and triple C.  And all of that is

18  in default.

19        So here, when I assumed is the company was rated single

20  B which is the long-term rate for a single B company is about

21  ten percent.

22  Q     And just so the record is clear when you say B you're

23  saying B as in boy?

24  A     Yes.

25  Q     Okay.  So you determined it was approximately ten

1 percent?

2 A    That's right.  So when we look at the chart just in

3 front of you -- go to 3-A.

4        MS. MILLER:  The page before, please, Ms. Reiser.

5        THE WITNESS:  There we go.  This shows the 12.9

6 percent for the cost of equity, the weighting at fifteen

7 percent, and the cost of debt of ten percent.  Remember --

8 notice here where it says the after-tax cost of debt is ten

9 percent.  If we are able to deduct interest from our income

10 taxes then this would be 7.4 percent because we would be able

11 to deduct the twenty-six percent for our tax rate.

12        Here we didn't do that.  We assumed that they were

13 not able to deduct it and so they paid the full freight goes

14 into this calculation of the weighted average cost of

15 capital.  So, eight-five percent of ten percent gives you 8.5

16 plus the 1.9.

17        So, we come up with a total of 10.4 which I

18 believe we have a fairly conservative approach to this whole

19 calculation of the discount rate.  It is in line with our

20 overall approach trying to be conservative without being

21 ridiculous.

22 BY MS. MILLER:

23 Q    We have to consider the terminal growth rate, right?

24 A    Yes.

25 Q    Just explain what is that?

1   A     Well, typically a company is going to give you the

2   five-year projections, but then what happens after the fifth

3   year?  That is where the evaluator needs to decide how the

4   company is going to perform into perpetuity or in the

5   terminal period.

6         What we typically assume is that a company that is a

7   going concern is going to grow somewhere between the

8   inflation rate and the overall growth of the economy of GDP.

9   So, we looked at those two indicators as, sort of, goal

10  posts.  We try to find a place in the middle of that where

11  the company belongs.

12        Here, again, trying to be somewhat conservative we

13  listed growing the company close to the rate of inflation of

14  2.5 percent.  We thought that that was --

15  Q     Can we turn to the previous page of this exhibit,

16  Schedule 2-C.

17        I don't mean to interrupt and make you repeat there,

18  Mr. Jeffers, but if you could just explain how you go to your

19  number with your schedule.

20  A     So here in the revenue line we see the terminal value

21  is growing at 2.5 percent.  That means that every year after

22  2024, every year after that the revenue grows at the rate of

23  the expected rate of inflation which is 2.5 percent.

24  Q     Now if I look at the percentage of growth rate in some

25  of the prior year's they're negative numbers, right?

1  A      They are.

2  Q      So is the growth rate of 2.5 aggressive?

3  A      Typically for companies that are going concerns we're

4  assuming that you get a growth inflation.  If we didn't

5  assume that that would mean that the real rate of growth

6  without inflation is negative and that is typically what we

7  see in companies that are failing or are not going concerns.

8       So we're very -- we understand that they're always

9  going to be bugging at companies and other companies that are

10 in industries that are not going to be successful in the

11 future.  Here, there doesn't seem to be any reason to believe

12 that.  What is happening with drug prices?  What is happening

13 with healthcare prices?  What if the growth of orphan drugs,

14 which is one of the primary targets for this company, they're

15 anticipated to grow ten percent in a year.

16      So all of these have indicated to me that the industry

17 was growing at a considerable rate and there doesn't seem to

18 be any reason why this company wouldn't enjoy, at least, some

19 of that and at least grow with the rate of inflation.

20 Q      Let me stop you there and take a pause on your

21 evaluation.  Let me ask you, you were in the hearing this

22 morning when Mr. Welch testified.  Is that right?

23 A      I was.

24 Q      All right.  Did you hear him testify about the products

25 that are listed in your declaration regarding the pipeline?

1  A      I was.

2  Q      Okay.  Do you have a response to that?

3  A      If I can refer to Page 12 of my declaration.  If you

4  look at the citation there that was taken from --

5  Q      Let me bring that up.  Ms. Reiser, can you go to Page

6  12 of 22, please.  Thank you.

7         Go ahead, Mr. Jeffers.

8  A      That was taken a presentation the company made back in

9  January of 2019.  One of the reasons I included it is that I

10 had seen this chart or something similar to it in a number of

11 presentations the company had made.  They were during the

12 context of showing the investment public that this company

13 had a very viable future, a good pipeline of very, sort of,

14 promising drugs.  So, that is why you should invest in this

15 company because we have, in part, because we have this good

16 pipeline.

17        So, if you -- my mistake here is that I took this chart

18 from January 2019.  If I had taken it from the company's

19 presentation in October of 2020, which if you look at that

20 presentation, I don't know what the JX number is, but if you

21 look on Page 13 of that presentation you will find a chart

22 very much like this.  Many of the drugs that are included

23 here almost all of them are in that later presentation.  Some

24 of them show progress in terms of registration or the ones

25 from phase one to phase two, or phase two to phase three.

1    All of that showed me the indication that this company

2 was making progress on these drugs that they had identified

3 as having a very viable future for the company.  And the fact

4 that one gets denied by the FDA and one gets delayed is not,

5 to me, an indication that somehow the company's pipeline is

6 somehow not very important or not a very good indication that

7 the company should be able to grow in the future.

8    So that is why I put that chart in there because the

9 company, itself, was using this as a way to express their

10 confidence in the future.

11 Q    So let me just go back and make sure we followed.  You

12 were talking about in October 2020 presentation is that --

13 are you referring to materials that were made public by the

14 company?

15 A    Yes.

16 Q    Okay.  And you -- did you rely on those in your

17 declaration otherwise?

18 A    I didn't rely on them in the sense of -- I didn't

19 evaluate each drug or anything like that.  What I was

20 evaluating was the company's willingness to present the

21 pipeline to the public in a fair amount of detail which is a

22 little unusual.

23    With the other companies that I have seen -- you know,

24 I looked at the SEC filings, I don't see quite this level of

25 detail made public.  But be that as it may what it showed me

1  is that the company is trying to show confidence in its

2  future performance.

3  Q    Okay.  So, you're not giving an evaluation or opinion

4  on any particular drug that is going to come to market or not

5  make it to market.  Is that fair?

6  A    I am not a pharmacologist.  I am not an expert in

7  drugs.  It's not my field.

8  Q    Okay.  All right.  So we started talking about that

9  because we were talking about the terminal growth rate.

10  A    Right.

11  Q    So, you were telling us some of the factors that you

12  considered to come up with your terminal growth rate.  What

13  did you conclude again?

14  A    I assumed that the terminal growth rate would be 2.5

15  percent.  And, you know, it's based on looking at a variety

16  of things; everything from the growth of the industry, the

17  increase in pricing among drugs, and the increase in

18  healthcare costs in general plus the company's own, sort of,

19  presentation about their ability to compete in the market and

20  to offer to the public very promising drug indications.

21        MS. MILLER:  Ms. Reiser, can we turn to Schedule

22  2-A.  It's probably around Page 18.

23  BY MS. MILLER:

24  Q    Okay.  Mr. Jeffers, why don't we walk through here at

25  the bottom part of your chart to explain to the court how you

1  came to the inputs coming to your conclusion?

2  A     Okay.

3  Q     Start with the -- all right, go ahead.

4  A     So we start on the top on, what we call, NOPAT, net

5  operating profit after taxes.  So to that we add

6  depreciation, we subtract capital expenditures, and we

7  subtract an increase in networking capital.  Notice, we do

8  that in each of the years during the projection period and

9  then we determine what that would be like in the terminal

10 period as well.

11 Q     Okay.

12 A     That gives un-levered cash-flow.  We use a discount

13 rate to discount each of those during the projection period.

14 We discounted them at 10.4 percent.  This gives us a -- if we

15 go down to the sum of cash-flows during the projection period

16 and that gives us a value of $1.5 billion.

17 Q     And then that's -- let me -- let's just walk through it

18 a little bit slower.  So, your sum of cash-flow is the sum of

19 the present value of free cash-flow is the line prior to

20 that?

21 A     That's correct.

22 Q     Okay.  All right. Then you are going to add to that

23 your terminal value.

24 A     Right. And you have to look at the little box over to

25 the lower right-hand corner.  We are capitalizing the

1  terminal cash-flow of $498 million and we're dividing by that

2  a capitalization rate of 7.9 percent.  So that is the 10.4

3  percent that we use as our weighted average cost of capital

4  subtracted by the 2.5 percent which is our terminal growth

5  rate.  And we come up with the terminal value of $6.3

6  billion.

7       Remember, that is five years in the figure.  So, we

8  have to dive -- we divide that by -- actually, we multiply it

9  by the present value factor to come up with the value of the

10 terminal value of about $4.4 billion.

11 Q    So the value of that five years cash-flow over value of

12 that today?

13 A    Yes.  Remember, that's the entire future of this

14 company after the projection period.

15 Q    Okay.

16 A    The discounted cash-flow --

17 Q    The chart here you used, you add them to come up with

18 your operating value of invested capital?

19 A    Right.  And that comes up with about $6 billion in the

20 value of invested capital.  We add the cash or, I should say,

21 the non-operating cash, we subtract the debt -- remember

22 here, we're taking on all the debt and we're also including

23 the $520 million of the Acthar litigation settlement and

24 we're considering that as long-term debt.  So, when we make

25 that calculation our result is almost a billion dollars, $989

 1 million.

 2 Q    So this $989 million value is that the right valuation

 3 of the company after the spinoff?

 4 A    Well can we look at the --

 5          MR. HARRIS:  Objection, Your Honor.  Can counsel

 6 clarify what company she is talking about?

 7          THE COURT:  You want to clarify, Ms. Harris -- Ms.

 8 Miller, I'm sorry.

 9          MS. MILLER:  We're talking about his valuation,

10 what he did.

11          THE WITNESS:  I'm talking about the value of

12 Mallinckrodt PLC minus or after the hypothetical spinoff of

13 Specialty Generics.

14          THE COURT:  Okay.

15          THE WITNESS:  Remember, any --

16          MR. HARRIS:  I object, Your Honor.  That is an

17 opinion that is not in his declaration.  There is no opinion

18 of the value of PLC.  There is an opinion of a spun-off

19 Specialty Brands business.  So, I would object to that.  If

20 that is the opinion he is trying to give that is outside of

21 the declaration.

22          THE COURT:  Ms. Miller?

23          MS. MILLER:  I don't think -- he's not changing

24 his opinion and he's not changing his valuation.  This is in

25 his declaration.  Maybe he can describe it clearer.  Maybe it

1  was not clear in his testimony, but he is not changing his

2  testimony.

3          THE COURT:  I don't think he's changing his

4  testimony.  I think what Mr. Harris is saying is that he's

5  giving an opinion that was not included in his declaration.

6          MS. MILLER:  I don't think that is the case, Your

7  Honor.  We're not presenting a different opinion that was not

8  in the declarations.

9          MR. HARRIS:  Your Honor, the only opinion in the

10 declaration is of a hypothetical spun-off Specialty Brands

11 business, a hypothetical spun-off Specialty Brands company.

12 I have the question limited to that.

13         THE WITNESS:  So, in my --

14         THE COURT:  Hold on, Mr. Jeffers.  I get to rule

15 first before you can speak.

16         THE WITNESS:  I'm sorry.

17         MS. MILLER:  I can try to clarify, Your Honor.

18 Maybe I misspoke when I asked the question because we are not

19 trying to elicit a different opinion.

20         THE COURT:  All right.  Why don't we ask the

21 question again?

22         MS. MILLER:  I have to remember what the question

23 was.

24 BY MS. MILLER:

25 Q    Mr. Jeffers, let's go back.  You gave your opinion is

1  your valuation of $989 million.  Just so we can make the

2  record clear what is that evaluation?

3  A    That's the value of Specialty Brands on a stand-alone

4  basis without the benefit of any (indiscernible).

5  Q    Okay.  So that valuation, using -- that is the right

6  valuation of that company as you have described it?

7  A    Well that is the most conservative value I can come up

8  with for the value of this segment because it doesn't include

9  any of the tax advantages.  Pharmaceutical companies have

10  made a widespread practice of using their tax benefits to

11  their greatest advantage including changing their

12  headquarters to Ireland which is a tax haven.

13       So, do I think the segment is worth a billion dollars,

14  no, I think it's worth much more than that. What I don't know

15  is how much more.  Is it worth $2.1 billion?  Is it worth

16  $2.7 billion?  I am not here to tell you that because I can't

17  tell you what those tax advantages would be.  All I know is

18  that some of those, if not all of them, will survive.

19            MS. MILLER:  That's all I have, Your Honor.

20            THE COURT:  Thank you.

21            Mr. Harris, cross?

22            MR. HARRIS:  Thank you, Your Honor.

23                      CROSS EXAMINATION

24  BY MR. HARRIS:

25  Q    Good afternoon, Mr. Jeffers.

1  A      Hello.  How are you?

2  Q      Good.  Thanks.

3         You currently work for the Griffin Group you testified,

4  right?

5  A      I do.

6  Q      Okay.  You were last an investment banker over twenty

7  years ago, right?

8  A      I was never an investment banker.  I was a commercial

9  banker.

10 Q      Thank you.

11        That was over twenty years ago that you were a

12 commercial banker, right?

13 A      That's correct.

14 Q      And the principal business of the Griffin Group is

15 performing business valuations, you testified, right?

16 A      Business valuations for M&A transactions primarily in

17 the Delaware Court of Chancery.

18 Q      Well eighty to ninety percent of the Griffin Group's

19 valuations are actually done for litigation purposes, right?

20 A      That's what I told you at the deposition, yes.

21 Q      And you personally spend about 90 percent of your time

22 on litigation services, right?

23 A      That's correct.

24 Q      The Griffing Group doesn't provide any investment

25 advice, right?

1  A     We do not.

2  Q     And you personally don't advise clients on whether to

3  buy or sell securities, right?

4  A     No, we do not.

5  Q     And you don't advise clients on whether to buy or sell

6  companies or business segments of companies, right?

7  A     Well, as I mentioned before in our deposition, there

8  are times when we will value a company that might be sold or

9  is being sold and they'll ask us to do a valuation for

10 reference purposes.

11 Q     Sir, you've never previously valued a business segment

12 to be spun out of a business, right?

13 A     Not per se, no.

14 Q     And you've never provided an expert valuation of a

15 company where the company is in a Chapter 11 before, right?

16 A     That's correct.  I've done things on the edges of that,

17 but not the company, per se.

18 Q     Well, you've never done a DCF calculation before of a

19 company in bankruptcy or even near bankruptcy, right?

20 A     I can say we haven't done one in bankruptcy.  I'm not

21 sure about the near bankruptcy.

22 Q     Well, you personally, have not done a DCF valuation of

23 a company even near bankruptcy, right?

24 A     Again, I'm not sure of that.

25 Q     You've never provided an expert valuation of a company

1  with large, contingent liabilities before, right?

2  A     No.  I've done contingent assets, not contingent

3  liabilities.

4  Q     And you've never valued litigation claims, right?

5  A     That's correct.

6  Q     And you're not an expert in bankruptcy, right?

7  A     I don't profess to be.

8  Q     You're not an expert in restructurings, right?

9  A     No, I'm an expert in business valuation.

10  Q     You're not an expert in arranging financing for

11  companies, right?

12  A     No, that's the purview of investment bankers.

13  Q     And you're not an expert in M&A transactions, right?

14  A     I don't know that that's not true.  I look at all sorts

15  of M&A transactions and determine whether they were done at

16  the right price or not, so I can't agree with you there.

17  Q     You're not an expert in orchestrating or arranging M&A

18  transactions, right?

19  A     No, again, that's what an investment banker does.

20  Q     And you're not an expert in the pharmaceutical

21  industry, right?

22  A     No, I don't -- no.

23  Q     Okay.  Now, the Griffing Group was contacted in early

24  November about this engagement, right?

25  A     That's correct.

1  Q     And you began working immediately, right?

2  A     I started reading some of the docket soon after that.

3  Q     And when I took your deposition just a couple of weeks

4  ago or a week and a half ago, you weren't sure whether you'd

5  spent more than 100 hours on the engagement at that time,

6  right?

7  A     I told you that I don't really count hours when this is

8  being done on a fixed-fee basis.

9  Q     How about as of now, the whole Griffing Group, do you

10 think the Griffing Group has spent 100 hours on this now?

11 A     Well, we haven't spent any more time to speak of since

12 the deposition, so if we didn't do it then, we didn't do it

13 now.

14 Q     All right.  I'd like to just quickly look at your

15 engagement letter.

16         MR. HARRIS:  Ms. Reiser, could you pull up

17 Mallinckrodt Exhibit 5.

18 BY MR. HARRIS:

19 Q     And, sir, that's the engagement letter that covers this

20 engagement, right?

21 A     Yes, it looks like it.

22         MR. HARRIS:  Ms. Reiser, can we turn to Page 2.

23 BY MR. HARRIS:

24 Q     And do you see at the top it indicates, at the very top

25 it says:

1           "Professional fees for valuation, consulting, and

2     testimonial services will be billed at our standard hourly

3     rates."

4           Do you see that, sir?

5     A     I do.

6     Q     Okay.  And for you that's $600 an hour, right?

7     A     It is.

8     Q     But this work that you're doing today through this

9     hearing is not hourly, right?

10    A     That's correct.

11    Q     You agreed to do the entire project through this

12    hearing for a fixed $15,000 fee, right?

13    A     I did.

14    Q     Okay.  That's 25 hours at your hourly rate, right?

15    A     That's correct, I think.  If you say so.

16    Q     And that fixed-fee arrangement is not disclosed in your

17    engagement letter, right?

18    A     No.

19    Q     And you'll only be --

20    A     Well, wait, wait, wait, wait a minute.

21          On the first line of fees and timing -- it's hard for

22    me to read this, I'm sorry:

23          "We will work with you to determine the best

24    process for billing for our services."

25          Do you see that?

1  Q      I do, sir.

2         So, do you see some reference in the engagement letter

3  to there being a fixed-fee arrangement for this portion of

4  it?

5  A      No, but that first sentence is unusual in our

6  engagement letters because of the unusual nature of this

7  engagement for us.

8  Q      And you'll only be able to start being hourly if the

9  equity committee is appointed, right?

10 A      That's correct.

11 Q      Okay.  Now, I want to talk about the data sources that

12 you used for your valuation.

13 A      Okay.

14 Q      You relied on a management presentation from October

15 2020, right?

16 A      No, I relied on a January 2019 presentation.

17        As I just testified, I compared that with one that was

18 done later, but in my declaration, I referred and used the

19 data from the 2019 presentation.

20 Q      Sir, you haven't reviewed Mallinckrodt's most recent

21 financial statements, the third quarter financial statements

22 released in November 2020, right?

23 A      Very briefly, I did look at the DIP lender and other

24 things, but very, very -- it was a very cursory analysis.

25              MR. HARRIS:  Ms. Reiser, could we pull up the

1  deposition transcript of Mr. Jeffers.  If we could go to

2  Page 182, please.  If we could go to Line 18.

3  BY MR. HARRIS:

4  Q    Sir, is this the question and answer:

5         "Question:  Have you reviewed Mallinckrodt's third

6  quarter financial statements released on November 3rd, 2020?

7         "Answer:  I have not."

8       Was that your testimony, sir?

9  A    Yes.  And let me explain.

10      I didn't review the third quarter as much as one of my

11  staff members did and he said, he asked me, should we put in

12  the third quarter debt numbers and sort of work on that basis

13  and I said, Yes.

14      So, when I said we have reviewed it, we have, but it

15  was to reflect the debt number.

16  Q    Okay.  And, sir, you didn't talk to management in

17  preparing your opinions here, right?

18  A    No.

19  Q    And you didn't review analysts' reports in preparing

20  your valuation, right?

21  A    No.

22  Q    And you didn't talk to any investors in Mallinckrodt,

23  other than the ad hoc group of shareholders, right?

24  A    Prior to writing these declarations, I did not talk to

25  any shareholders.

1  Q     And you'd normally take a much longer time to do a

2  valuation, right?

3  A     I'd certainly prefer that, yes.

4  Q     And you'd need more information like looking at the

5  company's peer group and evaluating the drugs that are coming

6  to market, in order to perform a valuation you'd be

7  comfortable in bringing to a Court, right?

8  A     Those are elements that we'd like to see more

9  information on, yes.

10 Q     All right.  Now, I want to focus on what valuation you

11 provided or are providing here.

12       You're not offering a standalone valuation --

13 standalone opinion on the value of PLC, right?

14 A     No.

15 Q     And you're not offering an opinion on the value of

16 shares of PLC, correct?

17 A     No.

18 Q     And you're not giving an opinion that the equity value

19 at PLC is, for instance, $500 million, right?

20 A     No.

21 Q     And you're not giving an opinion that the shares of PLC

22 are worth $6 or any other number, right?

23 A     That's correct.

24 Q     And you're not giving an opinion on what distributions

25 will occur in the bankruptcy on an absolute priority basis,

1  right?

2  A      No.

3  Q      You don't have a number that you're comfortable sharing

4  as to what the value of the equity of Mallinckrodt PLC is on

5  a consolidated basis, right?

6  A      No, as we talked about earlier, we did a very cursory

7  valuation of PLC as a check on our valuation of this

8  Specialty Brands on a standalone basis and it was just as a

9  check.  It wasn't for a standalone valuation.

10 Q      Okay.  So, you don't have a number that you're

11 comfortable sharing as to what the value of the equity of PLC

12 is, right, sir?

13 A      That's correct.

14 Q      So, all those times where you testified, you know, a

15 little while ago about the value of the company, you meant

16 the value of a hypothetical, standalone Specialty Brands

17 business, right?

18 A      Yes, but it seems that you're trying to make a

19 distinction between PLC minus Generics and Specialty Brands.

20 Q      We'll get there --

21 A      What I'm saying --

22 Q      Go ahead, sir.

23 A      -- from a hypothetical standpoint, they're one in the

24 same.

25 Q      All right.  Well, let's talk about how you did your

1  valuation of a hypothetical, standalone business of segment

2  brands, okay.  The company provided projections for 2020 to

3  2024, right?

4  A    It did.

5  Q    And you agree that the appropriate valuation

6  methodology is to start with the company's projections,

7  right?

8  A    As I've said before, that's where we'd like to start,

9  yes.

10 Q    Now, today you called management's projections

11 conservative in your direct testimony, right?

12 A    Well, I've been consistent on that.

13 Q    But the company doesn't describe its projections as

14 conservative, right?

15 A    It doesn't say anything about them.

16 Q    Well, you don't have any basis to believe that the

17 projections the company provided are not its best estimate of

18 future revenues, right?

19 A    I don't know that, either positively or negatively.

20 Q    And your only basis for calling management's

21 projections conservative is that they project a decline, as

22 opposed to an increase in revenues, right?

23 A    When a company shows a 30 percent decline in revenues

24 over the next 15 months, I consider that to be conservative.

25 I don't see that very often.

1  Q     Sir, my question is your only basis for calling

2  management's projections conservative is that they project a

3  decline as opposed to an increase in revenues, correct?

4  A     Yeah, and I'm just suggesting that it was the size of

5  the decline that indicates to me that this is conservative.

6  Q     And you testified earlier that sometimes you look at

7  how the company's projections have compared to their actual

8  results, right?

9  A     Yes.

10 Q     But here you didn't check how the 2020 estimates of

11 management have compared to actuals to date, right?

12 A     I don't believe that's possible.

13 Q     You didn't print (indiscernible) --

14 A     The projections --

15 Q     Go ahead.

16 A     The projections were made as of October 2020.  The only

17 actuals would have been a date, September 30th, which would

18 have been the date before they made the projections.

19 Q     Sir, you didn't look at, for instance, in the prior

20 year, how their projections for 2020 have compared to how

21 performance in 2020 has been, right, sir?

22 A     I didn't have those projections.

23 Q     And you're aware that other companies that have very

24 significant deadlines in revenue during the pandemic of 2020,

25 right?

1  A     Some have done very well.  Some have done very poorly.

2  Q     Now, the projections that you're using are from the

3  October 2020 presentation, right?

4  A     That's correct.

5            MR. HARRIS:  Ms. Reiser, could you pull up Joint

6  Exhibit 4 and could you go to, think it's PDF Page 26 or it

7  would be Page 25 at the bottom.

8  BY MR. HARRIS:

9  Q     Okay.  And these are the projections that you used,

10  sir, right?

11  A     They are.

12            MR. HARRIS:  And Ms. Reiser, could you pull up the

13  footnotes at the bottom.

14  BY MR. HARRIS:

15  Q     The notation source indicating that the projections are

16  as of June 2020.

17        Do you see that?

18  A     Oh, I didn't see that before.

19  Q     Okay.  And, sir, you didn't make any adjustments to

20  reflect any developments that have happened after June 2020,

21  right?

22  A     No, I don't know how that would be possible, quite

23  honestly, because (indiscernible) --

24  Q     Yeah, but you don't know if there's been any -- sorry.

25  A     And you're asking if we had one more quarter of

1  numbers, whether that would be a sign that this company is

2  doing better or worse than their annual projections, I can't

3  do that.

4  Q    Well, sir, you don't know if there's been any negative

5  impact recently regarding any of the drugs in the company's

6  pipeline, right?

7  A    No, I don't have that kind of detail.

8  Q    And you don't know what a CRL is, right?

9  A    Quite honestly, when Mr. Welch described what a CRL

10 was, that was, you know, that was new to me this morning.

11 Q    Okay.  So, you don't know if getting a CRL or complete

12 response letter is good or bad news, right?

13 A    As I understand, it's not good news.

14 Q    But you weren't aware of that at the time that you

15 provided your declaration, right?

16 A    No, but I hadn't actually reviewed any of the company's

17 experiences with the FDA, so I don't know if that would have

18 been rest.

19           MR. HARRIS:  Ms. Reiser, could you turn to the

20 next page in this slide, please.

21 BY MR. HARRIS:

22 Q    And do you see on the right, sir, there's a section

23 called brands, pipeline, Terlipressin updates.

24      Do you see that?

25 A    Yes.

1  Q     Okay.  And do you see it says FDA has issued a complete
2  response letter, a CRL, regarding Terlipressin.
3        Do you see that?
4  A     I do.
5  Q     Okay.  And you didn't make any adjustments to the
6  company's June 2020 projections with (indiscernible)
7  developments in the drug portfolio since the June projections
8  were generated, right?
9  A     No, this would have been reflected in those June
10 projections.
11 Q     I see.  So, you're assuming that the impact of the
12 Terlipressin CRL is reflected in the June projections.
13       Is that your testimony?
14 A     I would assume that.  I don't know that, but I would
15 assume it, because it's coming from the same presentation.
16 Q     Do you know when the CRL came out, sir?
17 A     No.
18 Q     Okay.  Would it surprise you to hear it came out in
19 September, after the June presentations?
20 A     If you say so.  I don't know anything about that.
21 Q     Okay.  Now, I want to focus on the work that you did
22 with these projections.
23       You only did a DCF analysis you testified to, right,
24 sir?
25 A     They only relied on a DCF.

1  Q      You didn't rely on a comparable companies' analysis or

2  a comparable M&A transactions' analysis, right?

3  A      That's correct.

4  Q      Okay.  So, I want to talk, then, about your DCF.

5          MR. HARRIS:  Ms. Reiser, could we pull up Joint

6  Exhibit 1, the declaration which has some of the schedules

7  behind it, and if we could go to, I believe it's Page 60, and

8  that's Schedule 2(a).  And can you blow up the line item,

9  Operating value invested capital.

10  BY MR. HARRIS:

11  Q      That row is where you estimate the value of the Brands

12  business as a hypothetical, standalone company at 5.99

13  billion, right?

14  A      Yes.

15  Q      Okay.  And then right above it is the plus terminal

16  value row, right?

17  A      That's correct.

18  Q      And that row shows that about three-quarters of your

19  valuation comes from your calculation of terminal value,

20  right?

21  A      Yes, that's (indiscernible) typical.

22  Q      Okay.  And the terminal value is the value after the

23  expiration of the period where management provided

24  projections, right?

25  A      It's during the terminal period, that's right.

1  Q     And the terminal value is driven principally by the

2  terminal growth rate and the weighted average cost of

3  capital; is that right, sir?

4  A     Those are elements of it, but there are other elements.

5  Q     But it's driven principally by those two elements,

6  right, sir?

7  A     Those are important elements, yes.

8  Q     And neither of those two elements were provided to you

9  by management, right?

10 A     That's correct.

11 Q     All right.  So, for the terminal growth rate, you're

12 projecting that the Brands business would experience 2.5

13 percent annual revenue growth forever, right?

14 A     That's correct, in line with inflation.

15 Q     Okay.  And that's what you did, for the terminal growth

16 rate, you used what you thought was the expected U.S.

17 inflation rate, right?

18 A     That's correct.

19 Q     And you thought that your 2.5 percent inflation number

20 came from the Federal Reserve District of St. Louis, right?

21 A     Yes, it did.

22 Q     But no one at the company has projected that Brands

23 revenue would increase 2.5 percent annually in perpetuity,

24 right?

25 A     No, this is very typical of the kind of information

1  that we will get from a company, that they give us a five-

2  year projection and then it's our obligation to determine

3  what the terminal value will consist of.

4  Q    Okay.  I just want it be clear, though.

5       No one at the company has indicated that they expect

6  Brands revenue to increase 2.5 percent annually in

7  perpetuity, right?

8  A    That's correct.

9  Q    So, until 2025, you rely on management's five-year

10 projections, '20 to '24, right?

11 A    That's correct.

12 Q    Okay.

13       MR. HARRIS:  Can we look at the next page of the

14 schedule or the next page of your exhibit, so it's

15 Schedule 2(b).  Thank you, Ms. Reiser.

16       And I want to focus on the revenue line item, the

17 top line item.

18       THE WITNESS:  Okay:

19 BY MR. HARRIS:

20 Q    So, in the company's projections, revenue growth is

21 calculated to be negative in three of the five years, right?

22 A    That's correct.

23 Q    And in only one of the years is growth more than 1

24 percent, right?

25 A    That's correct.

1  Q     And in the last year, 2024, management's projections
2  revenues are projected to decrease by negative 0.4 percent,
3  right?
4  A     That's correct.
5  Q     So, you project the revenues will then increase by 2.5
6  percent the following year, right?
7  A     That's correct.
8  Q     And the basis for your 2.5 percent assumption is that
9  you believe any going concern should grow at least the
10 inflation rate, right?
11 A     That's right.  The real growth would be, at a minimum,
12 zero.
13 Q     But the company is projected to be a going-concern in
14 2020, '21, '22, '23, '24, right?
15 A     They are.
16 Q     And yet the company is projecting that its revenues
17 will grow less than your inflation rate during this five-year
18 period, right?
19 A     That's correct.  It's part of the reason I've
20 considered this to be conservative.
21 Q     And, in fact, the company projects its revenues will
22 shrink over those five years, right?
23 A     Essentially, yes.
24 Q     And you don't believe that you're better at forecasting
25 the company's revenues than management is, right?

1    A    No, but I don't know what the purpose of their cash

2    flow projections actually were.  Was it litigation-driven or

3    was it driven by something else?

4         You know, normally, we look for projections that are

5    done in the normal course of business by management with the

6    idea that they would be used for the management of the

7    company.  We don't know that here and that's part of the

8    problem.

9    Q    Sir, you don't have any basis to believe that these

10   projections here weren't prepared in the ordinary course of

11   business for the purpose of managing the company, do you?

12   A    We don't know that either way; either positively or

13   negatively.

14   Q    Sir, you don't believe the company is misleading the

15   public about what its best estimates at future revenue will

16   be, do you?

17   A    I don't know that.

18   Q    And Mallinckrodt's growth rate after 2024 will depend

19   on the attractiveness of its products, right?

20   A    One would assume that, yes.

21   Q    And you're not giving any opinion on the attractiveness

22   of any of Mallinckrodt's products, right?

23   A    No, I don't have that information, especially during --

24   with the idea of this being a preliminary valuation.

25   Q    You haven't reviewed any of the results of the clinical

1 | studies for any of these products, right?

2 | A     No, that would require a very deep dive into the weeds

3 | here and I didn't do that.

4 | Q     You have reviewed any of the governmental reports on

5 | those products, right?

6 | A     Same answer, no.

7 | Q     You're relying on the company's views as the prospects

8 | of its future products coming to market, right?

9 | A     Yes and no.

10 | Q     Well, sir --

11 |           MR. HARRIS:  Can we pull up the deposition

12 | transcript again, Ms. Reiser.  Can we go to Page 72, please,

13 | Line 3.

14 | BY MR. HARRIS:

15 | Q     So, Line 3, were you asked this question:

16 |           "Question:  You were relying on the company's

17 | views as the prospects of its future products coming to

18 | market, right?"

19 |       And your answer was, "Yes."

20 |       That was your testimony, right, sir?

21 | A     Yes.

22 | Q     Okay.  Now, in your declaration, as you talked about

23 | earlier, you cited a January 2019 report by Mallinckrodt --

24 | A     I'm sorry, Chris.  Can I interrupt?  Can we go back to

25 | that statement?  I'm sorry.

1    In the deposition you said that I said that I did rely

2  on them and now I'm saying yes and no.  And what I'm doing is

3  I'm amplifying the answer I made in the deposition.

4    In the deposition, we were talking about the company's

5  projections, but here, what you've introduced is not just the

6  projections, but you're also introducing the terminal growth

7  rate.  And so, when I say I'm relying on the company's

8  projections for the -- I'm relying on the company's views of

9  its products for the projections, of course, I am.

10    But during -- in the terminal period, I'm looking not

11 so much to those views on the products.  I'm looking towards

12 the view of the industry and the position of the company

13 within that industry.  So, I'm not looking at the particular

14 drugs in that terminal period.  So (indiscernible) --

15 Q    Sir, in your report -- I'm sorry, sir -- in your

16 report, you don't cite to any industry reports about growth

17 rates for the industry, do you?

18 A    No, but I believe I don't.

19 Q    You don't cite in your declaration, any reports about

20 the growth rates for orphan drugs or their pricing, right?

21 A    I don't.  I did after I wrote the -- after we did the

22 deposition, I did look at a report on the growth of various

23 drugs and --

24 Q    Sir, I don't mean to cut you off, but I don't want to

25 hear about materials that were not cited in your report.

1   A      Okay.  That's fine.

2   Q      I apologize for cutting you off, but I just wanted to

3   limit --

4   A      Okay.

5   Q      Now, you did cite a January 2019 report by Mallinckrodt

6   that we looked at earlier, right, the admin chart?

7   A      I did.

8   Q      Okay.  And that was just taken almost exactly -- the

9   chart in your declaration was taken almost exactly from that

10  January 2019 report, right.

11  A      I tried to be as exact as I could.

12  Q      Okay.  You'd have no basis to change any of the

13  information presented in that January 2019 report, right?

14  A      I wasn't trying to change anything.

15  Q      Okay.  And you assume that all those drugs must be

16  promising, because they were all on this two-year-old chart,

17  right?

18  A      The company was making an announcement to the investing

19  public about the promising pipeline that they had in

20  progress.  So, I took that as something they were very proud

21  of.

22  Q      But you don't know the current status of any of those

23  drugs, right?

24  A      Well, I compared this with the very similar page,

25  Page 13 on that October 2020 presentation, and there we saw

1  almost all of the same drugs or drugs indications and many of

2  them had progressed along from one phase to another.

3          MR. HARRIS:  And Ms. Reiser, can we pull up the

4  deposition transcript again.  If we could go to Page 159,

5  Lines 16 to 18.

6  BY MR. HARRIS:

7  Q    Were you asked this question:

8          "Question:  Do you know what the current status is

9  of any of those --"

10 A    (Indiscernible.)

11 Q    And the answer was, "No."

12 A    At the time, that was true, and last night when I was

13 reviewing some materials, I found that chart on the October

14 2020 presentation and that's where I compared the two.

15 Q    All right.  Well, sir, at the time you formulated your

16 opinions and issued your declaration, you didn't know the

17 status of any of the drugs on that January 2019 chart, right?

18 A    That's correct.

19 Q    Okay.  Likewise, you didn't know if any developments

20 had occurred on any of those drugs since January 2019, right?

21 A    That's correct.

22 Q    And you didn't even attempt to determine whether there

23 had been positive of negative developments on any of those

24 products since January 2019, right?

25 A    No, as we've said many times, this was a preliminary

1  valuation.  That would have required a lot of additional

2  research.

3  Q     And you couldn't give an estimate of the probability of

4  success for any of these drugs, right?

5  A     No, I couldn't.

6  Q     And you don't know which of these drugs has considered

7  the most promising, right?

8  A     No, I didn't.

9  Q     And you don't know how much revenue the company

10  projects any of these drugs will generate, right?

11  A     Not personally, no.

12  Q     All right.  Now, another large assumption that drives

13  value in your DCF is the WACC, the discount rate, right?

14  A     Right.

15          MR. HARRIS:  If we could pull up your declaration,

16  again.  Ms. Reiser, it's Joint Exhibit 1.  And we could go to

17  Paragraph 17, it's Page 7, I think.

18  BY MR. HARRIS:

19  Q     Okay.  And this is a paragraph where -- yeah, I would

20  just need to look at 17, where you discuss the beta, right?

21  A     Yeah.

22  Q     Okay.  And a beta is one of the inputs into the

23  discount rate, right?

24  A     It is.

25  Q     And then the third line you say the most common method

1  of estimating beta is to use a sample of historical stock

2  price data or lookback period, right?

3  A    That's -- yes.

4  Q    And so, the most common or preferred method, if it's

5  feasible, is to use the company's own stock price to

6  determine beta, right?

7  A    That's correct.

8  Q    All right.  But you didn't do that here.

9       You, instead, looked at a set of comparable companies,

10 right?

11 A    We did both, actually.  We didn't use the company's own

12 data, but we did calculate it, which is a simple regression

13 that we do.

14      But as I explained in my direct, the beta that we

15 calculated for Mallinckrodt on a standalone basis use

16 outrageously high.  It didn't make any sense.  So, that's why

17 we looked at a group of peer companies and determined the

18 beta based on those peer companies.

19 Q    Well, and you had used for beta, the company's own

20 trading history, the discount rate you used would have been

21 significantly higher, right?

22 A    It would have been.  It would have been unreasonably

23 high.

24 Q    It would have been about 2 percentage points higher

25 discount rate, right?

1   A       I didn't calculate it, so I'm not sure.

2   Q       Well, it might have been about 2 percent, right?

3   A       If you say so.

4   Q       And that would have driven down the valuation of the

5   standalone Brands business by hundreds of millions of

6   dollars, right?

7   A       Conceivably, yes.

8   Q       And the other part of the WACC is the cost of debt,

9   right?

10  A       That's correct.

11  Q       And you assume the cost of debt would be 10 percent,

12  right?

13  A       I do.

14  Q       Okay.  And the basis for your believe, I think I heard

15  you testify that the cost of debt would be 10 percent -- the

16  basis that you decided that this hypothetical company would

17  have a B rating; is that right?

18  A       Single B, yes.

19  Q       But you've never worked for a rating agency before,

20  right?

21  A       I have not.

22  Q       You've never generated an actual rating issued by a

23  rating agency for a company, right?

24  A       No, but I calculated long-term debt ratings for my own

25  purposes both in banking and my work as a valuation expert.

1  Q     Okay.  But here, you didn't apply the formula and

2  criteria that the rating agencies use in order to generate a

3  rating with this amount of debt of this size, right?

4  A     No, I didn't.

5  Q     Okay.  Instead, your analysis that led to a B rating

6  was entirely in your head, right?

7  A     It was in my head, yes.

8  Q     You didn't look at Mallinckrodt's actual ability to

9  raise funds now, right?

10 A     Actually, after I wrote the declaration, I did.  In

11 April, they issued bonds at 10 percent.

12 Q     Okay.  Well, at the time you did your opinions and

13 issued your declaration, you had not looked at Mallinckrodt's

14 ability to raise funds, right?

15 A     I did not.

16 Q     Okay.  All right.

17       We talked about your DCF.  I want to talk about the

18 analysis you did not rely on, the comparable-companies

19 valuation.

20 A     That's correct, yeah.

21          MR. HARRIS:  Can we pull up your declaration,

22 again.  Ms. Reiser, it's Joint Exhibit 1, and go to

23 Paragraph 18, please.

24 BY MR. HARRIS:

25 Q     No, for purposes of calculating a beta, you selected

1  four companies you cited were comparable to Specialty Brands,

2  right?

3  A     Roughly comparable, yes.

4  Q     And you actually calculated the EBITDA multiples that

5  your four comparable companies trade at, right?

6  A     I didn't calculate them, but we did review them.

7  Q     Okay.  Well, you reviewed or determined the last 12

8  months and the next 12 months EBITDA multiples for your four

9  comparable companies, right?

10 A     Those were determined by Cap IQ and we did look at

11 that.

12 Q     Okay.  But after you looked at those EBITDA multiples,

13 you then decided not to do a comparable-companies valuation,

14 right?

15 A     We decided the result of the analysis were not

16 reliable.

17 Q     You made that decision after you saw what the EBITDA

18 multiples would be, right?

19 A     Yes, they bounce all over the place.

20 Q     Okay.  All right.

21       So, we've talked about your valuation of the

22 hypothetical Brands business, itself.

23       Another asset you valued is what the excess or

24 nonoperating cash would be, right?

25 A     That's correct.

1  Q     And you calculated that the Brands business would be

2  $805 million of excess cash, right?

3  A     Yes.

4  Q     Okay.  And you started that calculation by assuming

5  that all of the cash currently at Mallinckrodt went to

6  Specialty Brands, right?

7  A     That's correct, because all of the debt went there,

8  too.

9  Q     But you don't know whether Mallinckrodt's cash is

10 currently an asset of Specialty Brands or Specialty Generics

11 or some other entity, right?

12 A     We didn't have that visibility, no.

13 Q     Okay.  So, you don't have a basis for assuming that all

14 the cash belongs at Brands.  You just needed to make an

15 assumption, right?

16 A     Just like we had to make an assumption about debt.  We

17 had to start somewhere.

18 Q     Okay.  You don't know whether the actual amount of cash

19 at Specialty Brands is 800 million or 80 million, right?

20 A     It would be hard to believe it's 800 million.

21 Q     And you'd agree that if all of Mallinckrodt's cash is

22 given to Specialty Brands, it would be very difficult to

23 operate Specialty Generics without any cash, right?

24 A     That's correct.

25 Q     So, after --

1 A     But you're also giving them no debt, so to me, it's,

2 you know, you need to do it one way or the other.

3 Q     Well, sir, after you assume that Specialty Brands got

4 all of Mallinckrodt's cash, you then subtracted out the

5 amount of operating cash that you thought Specialty Brands

6 would need to operate, right?

7 A     We used the traditional 2 percent of cash being

8 necessary for the operation of the company.

9 Q     And in your -- before we get to the 2 percent, the

10 difference between the cash it has and the operating cash it

11 needs, that's excess cash that increases your valuation,

12 right?

13 A     That's correct.

14 Q     And you mentioned the 2 percent assumption.  That's a

15 traditional metric that you said is used by valuation

16 professionals, right?

17 A     That's correct.

18 Q     Two percent of revenues, right?

19 A     That's correct.

20 Q     But you don't know if that metric of 2 percent of

21 revenues is the typical amount of operating cash needed for a

22 pharmaceutical company, right?

23 A     We don't know that.

24 Q     And you don't know what management calculates is the

25 amount of operating cash it actually needs to operate, right?

1  A      That's correct.

2  Q      And if you had known how much operating cash

3  Mallinckrodt needs on a consolidated basis, you could have

4  divided that number up by segments, right?

5  A      Potentially, sure.

6  Q      For instance, you could have allocated 90 percent to

7  Brands and 10 percent to Generics, something like that,

8  right?

9  A      Certainly possible.

10 Q      But you also mention a potential third source of value,

11 tax attributes, right?

12         THE COURT:  Mr. Harris, before we switch subjects

13 here, why don't we take another short recess.  We're at 3:28.

14         Let's take a recess until 3:45 p.m.

15     (Recess taken at 3:28 p.m.)

16     (Proceedings resumed at 3:45 p.m.)

17         THE COURT:  All right.  Go ahead, Mr. Harris.  You

18 were cross-examining the witness.

19         MR. HARRIS:  Thank you, Your Honor.

20             CROSS-EXAMINATION (CONTINUED)

21 BY MR. HARRIS:

22 Q      We were just talking about taxes, Mr. Jeffers.

23         You are not a tax specialist, correct?

24 A      No, I'm not.

25 Q      Okay.  And your work to date on the tax attributes is

1  very preliminary, right?

2  A     It's very preliminary because we didn't have much

3  information at all.

4  Q     And, in fact, you don't have sufficient information now

5  to value the tax benefits, right?

6  A     We can't value the tax benefits that they might be able

7  to use.  We can value the tax benefits that are possible to

8  be used and that's what we did.

9  Q     Okay.  So, for instance, you don't know whether the

10  hypothetical, standalone company would be able to deduct

11  interest for tax purposes, right?

12  A     That's what we have assumed in our initial value of

13  about a billion dollars, that's right.

14  Q     Okay.  And that value of a billion dollars would only

15  take place or would only be recognized if the company, in

16  fact, could deduct interest, right?

17  A     Right.

18  Q     And you don't know whether this hypothetical company

19  would be able to do so or not, right?

20  A     I assume that they could, but I don't know how much

21  they could.  That's the problem.

22  Q     And the other tax benefit or possible tax benefit that

23  you mention is the possible impact of using the net operating

24  cost carry-forwards, right?

25  A     Their NOLs or net operating losses, yes.

1  Q     But you don't know in what country those NOLs are

2  located, right?

3  A     No, not specifically, no.

4  Q     You don't know whether the NOLs are in the U.S. or in

5  some foreign jurisdiction or a combination, right?

6  A     That's correct.

7  Q     And you don't know whether you could use U.S. NOLs to

8  offset foreign tax obligations for instance, right?

9  A     That's -- yes, we don't know that.

10            THE COURT:  There's someone on the line who is not

11  muted.  If you are not speaking, please mute your phone.

12  Thank you.

13            Go ahead, Mr. Harris.

14            MR. HARRIS:  Thank you, Your Honor.

15  BY MR. HARRIS:

16  Q     You don't know, for instance, whether the NOLs can be

17  used currently, right?

18  A     I just don't have that information.  It was not made

19  public.

20  Q     And you don't know if spinning off Specialty Brands

21  would affect the ability to use NOLs in the future, right?

22  A     We don't know that exactly.  We do know these are a

23  little unusual in the sense that they don't have any time

24  limitations on them.

25            Usually, NOLs do, but these particular ones don't.

1  Q      Well, sir, my question is, you don't know if spinning

2  off Specialty Brands would affect the ability to use NOLs in

3  the future, right?

4  A      That part, we don't know.

5  Q      Okay.  And you agree, the company appears to have

6  carefully structured its operations to maximize tax benefits,

7  right?

8  A      We have said that, yes, based on their hypothetical tax

9  payments, which have been fairly minimal.

10 Q      And you don't know whether a spin-off would interfere

11 with that careful structuring of those tax operations, right?

12 A      No, because we don't know how they were put together in

13 the first place.

14 Q      And your analysis here would have the impact if the

15 company doesn't pay any taxes for the foreseeable future,

16 right?

17 A      That's in the -- as long as you have three different

18 values, that is true for the highest value of about $2.7

19 billion.  That's where they basically don't pay taxes.

20 Q      Okay.  And you can't tell whether that's an accurate

21 tax valuation without knowing whether the tax attributes can

22 actually be used, right?

23 A      That's right.  And that's why we're trying to be very

24 careful about that.

25 Q      Okay.  All right.

1      So, we've talked about assets.  I now want to talk

2  about liabilities and expenses --

3  A    Okay.

4  Q    -- and what was factored into the free cash flow that

5  you projected.

6      Now, you started with EBITDA by business segment that

7  the company provided, right?

8  A    That's correct.

9  Q    And then you applied adjustments to that EBITDA to get

10  to the free cash flow that you used in your DCF, right?

11  A    I did.

12  Q    But in the October 2020 presentation that you used,

13  management also provided projections for unlevered, free cash

14  flow, but it was on a consolidated basis, right?

15  A    And we didn't use that.

16  Q    Right.  But instead of taking the consolidated free

17  cash flow and dividing it up, you, instead, started with the

18  segment's estimate of EBITDA and then making adjustments to

19  that segment to get to cash flow, right?

20  A    Right.  Can we bring up the presentation on the cash

21  flows?

22  Q    Sure.

23          MR. HARRIS:  Ms. Reiser, could you pull up, it's

24  Joint Exhibit 4, and I think we want to go to PDF, Page 26.

25  Thank you.

1        THE WITNESS:  I'm interested in the footnotes

2   here.

3   BY MR. HARRIS:

4   Q    So, sir, instead of starting with the unlevered, free

5   cash flow item, you started with the EBITDA segment Brands

6   line item, right?

7   A    That's correct.

8        And we compared our results with the free cash flow

9   numbers, but we didn't use the free cash flow numbers.

10  Q    And So, the resulting segment free cash flow numbers

11  you used, that's an estimate you made based on applying

12  assumptions to management's segment EBITDA projections,

13  right?

14  A    Right.  We made assumptions -- remember, we had capex

15  and working capital and we had to divide those two up.

16  (Indiscernible).

17  Q    You never previously projected cash flows for a

18  business segment based on management's segment level EBITDA

19  projections without management also providing segment-level

20  projections for depreciation and amortization and capital

21  expenditure, right?

22  A    Well, that's not true.  You'd be surprised about what

23  we have to work with at times.

24        MR. HARRIS:  Okay.  Could we pull up the

25  deposition transcript, Ms. Reiser, and could we go to

1 Page 27, Line 12.

2 BY MR. HARRIS:

3 Q     Were you asked the question:

4         "Question:  Okay.  You have not previously

5 projected cash flows on a business segment based on

6 management's segment-level EBITDA projections without

7 segment-level projections for depreciation, amortization,

8 capital expenditures, or incremental networking capital,

9 right?

10         "Answer:  While that's true, I don't think it's

11 particularly relevant because of the information we were

12 given on the segment level here was typical to what we would

13 typically receive for a company as a whole and that's how we

14 treated it."

15     Was that your testimony, sir?

16 A     It's not different from what I'm saying today.

17     Your question here had to do with segment-level of

18 projections and if we haven't done projections based on

19 segment-level projections.  We've done them for companies as

20 a whole and that's, as I said, that's the way we treated

21 these numbers here.  We assumed that Brands was working as a

22 company that was a standalone.

23 Q     And, sir, you don't know whether the assumptions that

24 you applied to management's segment EBITDA projections are

25 accurate or not, right?

1  A      There's some -- yes, with any assumption you make,

2  there's the possibility that you're not exactly capturing the

3  right number.  But here we thought we were pretty close.  We

4  couldn't -- we didn't have any way to verify that, though.

5  Q      Well, sir, you don't know, for instance, whether there

6  are certain expenses that Specialty Brands would have that

7  bear as a standalone business that aren't included in the

8  segment EBITDA estimate, right?

9  A      Well, that's where I relied on Stephen Welch's comments

10 about how both businesses operated on a standalone basis

11 without really being dependent on the other.  So, that -- and

12 this is from his first day declaration.

13            MR. HARRIS:  Ms. Reiser, could we pull up the

14 deposition transcript and could we go to Page 155, Line 4.

15 BY MR. HARRIS:

16 Q    Was this your testimony:

17            "Question:  Okay.  You don't know, for instance,

18 whether there are certain expenses, especially Brands would

19 have to bear as a standalone business that aren't included in

20 a segment EBITDA estimate, right?

21            "Answer:  That's true.  And you know, we didn't

22 have the visibility."

23      Was that your testimony, sir?

24 A    Well, that is true, but what I'm saying here is that

25 with Welch's testimony, we recognized that these companies

1  could operate and do operate pretty much by themselves.

2       Are there other expenses that (indiscernible) include?

3  Sure.  There's some things that we just don't know.

4  Q    And you don't know if all the expenses that are in the

5  company's consolidated, unlevered, free cash flow line item

6  in that presentation we looked at, made it into these segment

7  EBITDA estimates, right?

8  A    We don't know the relationship between the two.

9  Q    And so, if there are expenses that didn't make it into

10 the segment EBITDA estimates, they wouldn't have made it into

11 your free cash flow estimates either, right?

12 A    That's correct.

13 Q    All right.  So, I want to talk about some particular

14 expenses.

15      You have some understanding of what administrative and

16 priority claims refer to in a bankruptcy, right?

17 A    I do.

18 Q    Okay.  And you don't have any reason to disagree with

19 the debtors' estimate of what the administrative and priority

20 claims will be, right?

21 A    No, I don't know where I'd come up with that, yeah.

22 Q    And you understand that if those expenses and claims --

23 you understand that those expenses and claims would need to

24 be paid before the shareholders would receive a return in the

25 bankruptcy, right?

1  A     That's my understanding.

2  Q     And, likewise, you don't have any reason to disagree

3  with the debtors' estimate of what trade claims and general

4  unsecured claims will be in the bankruptcy, right?

5  A     That's correct.

6  Q     And you don't, in your calculation of the hypothetical

7  Brands business debt, include an amount for restructuring

8  expenses, right?

9  A     No, we don't.

10  Q     And you don't include an amount for administrative and

11  priority claims being paid off, right?

12  A     I don't.

13  Q     And you don't include an amount for trade creditors'

14  pre-petition claims being paid off, right?

15  A     No.

16  Q     And you don't include an amount for general unsecured

17  creditors' pre-petition claims being paid off, right?

18  A     That's correct, we don't.

19  Q     Okay.  All right.  I want to shift from expenses to

20  litigation liabilities.

21           MR. HARRIS:  If we could pull up your declaration,

22  again, which is Joint Exhibit 1 and go to Paragraph 8.

23  BY MR. HARRIS:

24  Q     You refer to the recent increase in litigation

25  involving Acthar.

1      Do you see that?

2  A    I do.

3  Q    Okay.  But you don't know when the Acthar cases were

4  filed, right?

5  A    I don't know exactly, no.

6  Q    You haven't looked at any of the complaints in the

7  Acthar cases, right?

8  A    I have not.

9  Q    In fact, you haven't looked at the complaints in any

10 cases involving Mallinckrodt, right?

11 A    That's correct.

12 Q    You haven't looked at any judgments or decisions in any

13 of the cases, right?

14 A    That's also correct.

15 Q    Is it fair to say you don't have an understanding of

16 what the substance is of the claims involving Acthar, right?

17 A    I have a general idea, but not specifics.

18 Q    Okay.  Now, you mentioned the potential $260 million

19 settlement of certain governmental Acthar claims, right?

20 A    I have.

21 Q    And you understand that the settlement isn't final and

22 binding, right?

23 A    I understand that it's a settlement in principle.

24 Q    Okay.  And when you did your analysis that led to your

25 declaration, you weren't aware that the Government had

1  required as a condition to the settlement that PLC file for

2  bankruptcy, right?

3  A     I didn't know that, no.

4  Q     And you don't know whether the Government's agreement

5  to settle for 260 million was based on an evaluation of the

6  debtors' ability to pay, as opposed to the merits of the

7  lawsuit, right?

8  A     That's correct, I didn't know that.

9  Q     Okay.  And you don't know whether the Government would

10 still be willing to enter into that potential $260 million

11 settlement if PLC, in fact, is solvent, right?

12 A     I (indiscernible) so, no, I don't know.

13 Q     Okay.  You're not giving an opinion on that issue,

14 right?

15 A     No, I'm not.

16 Q     And you're also not giving an opinion on whether that

17 settlement is a good or bad settlement for Mallinckrodt,

18 right?

19 A     No, that's not part of my analysis.

20 Q     In fact, you'd have no way of assessing that, right?

21 A     Not without reviewing the whole case.

22 Q     And if the $260 million settlement were to go away, as

23 you're sitting here today, you don't have a way to value the

24 Government's litigation claims, right?

25 A     No, I don't know what the claims would be.

1  Q     All right.  Now, let's talk about the private Acthar

2  cases.

3       You also assumed that all the private Acthar cases

4  could be settled for $260 million, right?

5  A     Right.  As we talked about before, I needed a

6  placeholder for that amount.  I had to give it some number

7  and so it a seems plausible to assume that they would settle

8  for a number similar to what the Government had settled for.

9  Q     But you're not giving any opinion as to whether the

10 civil Acthar-related liabilities could, in fact, be settled

11 for $260 million, right?

12 A     No, that's not my intent.

13 Q     Okay.  And you're not giving an opinion whether the

14 $260 million number is an appropriate number to estimate the

15 civil liabilities, right?

16 A     That's correct.

17 Q     In fact, you don't have any way of determining what a

18 reasonable estimate what the civil Acthar litigation

19 liabilities should be, right?

20 A     Right.  Without reviewing the whole thing and doing a

21 lot of analysis and talking to lots of people, I wouldn't

22 know.

23 Q     You don't know, for instance, how many civil

24 litigations have been filed, right?

25 A     No, I don't.

1  Q     You haven't spoken with any of the Acthar Plaintiffs,

2  right?

3  A     No.

4  Q     You don't know who they are, right?

5  A     No.

6  Q     And you don't have any basis for believing that the

7  plaintiffs would accept $260 million as a settlement, right?

8  A     No.  I have no way to assess that.

9  Q     All right.  Now, I want to talk about the opioid

10 litigation liabilities.

11       So, other than the fact of the $1.6 billion potential

12 settlement, you haven't made any attempt to value the opioid-

13 related liabilities, right?

14 A     That's correct.

15 Q     You don't know how many trials the debtors currently

16 face in opioid-related liabilities in the next year, right?

17 A     I've read a number, but I don't remember what it is.

18 Q     You don't have a projection of what judgments will

19 result from those eight trials that I'll represent to you

20 that are coming in the next year, right?

21 A     I don't.

22 Q     You don't have a projection of what the judgments could

23 be in all of the opioid-related lawsuits, right?

24 A     I don't.

25 Q     You are aware there's been two settlements that have

1  occurred to date of opioid-related lawsuits, right?

2  A     I do; the two in Ohio, as I understand it.

3  Q     But you haven't attempted to analyze using that or any

4  other data how much it would cost to settle all the opioid-

5  related lawsuits if the $1.6 billion settlement goes away,

6  right?

7  A     That's correct.

8  Q     You don't know, for instance, how many cases that name

9  the parent PLC, right?

10  A     Only from the testimony today.

11  Q     Okay.  And you're aware that the $1.6 billion opioid

12  settlement isn't final and binding, right?

13  A     That's what I understand.

14  Q     And you're aware that the RSA contemplates that

15  existing shares of PLC will be cancelled, right?

16  A     I do.

17  Q     And if instead the shares are not cancelled and a

18  distribution is made to the existing shareholders, that would

19  be inconsistent with the RSA, right?

20  A     That's not what the RSA, you know, determines that it

21  should happen, so, yes.

22  Q     And you don't know whether the opioid plaintiffs would

23  be willing to continue with the $1.6 billion settlement if

24  the existing shares are not cancelled, right?

25  A     Again, that's hard for me to get into the minds of

1  other claimants.

2  Q      You don't know whether they would be willing to

3  continue with the settlement if, in fact, PLC is solvent,

4  right?

5  A      Again, as I've said, I don't know.

6  Q      And you don't know how much opioid-related litigation

7  expenses would be if the settlement were to fall apart,

8  right?

9  A      Strictly hypothetical.  I don't know.

10 Q      And you don't know whether there are opioid-related

11 liabilities that are not addressed by the $1.6 billion

12 settlement, right?

13 A      I think that there are, but I don't know the magnitude

14 of them.

15 Q      Well, focusing on indemnification liabilities, your

16 analysis doesn't include any indemnification liabilities that

17 PLC has to any company, based on opioid claims, right?

18 A      No, I don't.  That would require a fair amount of

19 analysis of documents that are not public.

20 Q      Okay.  And you haven't done that analysis, right?

21 A      As I mentioned before I didn't have any non-public

22 information.

23 Q      Okay.  And you weren't aware of those indemnification

24 obligation at the time you issued your declaration, right?

25 A      No, those sort of came out in the testimony later.

1  Q      And you haven't factored those indemnification

2  liabilities into your analysis, right?

3  A      No, I haven't redone my analysis.

4  Q      Okay.  Now, you also assume that the spun-off Brands

5  entity would not be subject to the opioid liabilities, right?

6  A      Say that again.

7  Q      You assumed that the spun-off Specialty Brands entity

8  would not be subject to the opioid liabilities; is that

9  right?

10 A      That's correct.  I wanted to make sure I was hearing

11 that correctly.

12 Q      But you're not giving an opinion that, in fact, the

13 opioid-related liabilities will not be imposed on the

14 Specialty Brands segment entities, right?

15 A      That's one of the assumptions I made and

16 (indiscernible).

17 Q      It's an assumption, but you're not giving that as an

18 opinion, right?

19 A      That's correct.

20 Q      All right.  Now, I want to talk about the feasibility

21 of this hypothetical business.

22        You're valuation assumes that a spin-off occurs, right?

23 A      Yes.

24 Q      You haven't done an analysis of how a bankruptcy plan

25 would be structured that would encompass a spin-off of

1  Specialty Brands, right?

2  A     No, but the company has.

3  Q     So, you think the company has analyzed a bankruptcy

4  plan that spins off Specialty Brands?

5  A     Yes.

6  Q     Have you seen this bankruptcy plan?

7  A     No, but as I understand it, Project Balboa was a spin-

8  off, pretty much as you're describing.

9            THE COURT:  Hold on, Mr. Harris.

10           I'm hearing someone typing and coughing.  If you

11  are not one of the two people speaking, please mute your

12  phones.  Thank you.

13           MR. HARRIS:  Thank you, Your Honor.

14  BY MR. HARRIS:

15  Q     Mr. Jeffers, you don't know which entities are within

16  the Specialty Brands business segment, do you?

17  A     Not specifically.

18  Q     You don't know the ownership structure of the entities

19  within the Specialty Brands business segment, right?

20  A     Well, as we've discussed before, I've seen the

21  organizational chart.  It was shown earlier this morning.  I

22  recognized that, but I can't tell you the names of each of

23  the subsidiaries.

24  Q     You don't know what are the liabilities at each entity

25  within the Specialty Brands business segment, right?

1  A      That's not public information.

2  Q      Okay.  Now, you have testified that your hypothetical

3  company structure assumes that all the debt of Mallinckrodt

4  is borne by the Specialty Brands segment, right?

5  A      I have said that, yes.

6  Q      You're aware that the secured bondholders currently

7  have a lien on all the assets, not just the Specialty Brands

8  assets, right?

9  A      I don't know that.  I haven't read those security great

10  many times.

11  Q      Okay.  Well, you're not giving an opinion whether the

12  secured bondholders would agree to a spin-off of Specialty

13  Brands, in which their security against the Generics assets

14  is released, right?

15  A      I am not making that opinion.  I had to make an

16  assumption about where the debt would go, and so I took the

17  most conservative (indiscernible) assumption that I could,

18  which was that Specialty Brands would carry all of the debt.

19  Q      You haven't analyzed whether a spin-off of Specialty

20  Brands with all of the debt would be feasible, correct?

21  A      No, but remember, you're describing it a little

22  differently than the way I have talked about it in the

23  report.  My assumption is that Specialty Generics would be

24  spun off and that's the way that the company designed to do

25  it in Project Balboa.  They've done an extensive amount of

1  work about how that could be done and that is not public

2  information.

3  Q    You're not giving an opinion whether a spin-off your

4  feasible, right?

5  A    You're turning this around a little.

6       I'm assuming that Specialty Generics is the one spun

7  off and you're saying that Specialty Brands is being spun

8  off.

9       I'm saying that Brands could be valued on a standalone

10 basis after Generics has been spun off.

11 Q    Sir, you're not giving an opinion whether any spin-off

12 of any entity is feasible in the bankruptcy, right?

13 A    I am not.  I'm making that assumption that it could

14 happen.

15 Q    Okay.  So, in the debt structure of your hypothetical

16 company, Specialty Brands would have the existing

17 $5.3 billion of funded debt, right?

18 A    That's correct.

19 Q    And then it would have another $520 million of

20 settlement expenses that you assume occur, right?

21 A    That's correct.

22 Q    And the total is about $5.8 billion of funded debt you

23 assume that this entity will bear, right?

24 A    No.  I'm assuming that the litigation settlement is not

25 interest-bearing, so I don't consider that funded debt.

1  Q     So, you're assuming there'll be 5.3 billion of funded

2  debt?

3  A     Essentially, yes.

4  Q     And how do you expect that $520 million to be paid,

5  then?

6  A     It would be paid over time and it would be noninterest-

7  bearing.  That is not -- in the analysis that we did, that

8  assumes that it is long-term debt and it's charged at 10

9  percent.

10 Q     Sir, I just want to make sure I understand.

11       Are you saying that you assume that the settlements

12 would be -- for $520 million would not be interest-bearing?

13 A     Yeah.

14 Q     Okay.

15 A     But the analysis that we did assumes that it is.

16 Q     I see.  So, your analysis assumes you'll have

17 $5.8 billion of interest-bearing debt; is that right?

18 A     Yes, that's correct.

19 Q     Okay.  And the cost of debt, you assume, is 10 percent,

20 right?

21 A     That's correct.

22 Q     And that cost of debt means the interest rate, right?

23 A     Not exactly.

24       If you look at the interest rates for 2019 for the

25 company, that interest rate was about 6 percent.  So, they

1  paid about $300 million in interest expense on about $5.2

2  billion worth of debt.

3       So, what we are doing is we are using the 10 percent as

4  the long-term estimate of what single B debt would be priced

5  at.  So, we're assuming that the -- we're making sort of the

6  conservative assumption that they're actually paying a much

7  higher interest rate than what they're actually paying.

8  Q    Sir, just let me make sure I understand it.

9       The term cost of debt that you assume is 10 percent

10  means the long-term interest rate, correct, sir?

11  A    It's the hypothetical, long-term interest rate for that

12  type of debt.

13  Q    Okay.  And you assume that this entity would have

14  $5.8 billion of long-term debt, right?

15  A    That's the way that model works, yes; you make

16  simplified assumptions.

17  Q    But you haven't analyzed how much the interest expense

18  of Specialty Brands would be if it were spun off with

19  $5.8 billion of debt, right?

20  A    Not specifically, but in general, if we assume that the

21  parts of the RSA continue and the secured debt of

22  $3.6 billion is reinstated at its current interest rate, then

23  that current interest rate is somewhere between, I'm

24  guessing, 6 and 8 percent.  So, it would be, for most of the

25  debt, it would be less than the 10 percent.

1    So, our analysis is quite conservative because it makes

2  simplified assumptions.  The actual calculation of interest

3  expense would be lower.

4  Q    Okay.  Sir, you have not analyzed how much the interest

5  expense of Specialty Brands would be if it were spun off with

6  $5.8 billion of debt, right?

7  A    Not in total, no.

8  Q    Okay.  Now, you do understand the existing debt has

9  maturity dates, right?

10  A    I do.

11  Q    But you don't know when the different tranches of debt

12  come due, right?

13  A    I've seen a chart that suggests that there's some

14  significant maturities that come due in a couple of years,

15  but before that, not so big.

16  Q    You haven't evaluated whether whenever a particular

17  tranche of debt comes due, whether this hypothetical

18  Specialty Brands company would be able to refinance it,

19  right?

20  A    No, but I do look to their ability to refinance debt

21  back in April.

22  Q    All right.  Sir, you haven't attempted to value what

23  the hypothetical Brands company would be worth if it were

24  forced to liquidate, right?

25  A    No, and that's a pretty severe assumption.

1  Q      You're aware that a liquidation --

2  A      (Indiscernible) not a going-concern.

3  Q      Okay.  You say severe because a liquidation analysis

4  often results in a substantially lower value than a going-

5  concern value?

6  A      It assumes that there's no going-concern value.

7         This is a very profitable company.  Why would you ever

8  assume that its highest value would be on a liquidation basis

9  or an asset basis?

10  Q      And you didn't analyze what would be the result if the

11  Specialty Brands business had to liquidate because it was

12  unable to refinance its debt, right?

13  A      No, I didn't, because I didn't think that that was a

14  very likely possibility.

15  Q      Okay.  Last topic I want to talk about is the market's

16  views of PLC.

17         You're familiar with the efficient market theory,

18  right?

19  A      I am.

20  Q      And that provides, in part, that in an efficient

21  market, the market will quickly assimilate all publicly

22  available information, right?

23  A      That's part of it, yes.

24  Q      So, it assumes that if a security is worth more than

25  its trading price, then rational investors will purchase the

1 security and drive up the price, right?

2 A    That's one of the assumptions, yeah.

3 Q    And you're not giving any testimony or opinions in this

4 case that the markets for Mallinckrodt securities are

5 efficient, right?

6 A    No, I'm not.

7 Q    And the documents that you relied on that are cited in

8 your report, those are all public sources, right?

9 A    Yes.

10 Q    Okay.  And these sources are all things that investors

11 have access to, right?

12 A    They do.

13 Q    Likewise, analysts covering Mallinckrodt, have access

14 to all of the information, as well, right?

15 A    They do.

16 Q    And the DCF analysis you did is a typical kind of

17 analysis to do when valuing a company, right?

18 A    It is not exceptional, no.

19 Q    And investors can do their own DCF analyses, right?

20 A    As they often times do.

21 Q    Likewise, analysts could do their own DCF analyses,

22 right?

23 A    That's correct.

24 Q    And you don't believe that you're better situated to

25 perform a DCF of Mallinckrodt than institutional investors

1  are, right?

2  A    No, but I believe that we'd be making different

3  assumptions.

4  Q    And you don't believe you're better situated to do a

5  DCF of Mallinckrodt than the analysts who covered

6  Mallinckrodt are, right?

7  A    No.

8  Q    You view the value of Specialty Brands business plus

9  the excess cash, combined, to be a value of about $6.8

10  billion, right?

11  A    Well, before you take off the debt, yes.

12  Q    Okay.  And you understand that all of those assets are

13  pledged to the company's security debt, right?

14  A    I do.

15  Q    Okay.  You don't know exactly how much --

16  A    I'm sorry, I've heard that represented.  I don't know

17  that for a fact.

18  Q    But you don't know exactly how much the secured debt

19  is, right?

20  A    I heard this morning that it was $3.6 billion.

21  Q    Okay.  That's significantly less than the $6.8 billion

22  that you valued the Specialty Brands business, plus the

23  excess cash to be, right?

24  A    And that's why that debt was characterized as being

25  oversecured.

1  Q    Okay.  But you would agree that the market seems to

2  have a different view of the expected return on the secured

3  debt than you do, right?

4  A    Yes, because I think they're looking at the RSA and the

5  expectation for payouts for different securities and they're

6  trading on that information.

7  Q    You don't know what the market does not properly

8  understand about Mallinckrodt's assets or liabilities, right?

9  A    I can't say that I know what the market knows.  I'm not

10 in the mind of the market.

11 Q    You think one issue is that the markets are

12 particularly focused on litigation damages, right?

13 A    I think that they are very concerned about litigation

14 damages.  They're also concerned about how they might be

15 treated in a bankruptcy.  They know that there's a fair

16 amount of risk there.

17 Q    And you've made assumptions to simplify the ability to

18 assess the litigation damages, right?

19 A    Yes.

20 Q    And is it possible the market that has reached views on

21 litigation damages different than the assumptions you

22 applied?

23 A    Oh, I think that's quite likely.

24 Q    And it's also possible the market has reached views

25 different than what you calculated on the value of

1  Mallinckrodt's business, right?

2  A    Based on the stock market pricing, yes, I would say

3  that.

4  Q    And is it possible that the market is right and that

5  you are incorrect on these issues?

6  A    I think anything is possible.

7  Q    All right.  Thank you, sir.

8            MR. HARRIS:  I have nothing further.

9            THE WITNESS:  I have one --

10           THE COURT:  No, you have to have a question

11 pending, Mr. Jeffers.

12           Let's turn it back over to your counsel for

13 redirect.

14                   REDIRECT EXAMINATION

15 BY MS. MILLER:

16 Q    Mr. Jeffers, you were asked a lot of questions about

17 the terminal growth rate and the terminal value.

18      Is that a methodology that's used and accepted by

19 valuation professionals?

20 A    In terms of having a sort of range of terminal growth

21 rates between the inflation rate and the or the rate of GDP,

22 yes, that's quite common.

23 Q    And I think you testified, but the calculation of a

24 terminal rate, that's not something a company would do,

25 right?

1  A      No, that's the -- for lack of a better word, that's the

2  jurisdiction of the valuation person.

3  Q      You were asked a lot of questions about projections and

4  I know you testified several times today that you rely on

5  them as being reliable because you didn't have that

6  information.

7       In your experience, is it unusual for a company to have

8  more than one set of projections?

9  A      Yes, quite common.

10 Q      And you also testified about or were asked questions

11 about the single B rating and that you didn't do a formal

12 analysis of that.

13      Do you have any experience with ratings, debt ratings

14 like that?

15 A      I've done a lot of debt ratings both, as a banker and

16 as a valuation professional.  We also look at other

17 indicators of where a company's debt would trade.  We noticed

18 in this case that Endo (phonetic), who has an 88 percent

19 debt-to-capital ratio, their debt trades at an effective rate

20 of a little less than 10 percent.

21      You know, those are the kinds of indicators that we had

22 that told us that not only was the single B appropriate, but

23 the 10 percent was also very much in the range of where we

24 should be.

25 Q      And then you were asked a lot of questions about the

1  tax structure and where the tax benefits may sit.

2       And you don't have that information available, right?

3  A    That's typically not public information and, you know,

4  that's not something we had available.

5  Q    And you were asked about the valuation of the

6  $2.7 billion.

7       That included potential tax benefits, right?

8  A    Right.  And your problem is that we just don't know if

9  the value is a billion or 2.7 billion.  We think it's much

10 higher than a billion but saying that it's 2.7 billion is

11 kind of a bridge too far for me to go at this point.

12 Q    Okay.  And so, the valuation of the 989 million,

13 roughly a billion debt did not include any tax benefits?

14 A    That's correct.

15          MS. MILLER:  Thank you, Your Honor.

16          I have no further questions.

17          THE COURT:  Thank you, Ms. Miller.

18          Mr. Jeffers, you are excused.  Thank you.

19          THE WITNESS:  Thank you.

20      (Witness excused)

21          THE COURT:  What other witnesses do we have now?

22 Do the movants have any more witnesses?

23          MR. EAGEL:  We do, Your Honor:  Mr. Hayes.

24          I guess the question was, Mr. Harris, are you

25 going to do any direct of Mr. Hayes or are we going to start

1  with you're just going to rely on the affidavit, and we would

2  do the direct?

3          MR. HARRIS:  I was going to do a direct of

4  Mr. Hayes.

5          THE COURT:  So, this is the debtors' witness, not

6  the movants' witness, right?

7          MR. EAGEL:  Your Honor, we were going to call

8  Mr. Hayes, but I think because (indiscernible) keep it, it

9  is, I guess, our witness, as well, but we will let the debtor

10 go first and do their direct.

11         THE COURT:  Okay.  So, timing-wise, we've probably

12 got a half hour left.  Are we going to be able to finish this

13 witness in a half hour?

14         MR. HARRIS:  Your Honor, I think the direct would

15 probably be a half hour and I know Mr. Eagel has cross-

16 examination that will probably be at least half an hour, so

17 my guess is the answer is no.

18         THE COURT:  Mr. Eagel, do you think you can do it

19 in half an hour?

20         MR. EAGEL:  I do, Your Honor.

21         THE COURT:  All right.  Mandy, are you okay to go

22 until 5:30?

23         THE CLERK:  Yes, I am, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         Let's go ahead, then.  Who are we calling, I'm

1  sorry -- Mr. Hayes.

2           MR. HARRIS:  We're calling Brendan Hayes of

3  Guggenheim.

4           THE COURT:  All right.  Mr. Hayes, let me

5  spotlight you here first.

6           Can you state your full name and spell your last

7  name for the record, please.

8           THE WITNESS:  Brendan Hayes, H-a-y-e-s.

9       (Oath administered)

10          BRENDAN HAYES, DEBTORS' WITNESS, AFFIRMED

11          THE WITNESS:  I do.

12          THE COURT:  Thank you.

13          Go ahead, Mr. Harris.

14          MR. HARRIS:  Thank you, Your Honor.

15   DIRECT EXAMINATION

16  BY MR. HARRIS:

17  Q    Mr. Hayes, where are you currently employed?

18  A    Guggenheim Securities.

19  Q    And what is Guggenheim Securities?

20  A    Guggenheim Securities is an investment bank.

21  Q    And what is your role at Guggenheim?

22  A    I'm a senior managing director in the restructuring

23  group.

24  Q    And what would you describe as your areas of expertise

25  as an investment banker?

1  A     Restructuring, financial restructuring matters,

2  refinancing, financing of companies, M&A, as well as

3  valuation.

4  Q     And can you just briefly tell us where you worked prior

5  to joining Guggenheim.

6  A     Sure.  I joined Guggenheim in 2018.  Before that, I was

7  at Millstein & Company.  That firm, I was a managing director

8  at that firm and that firm's business, investment banking

9  business was sold to Guggenheim in 2018.

10 Q     Again, briefly, what is your educational background?

11 A     I have a BS have Tulane University in math and history.

12 I have an MBA from New York University.

13 Q     And do you have any professional certifications?

14 A     Yes, I'm a CFA charterholder, a chartered financial

15 analyst, charterholder.

16 Q     And how many years have you worked as an investment

17 banker?

18 A     About 16.

19 Q     And how many years have you been in the restructuring

20 field?

21 A     Around 10 years.

22 Q     And how many times would you say you've worked on

23 restructurings either in or out of court?

24 A     I would say 20 or more, roughly.

25 Q     And how many times have you worked on refinancing debt

1   for a company?

2   A    Probably in the range of 40 or 50.

3   Q    And in your engagements, do you typically value the

4   companies you're covering?

5   A    I do.  It depends on the engagement, but, generally,

6   yes, particularly in restructurings.

7   Q    And how many times have you worked on evaluating

8   whether a plan in bankruptcy would be feasible?

9   A    I would say in the range of 5 to 10.

10   Q    Okay.  Now, talking about Guggenheim, what is

11   Guggenheim's relationship with the debtors?

12   A    We've been advising the company since September 2019 on

13   a number of the matters that I've described.

14   Q    And how long have you personally been on the

15   Mallinckrodt engagement?

16   A    From the beginning, since September 2019.

17   Q    Okay.  And so, what is your personal role on the team?

18   A    I lead our restructuring team, which is about, in

19   total, four or so people.

20   Q    And since working with the debtors, have you become

21   familiar with the debtors' capital structure and business?

22   A    I have.

23   Q    And based on your knowledge of the debtors' capital

24   structure and business, do you know what the company's

25   funded-debt obligations are?

1    A      Yes, about 5.3 billion.

2    Q      Okay.  So, based on your knowledge of Mallinckrodt

3    PLC's capital structure and business, do you have a view as

4    to whether there's a reasonable likelihood that the shares of

5    PLC would receive a recovery in the bankruptcy?

6                   MR. EAGEL:  Your Honor, I'll going to object.

7                   I don't know that the witness is qualified or has

8    been qualified as an expert in determining Mallinckrodt PLC

9    has any value in the bankruptcy.  I don't believe he's an

10   expert on that or has been qualified as an expert on that in

11   any matter, including this one.  I note my objection to any

12   testimony on the opinion that's going to be offered here.

13                  THE COURT:  Mr. Harris?

14                  MR. HARRIS:  Your Honor, the witness is an expert

15   in valuation and restructuring and refinancing.  He's worked

16   on them dozens of times.  He's eminently qualified to give a

17   view on those topics.

18                  THE COURT:  Maybe you need to give a little more

19   experience on his experience in those areas.

20                  MR. HARRIS:  Sure.

21   BY MR. HARRIS:

22   Q      So, Mr. Hayes, how many times would you say you have

23   valued a company in the course of your work as an investment

24   banker?

25   A      Yeah, I'd say informally and formally, you know,

1  probably in the -- on the order of 20 to 30 times, in that

2  area.

3  Q    And how many times have you or could on a restructuring

4  in a Chapter 11?

5  A    Again, I think it's in the 5 to 10 area.

6  Q    How many times have you analyzed recoveries in a

7  Chapter 11?

8  A    I would say in the same, 5 to 10.

9        MR. HARRIS:  Your Honor, we'd propose Mr. Hayes is

10 an expert on valuing companies, including in Chapter 11, and

11 on evaluating restructurings in a Chapter 11.

12        THE COURT:  Mr. Eagel?

13        MR. EAGEL:  Yeah, I'd renew my objection, Your

14 Honor.  I don't think the witness has done a valuation of

15 this company and, in particular, I think he testified at his

16 deposition he did not do a valuation and I think he's also

17 testified that each company in each situation is different

18 and I don't know that there is an expert who can testify as

19 to, he's essentially giving a fact assessment of his work

20 while at -- while working for Mallinckrodt.

21        I don't consider that expert testimony.  I guess

22 if he's being offered as a fact witness, I would still object

23 on the grounds he's simply just not qualified.

24        THE COURT:  Well, you're mixing your arguments

25 there, Mr. Eagel.  The question is whether he's qualified and

1  then the question is whether he did a valuation of the debtor

2  in this case; those are two different things.

3       I'm going to find that he is qualified to testify

4  and then we'll find out whether test done a valuation of the

5  debtors here and you'll have the right to cross-examine.  The

6  fact that he's been working for the debtors does not mean he

7  can't also testify as an expert.  A lot of times you have the

8  (indiscernible) case from the Supreme Court.  It was a case

9  where the -- it was an employee who was testifying for the

10 company in that case.  So, that's not disqualifying.

11      So, go ahead, Mr. Harris.

12 BY MR. HARRIS:

13 Q    Sir, what is your view as to whether there's a

14 reasonable likelihood that the PLC shares will receive a

15 recovery in the bankruptcy?

16 A    Yeah, I believe there's not a reasonable likelihood.

17 Q    And how did you come to that conclusion?

18 A    I reviewed both bond trading levels, as well as past

19 cases where there were traded securities and also just based

20 on my experience with this particular company and all of its

21 stakeholders over the past, you know, year-plus.

22 Q    Focusing on the bond trading levels, what types of

23 bonds did you review?

24 A    The company's unsecured notes.

25 Q    And why did you look at the unsecured notes for this

1    purpose?

2    A       Those notes are the fulcrum, the guaranteed unsecured

3    notes are the fulcrum in the proposed restructuring under the

4    RSA.

5    Q       So, what did you find when you analyzed the trading

6    value of the guaranteed unsecured notes?

7    A       Those notes are traded in the area of 35 cents on the

8    dollar.

9    Q       So, what does that indicate to you about the market's

10   view of PLC's assets and liabilities?

11   A       It suggests that the market believes assets are worth

12   less than the aggregate liabilities.

13   Q       And when will the guaranteed unsecured notes mature?

14   A       Between 2022 and 2025.

15   Q       And what's the face value of the guaranteed unsecured

16   notes?

17   A       Approximately one and a half billion dollars.

18   Q       All right.  Did you also look at the trading of the

19   unguaranteed unsecured notes?

20   A       Yes.

21   Q       And what did you find when you analyzed the trading

22   value of the unguaranteed notes?

23   A       Those notes are trading around seven and a half cents

24   on the dollar.

25   Q       And when will those notes mature?

1   A      Those notes mature in 2023.

2   Q      And so, how does the market trading values of the

3   public notes impact your view as to whether there's a

4   reasonable likelihood that equity will receive a recovery in

5   the bankruptcy?

6   A      They suggest that the market believes equity will not

7   receive a recovery.  You know, even under the RSA, the

8   guaranteed notes are getting 100 percent for the equity,

9   subject to dilution from the opioid warrants and with that

10  recovery, those notes still trade at a very significant

11  discount (indiscernible).

12  Q      So, what information do market participants have here

13  regarding the company's assets and liabilities?

14  A      The company is a public company, it has been for a

15  number of years, so they have access to SEC-filed financial

16  statements and other periodic disclosures.  The company last

17  filed their Q3 10-Q in early November.

18         In addition, here, the market has more information that

19  is typical for a public company because the company, when it

20  filed for bankruptcy, filed a presentation, which was pretty

21  expensive around the financial forecast, details on the

22  company's pipeline, as well as intercompany obligation

23  details.  So, it's an expansive amount of information out in

24  the market.

25  Q      And does the market have information regarding the

1  company's litigation exposure?

2  A     It does.  A number of that, a bunch of that litigation,

3  I believe, is publicly filed, but the company also describes

4  that litigation both in the presentation, as well as their

5  periodic report.

6  Q     All right.  So, after you analyzed the trading value

7  for the unsecured notes, did you do anything else to help you

8  assess the likelihood of a return to incorrect this

9  bankruptcy?

10  A     Yes, we looked at other bankruptcy cases for public

11  companies.

12  Q     Can you describe the criteria you used to select cases

13  for your view.

14  A     Yes, we looked back to June 2015.  We selected

15  companies with publicly traded stock and with funded debt

16  greater than $1 billion.

17          MR. HARRIS:  Ms. Reiser, could we pull up

18  Mr. Hayes' declaration.  So, it should be Joint Exhibit 3 and

19  could we go to Page 9.

20  BY MR. HARRIS:

21  Q     Mr. Hayes, what is this exhibit, what does it reflect?

22  A     This reflects 13 bankruptcy cases that were in that

23  date time frame that I outlined.  We looked at, again, public

24  companies.  We did exclude oil and gas companies because of

25  the fact that they are commodity sensitive, unlike

1  Mallinckrodt and unlike these other companies.

2  Q    So, does this list all of the cases that meet the

3  criteria that you described?

4  A    Yes, based on the search that we did.

5  Q    So, what was the conclusion you reached, after

6  reviewing the other Chapter 11s with the billion dollars of

7  funded debt since 2015?

8  A    It reinforced, you know, what I believed, based on

9  where the bonds trade and where Mallinckrodt's stock trades,

10  which is at, you know, its low trading values both, of

11  equity, particularly, as compared to the amount of funded

12  debt in those situations, save for one, which is PG&E, which

13  is number three on this list.  In all of those situations,

14  the equity did not receive a recovery.

15  Q    And did you analyze any reasons why the one company in

16  your dataset, PG&E, was similar or dissimilar to the other

17  cases or to Mallinckrodt?

18  A    Yes.  If you look at PG&E, it was dissimilar in that,

19  number one, it traded a month into the bankruptcy case with a

20  $9 billion market cap.  Its filing was based on wildfire

21  liabilities, which were relatively cabined issues and, in

22  particular, in that case, the State of California created a

23  wildfire fund which helped the company exit from bankruptcy.

24      So, as a public utility, it was a bit of a different

25  situation.  You can see on this list that the equity value of

1  the company one month into the case was about 37 percent of

2  the funded debt.

3  Q      So, how did the market's view of the likelihood of a

4  recovery to PG&E shareholders compare to the market's view of

5  the debtors' position here?

6  A      It's very different.  You know, here, the market cap is

7  a very small fraction.  I believe it's less than one-half of

8  one percent of the total funded debt of the company.

9  Q      So, how did your review of these Chapter 11 cases

10  affect your view as to whether the shareholders here have a

11  reasonable likelihood of a recovery in the bankruptcy?

12  A      It reinforced my view that they're not likely to get a

13  reasonable recovery.

14  Q      So, what is the Mallinckrodt stock trading at today?

15  A      As of today, I don't know.  As of when I filed my

16  declaration, I believe it was 17 cents a share.

17  Q      So, is this positive stock trading value inconsistent

18  with your conclusion that there's no reasonable likelihood of

19  a recovery for shareholders here?

20  A      No, it's not.  Often times, as in these other cases,

21  the public equity traded with value post-filing, and that

22  value really reflects option value, not necessarily intrinsic

23  value.

24  Q      And did you hear the ad hoc committee counsel ask

25  Mr. Welch about the stock trading price earlier in the year?

1   A      I did.

2   Q      And when was the last time Mallinckrodt's share price

3   was above $5 per share?

4   A      I believe it was before March.  You know, March is

5   when, as Mr. Welch testified, when the CMS judgment in the

6   Acthar case was handed down.

7   Q      And what happened to the stock price in March after the

8   CMS judgment came out?

9   A      It believe it initially went down to around a dollar or

10  below a dollar a share.

11  Q      Okay.  So, you've seen Mr. Jeffers' declaration that

12  was submitted at the same time as yours, right?

13  A      Yes, I have.

14  Q      After seeing Mr. Jeffers' declaration, did you review

15  any other third-party views of value to see whether

16  Mr. Jeffers' valuation was credible?

17  A      Yes.  I had my team pull research reports.

18  Q      What research reports --

19          MR. EAGEL:  Objection.  I'm just going to lodge an

20  objection.

21          This is beyond the scope of his declaration.

22          THE COURT:  Mr. Harris?

23          MR. HARRIS:  Your Honor, this is rebuttal

24  testimony.  It was impossible for it to be in his

25  declaration, because it's rebutting Mr. Jeffers' testimony in

1  his declaration submitted at the same time.  And in

2  Mr. Hayes' declaration, he specifically said he would

3  evaluate whatever valuation was provided and provide

4  commentary on it.

5          THE COURT:  The objection is overruled.

6          Go ahead.

7  BY MR. HARRIS:

8  Q    So, Mr. Hayes, what analyst reports did you look at?

9  A    We pulled six analyst reports that were from the second

10 half of 2020.

11 Q    Did any of them have an implied enterprise valuation of

12 Mallinckrodt?

13 A    They did.

14 Q    And what were the implied enterprise valuations in the

15 analyst reports?

16 A    I don't remember every one of them off the top of my

17 head, but they were in the four and a half to $5 billion

18 range, roughly.

19         MR. EAGEL:  I would object on hearsay, but I

20 assume that -- I think it seems like hearsay to me, Your

21 Honor.

22         THE COURT:  Well, he's testifying as an expert.

23 Experts can rely on hearsay.

24         Go ahead.

25 BY MR. HARRIS:

1  Q     And, sir, were these valuations just for the Specialty

2  Brands business or ford entire combined Mallinckrodt

3  enterprise?

4  A     They were for the consolidated company.

5  Q     And what did that indicate to you about whether

6  Mr. Jeffers' evaluation of just the Brands business is

7  consistent with the market's views?

8  A     It told me that it was inconsistent with the market's

9  views.

10 Q     Okay.  So, I want to talk about your review of

11 Mr. Jeffers' evaluation of the Specialty Brands business as a

12 standalone company and I want to talk about the asset side

13 first.

14       So, what are the two assets of the hypothetical,

15 Specialty Brands business that Mr. Jeffers attempts to value?

16 A     The business, the enterprise, and the cash and balance

17 sheet.

18 Q     And to value the hypothetical Brands business, what

19 valuation methodologies does Mr. Jeffers rely on?

20 A     He relied on a DCF methodology.

21 Q     And in your experience, is it typical in valuing

22 companies to only use the DCF?

23 A     No, we typically look at three, which is the DCF,

24 comparable companies from a trading perspective, as well as

25 M&A transactions.

1  Q     And what's the benefit of including a comparable-

2  companies analysis and an M&A transaction analysis?

3  A     It really checks the DCF, based on, you know, current

4  views in the market on where comparable companies trade.

5  Q     All right.  So just focusing on the DCF, what is the

6  total value of the Brands business, according to Mr. Jeffers'

7  DCF model?

8  A     It's $5.99 billion.

9          MR. HARRIS:  Ms. Reiser, could we pull up

10  Mr. Jeffers' declaration and the model.  If you could go to

11  Joint Exhibit 1, and could we go to Schedule 2(b), which is

12  Page 17 -- I'm sorry, it would be 2(a).  Sorry.

13  BY MR. HARRIS:

14  Q     And do you see the operating value and invested capital

15  line item, the 5.991 billion?

16  A     Yes.

17  Q     Is that Mr. Jeffers' valuation of the standalone

18  Specialty Brands company?

19  A     Yes, it is.

20  Q     So, what percentage of that $6 billion valuation comes

21  from cash flows during -- using the company's actual

22  projections?

23  A     Roughly a quarter.

24  Q     And what percentage comes from Mr. Jeffers' valuation

25  of the terminal period, instead?

1    A      Roughly three-quarters.

2    Q      Okay.  So, I want to talk about the company's

3    projections and the projection periods 2020 to 2024.

4          Do you know what set of projections Mr. Jeffers used in

5    his DCF?

6    A      Yes, he used projections that were based on the

7    company's October presentation, which was made public;

8    although, he made, you know, a number of adjustments to get

9    to just the Brands' forecast.

10    Q      And what is the date of the projections that are in the

11    October presentation?

12    A      June 2020.

13    Q      And to your knowledge, are those June 2020 projections

14    still fully accurate today?

15    A      No, they're not.

16    Q      And so what happened after the June 2020 projections

17    that's caused those projections to no longer be accurate?

18    A      Well, one is the passage of time, but, two, a

19    significant item that occurred earlier this fall is the CRL

20    in Terlipressin.

21    Q      How important is Terlipressin to the company's pipeline

22    of future products?

23    A      Very important.

24    Q      Is it expected to be a high-margin or a low-margin

25    product?

1    A    A high-margin product.

2    Q    And what impact would excluding Terlipressin from the

3    June projections have on those 2020 to 2024 revenue

4    projections?

5    A    It's likely in the hundreds of millions.

6    Q    And is that revenue impact reflected in Mr. Jeffers'

7    valuation in any way?

8    A    It's not.

9    Q    Okay.  Now, I want to talk about the terminal value

10    period.

11        What are the key factors that drive the terminal

12    valuation?

13    A    The terminal year cash flow and the discount rate.

14    Q    And did the company provide either of those inputs?

15    A    No, it did not.

16    Q    And what does Mr. Jeffers choose as the terminal growth

17    rate for his model?

18    A    Two and a half percent.

19    Q    And what is that based on?

20    A    He indicates it's based on inflation.

21    Q    Is 2 and a half percent, in fact, the Federal Reserve's

22    projected rate of inflation?

23    A    No, I don't believe so.

24    Q    What is the Fed's projected rate of inflation?

25    A    We looked at the Fed website and it's 1.95 percent.

1  Q     So, if you corrected Mr. Jeffers' DCF valuation, just

2  using the actual federal projected rate of 1.95 percent, what

3  effect would that have on his model?

4  A     It would reduce the valuation by about $250 million.

5  Q     Okay.  Now, let's talk about whether it's appropriate

6  to use the projected inflation rate at all as a terminal

7  value.

8        In your opinion, is that a realistic assumption to use

9  for Mallinckrodt's growth rate after 2024?

10 A     No, I don't believe it is.

11 Q     And why do you say it's not?

12 A     Because the company is not, and under the forecast, if

13 those numbers are hit, would not be growing; it's actually in

14 decline.

15 Q     Has the company ever projected that it will grow at 2.5

16 percent in perpetuity?

17 A     No, not to my knowledge.

18 Q     And if Terlipressin is not a successful product, how

19 big of an impact could that have on the company's ability to

20 grow after 2024?

21 A     It could have a significant impact.

22 Q     And what was the growth rate projected in the company's

23 last year of projections, so 2024?

24 A     I believe it was a revenue decline of negative 0.4

25 percent.

1   Q      And if Terlipressin is not launched, would the

2   company's growth rate in the last year be less than the

3   currently projected negative 0.4 percent?

4   A      Yes, it would.

5   Q      So, if we just stuck with negative 0.4 percent as the

6   terminal growth rate, what impact would that have on

7   Mr. Jeffers' valuation?

8   A      Likely in the area of around one and a quarter billion.

9   Q      Is that positive or a negative change to his valuation?

10  A      It's a negative impact of one and a quarter billion.

11  Q      Okay.  All right.

12         Now, I understand Mr. Jeffers did not do a comparable-

13  companies valuation, right?

14  A      That's correct, as far as I know.

15  Q      But did he select what he viewed to be comparable

16  companies?

17  A      He did, for purposes of calculating his WACC.

18  Q      And did you check what multiples of EBITDA his

19  comparable companies trade at?

20  A      Yes, we did.

21  Q      And what was the average EBITDA multiple that they

22  trade at?

23  A      A     little less than eight times EBITDA.

24  Q      And what multiple of EBITDA does Mr. Jeffers' terminal

25  valuation imply?

1   A      Nine times.

2   Q      So, what does that tell you about whether his terminal

3   valuation is consistent with the market's views?

4   A      It's inconsistent.

5   Q      And if the terminal valuation, instead, used an 8 times

6   multiple, how would that one change affect Mr. Jeffers' DCF

7   valuation?

8   A      It's approximately 500 million, which is the

9   $700 million terminal year EBITDA multiplied by one,

10  discounted back at 70 percent.

11  Q      All right.  Let's talk about the next asset he values,

12  the excess cash.

13         What is the amount of excess cash he assumes the

14  hypothetical spun-off Brands business would have?

15  A      A little over $800 million.

16  Q      And how does he calculate that figure?

17  A      He takes aggregate cash from the balance sheet and

18  deducts what he deems as operating cash of 2 percent sales,

19  which is $39 million.

20  Q      All right.  So, starting with that first step, is it

21  accurate to assume that all of Mallinckrodt's current cash

22  sits with the Brands business?

23  A      No, it's not.

24  Q      Is there any reason, based on your experience with the

25  company to believe that Mallinckrodt's creditors would agree

1  to give all the cash to the Brands business?

2  A      No, there's not.

3  Q      If that were to happen, could the Generics business

4  function with no cash?

5  A      No, it could not.

6  Q      So, is this a realistic starting place to assume for

7  Brands' cash?

8  A      No, I don't believe it is.

9  Q      Now, I think you said he then subtracts operating cash

10 from whatever is the starting amount of cash; is that right?

11 A      Yeah.

12 Q      And how much operating cash does he determine Brands

13 would need?

14 A      Around 39 million.

15 Q      And is 39 million inconsistent with your understanding

16 of the amount of operating cash Mallinckrodt uses?

17 A      No, my understanding is that their minimum cash is

18 around $200 million.

19 Q      But what has the company estimated the amount of

20 operating cash Specialty Brands would need?

21 A      Likely a little bit less; closer to $175 million.

22 Q      Now, the $200 million figure you mentioned is if the

23 company continues to operate as a consolidated basis; is that

24 right?

25 A      Correct.

1  Q     If, instead, Generics were a standalone business, how

2  much operating cash would Generics need?

3  A     Around $100 million.

4  Q     So, if you have two separate businesses, what would the

5  total operating cash need to be?

6  A     It would be the 175 plus the 100 for Generics, which

7  is 275.

8  Q     So, how much would changing these cash figures change

9  Mr. Jeffers' overall valuation?

10 A     Approximately $236 million, which is the 275, less

11 the 39 that he assumes.

12 Q     Okay.  I want to talk about the tax attributes in

13 Mr. Jeffers' valuation.

14       Did you look at Mr. Jeffers' analysis of the tax

15 attribute, the NOLs?

16 A     Yes.

17 Q     And what is the real world impact if the NOLs have a

18 tax effect that Mr. Jeffers said is theoretically possible?

19 A     That the company never pays taxes.

20 Q     And in your experience, is it realistic that this type

21 of business would never pay taxes in the future?

22 A     No, I don't believe it is.

23 Q     Okay.  And why do you say that?

24 A     Because the company has had access to tax attributes,

25 including NOLs, but has done a recent cash taxpayer,

1  including the last fiscal year.

2  Q    Okay.  All right.

3        Let's talk about liabilities now.  How much in

4  liabilities does Mr. Jeffers assume that the hypothetical

5  Brands business would have?

6  A    $5.8 billion.

7  Q    Okay.  And in addition to the $5.8 billion, does the

8  company have severance costs and milestone payments that it

9  would have to pay before shareholders received a recovery?

10 A    Yes, it does.  In the near term, associated with on the

11 severance front, some headcount reductions.

12 Q    And what are the milestone payments?

13 A    The milestone payments are associated with investments

14 they made in products.

15 Q    And what are the total amount of those costs in 2021?

16 A    They're in the range of fifty to $100 million.

17 Q    And in addition to those, does Mallinckrodt have

18 restructuring costs, administrative and priority claims,

19 trade, and general unsecureds it would have to pay before

20 shareholders receive a recovery?

21 A    Yes, those were in that same October presentation.  I

22 think they total $410 million.

23 Q    Does Mr. Jeffers include those in his values?

24 A    No, he does not.

25 Q    So, using Mr. Jeffers' discount rate, how much would

1  including the severance and milestone payments, restructuring

2  costs, administrative and priority claims, trade claims, and

3  GUCs, if he included those, how much would those reduce

4  Mr. Jeffers' valuation by?

5  A     Yeah, because they're in the relative near term,

6  associated with this restructuring, they'd be in that area

7  of 450 or $475 million.

8  Q     Okay.  Now, I want to talk briefly about the litigation

9  liabilities.

10        Were you involved in negotiations about the

11  governmental Acthar settlement?

12  A     I was.

13  Q     And based on your involvement in the negotiations, do

14  you think it's a realistic assumption that if, in fact, PLC

15  is solvent and can pay a recovery to shareholders, that that

16  settlement would stay in place?

17  A     No, I don't think it's realistic.

18  Q     Is there anything about the way the negotiations

19  unfolded that informs your view that it would not be

20  realistic to assume that it stays in place if PLC is solvent?

21  A     Yeah, they're in negotiations.  They were very focused

22  on the ability to pay and so if the company had a greater

23  ability to pay, then I think they would ask for more.

24  Q     All right.  Now, I want to talk about the opioid-

25  related liabilities.

1       Were you involved in the negotiations about the opioid-

2   related settlements?

3   A     Yes, I was.

4   Q     And does that settlement depend on the RSA being

5   implemented?

6   A     Yes, it does.

7   Q     And if the shares are not cancelled, but instead,

8   receive a return, would that violate the RSA?

9   A     Yes, it would.

10  Q     Okay.  And so would the governmental opioid plaintiffs

11  be able to get out of the RSA if, instead, the shares are not

12  cancelled?

13  A     Yes, they would.

14  Q     And based on your experience with the negotiations, do

15  you expect that the opioid plaintiffs would continue with the

16  $1.6 billion settlement if, in fact, PLC is solvent?

17  A     I'd say likely not.

18  Q     Would you expect that the opioid plaintiffs would agree

19  to release the Brands business from any opioid liabilities if

20  PLC is solvent?

21  A     No, I do not.

22  Q     Okay.  Last topic I want to go through is feasibility

23  of Mr. Jeffers' scenario.

24      Generally, what is your view of the feasibility of

25  Mr. Jeffers' assumption that there would be a spin-off where

1   Specialty Brands would have the debt structure that he

2   contemplates?

3   A    I don't believe it's feasible.

4          MR. HARRIS:  Ms. Reiser, can we pull up Joint

5   Exhibit 1 and look at the DCF analysis again.  I want to go

6   to Schedule 2(a), Page 16.

7   BY MR. HARRIS:

8   Q    Okay.  Can you point the Court to where Mr. Jeffers

9   projects how much free cash flow the hypothetical company

10  would have?

11  A    His unlevered free cash flow line item, which is

12  towards the top in bold.

13  Q    So, assuming his revenue projections and everything are

14  accurate, how much free cash flow does he project?

15  A    Between 354 and $502 million per annum.

16  Q    And how much long-term debt does Mr. Jeffers assume

17  that the Brands business would have?

18  A    $5.8 billion.

19  Q    And what is the cost of debt that he assumes?

20  A    He assumes 10 percent.

21  Q    And what would that mean the annual interest payments

22  are?

23  A    $580 million.

24  Q    So, given the amount of annual free cash flow we see,

25  is it feasible to support $580 million of interest payments

1  with that amount of cash flow?

2  A     Likely not.  There could be, you know, tax impacts that

3  could impact the numbers, that likely would impact the

4  numbers, but likely not.

5  Q     So, in your opinion, is that a sustainable debt

6  structure?

7  A     No, it's over eight times levered is really not

8  sustainable for this business.

9  Q     And let's talk about the secured creditors, where does

10  Mr. Jeffers assume the funded debt would reside?

11  A     All of the branded portions of the business.

12  Q     Okay.  And currently, do the secured creditors have

13  liens on all assets?

14  A     Yes, virtually all assets.

15  Q     Do you have any reason to believe the secured creditors

16  would agree to release their liens on the Generics' assets

17  and cash?

18  A     No, I do not.

19  Q     Okay.  And in terms of refinancing, are there any

20  maturities coming up in the near term on the funded debt?

21  A     Yes, there are.

22  Q     When are those maturities occurring?

23  A     Between 2022 and 2025.  In 2022, the company has a

24  $900 million revolver that matures and over $600 million of

25  bonds on secured notes.

1   Q      And based on your experience in refinancing, would this

2   hypothetical business be able to refinance this debt?

3   A      No, I don't believe it would.

4   Q      And why do you say that?

5   A      Well, a good example is, you know, based on where the

6   debt trades, but leverage it over eight times with cash flow

7   coverage, as low as it's likely to be, based on the forecast

8   is not likely to be something that the creditors would

9   support.

10  Q      So, what do you expect would happen as each tranche of

11  debt would come due in the next few years?

12              MR. EAGEL:  Objection, Your Honor.

13              THE COURT:  Basis?

14              MR. EAGEL:  Speculation.

15              THE COURT:  Well, he's testifying as an expert.

16  He can answer.

17              Go ahead, Mr. Hayes.

18              THE WITNESS:  I mean, usually, when capital

19  structures are unsustainable, companies would have to

20  restructure their debt.

21  BY MR. HARRIS:

22  Q      All right.  So, just stepping back, based on your

23  experience, your knowledge of the debtors, and your analysis

24  of market data, is there a reasonable likelihood of a

25  material recovery to shareholders here?

1  A      No, I don't believe there is.

2  Q      Okay.

3              MR. HARRIS:  I'd pass the witness.

4              THE COURT:  Mr. Eagel, I don't want to hold you to

5  the half an hour.  Well, since Mr. Harris went over a little

6  bit, you've only got about 20 minutes left.

7              So, do we have any other witnesses after

8  Mr. Hayes?

9              MR. HARRIS:  We do not, Your Honor.

10             THE COURT:  All right.  And I'm assuming the

11 parties are going to want to do closings, correct?

12             MR. HARRIS:  Yes, Your Honor.

13             THE COURT:  So, I think we're going to adjourn for

14 the day and allow Mr. Eagel to pick up with his cross

15 tomorrow and I'm assuming there'll be at least some redirect.

16             Let's go ahead and we'll start at 11:00 a.m.

17 tomorrow and we'll go from there.

18             Mr. Hayes, because you are still under oath, you

19 are not allowed to talk to anybody overnight about your

20 testimony or the substance of your testimony.  So, I would

21 just avoid any conversations with anybody connected with the

22 debtors at this point.

23             And Mr. -- let me go back to the gallery view here

24 so I can see everybody -- Mr. Eagel, you can pick up at 11:00

25 tomorrow morning with your cross and we'll get it finished

1  up.  How much time do the parties think they'll need to the

2  closings?

3          MR. MANTHEY:  Your Honor, this is Tristan Manthey

4  on behalf of the ad hoc equity committee.  I would suspect 30

5  minutes or less, but you anyway how bad we've all been on our

6  timing, but I think that would be the best estimate that I

7  would throw out there.

8          THE COURT:  All right.  So, I'll give each side 30

9  minutes and obviously you can reserve some of yours for

10  rebuttal, Mr. Manthey, and so that should get us --

11  hopefully, we finish up in, say, 45 minutes, and then we'll

12  go right into closings.  Hopefully we can get that done

13  before lunchtime and we'll be done for the day.  So, that's

14  what we'll do.

15          All right.  So, for now, we are adjourned.  I will

16  see everybody at eleven o'clock tomorrow morning.

17          COUNSEL:  Thank you, Your Honor.

18          (Proceedings concluded at 5:10 p.m.)

19

20

21

22

23

24

25

244

1                              CERTIFICATE

2

3        We certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              December 16, 2020
7   Mary Zajaczkowski, CET**D-531

8
    /s/William J. Garling             December 16, 2020
9   William J. Garling, CE/T 543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25